UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                               :
ALLIANZ GLOBAL INVESTORS GMBH, et  :
al.,                                      :           18 Civ. 10364 (LGS)
                    Plaintiffs,  :
                                     :       **OPINION AND ORDER**
             -against-         :
                                     :
BANK OF AMERICA CORPORATION, et al.,  :
                      Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

       This case concerns an alleged conspiracy among the world's largest banks to fix prices in the foreign exchange ("FX") market. Plaintiffs[1] bring this action against sixteen banks and their affiliates, alleging that Defendants manipulated the FX market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.* and the common law doctrine that prohibits unjust enrichment.

       Defendants HSBC Bank plc ("HSBC Bank"), MUFG Bank, Ltd. ("MUFG Bank"), Royal Bank of Canada ("RBC"), The Royal Bank of Scotland plc ("RBS"), Societe Generale ("SocGen"), Standard Chartered Bank ("Standard Chartered") and UBS AG (collectively, the "Foreign Defendants")[2] move to dismiss the Second Amended Complaint (the "Complaint") for lack of personal jurisdiction in accordance with Federal Rule of Civil Procedure 12(b)(2). For the reasons discussed below, the motion is denied as to HSBC Bank, RBS, SocGen, Standard Chartered and UBS AG, and granted as to MUFG Bank and RBC.

---

[1] Plaintiffs are almost 1,300 investment firms and government entities that opted out of the class action captioned *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13-cv-7789 (LGS) (S.D.N.Y. ) ("*In re Forex*").

[2] Credit Suisse International was voluntarily dismissed.

## I.     BACKGROUND

The following brief summary is taken from the Complaint.  *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012); *accord GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18 Civ. 4945, 2019 WL 293329, at *3 (S.D.N.Y. Jan. 23, 2019).  For the purpose of this motion, the allegations in the Complaint are taken as true to the extent they are uncontroverted by the Foreign Defendants' affidavits.  *See MacDermid*, 702 F.3d at 727; *accord GlaxoSmithKline*, 2019 WL 293329, at *3.

From approximately 2003 to 2013, Defendants conspired with each other to manipulate the FX market for their own financial benefit.  Defendants exchanged confidential customer information and coordinated their trading strategies to manipulate FX benchmark rates and to inflate bid/ask spreads, through non-public methods of communications, including private chatrooms and text messages.  As a result of the conspiracy, Plaintiffs, who were participants in the market for FX instruments, were harmed.

## II.    STANDARD

### A.     Requirements for Personal Jurisdiction

"[W]hen a motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written materials, the plaintiff need only make a prima facie showing" of jurisdiction. *MacDermid*, 702 F.3d at 727; *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018).  The court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013); *accord Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 333 (S.D.N.Y. 2018).  "[A] prima facie showing suffices, *notwithstanding any controverting presentation by the moving party*, to defeat the motion." *Dorchester Fin. Sec.,*

*Inc.*, 722 F.3d at 86 (emphasis in original) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *accord Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 332 (S.D.N.Y. 2019).

"[T]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *MacDermid*, 702 F.3d at 727; *accord Kuehne + Nagel, Inc.*, 328 F. Supp. 3d at 332.  Courts will not resolve "argumentative inferences in the plaintiff's favor" or "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted); *accord Zornoza v. Terraform Glob., Inc.*, 419 F. Supp. 3d 715, 726 (S.D.N.Y. 2019).  "'[C]onclusory non-fact-specific jurisdictional allegations' or 'legal conclusion[s] couched as a factual allegation' will not establish a prima facie showing of jurisdiction." *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018) (summary order) (quoting *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998)); *accord Comunale v. Gemma*, No. 18 Civ. 12104, 2020 WL 635554, at *2 (S.D.N.Y. Feb. 11, 2020).  "A plaintiff that initially establishes jurisdiction by a prima facie showing eventually must establish jurisdiction by a preponderance of the evidence, based on the presentation of evidence." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 290 (S.D.N.Y. 2019) ("*Contant*") (citing *Dorchester*, 722 F.3d at 85).

A prima facie showing of personal jurisdiction requires: (1) procedurally proper service of process, (2) "a statutory basis for personal jurisdiction that renders such service of process effective" and (3) that "the exercise of personal jurisdiction . . . comport with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016); *accord Johnson v. UBS AG,* 791 F. App'x 240, 242 (2d Cir. 2019) (summary order).  The parties do not dispute service or whether the provisions of the federal antitrust laws provide the statutory

basis for personal jurisdiction.  The parties' dispute concerns whether or not the exercise of

personal jurisdiction would violate constitutional due process.  Plaintiffs argue that there is

personal jurisdiction over each of the Foreign Defendants through the theories of specific (versus

general) jurisdiction applied by this Court in three related matters: *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31,

2016) ("*Forex*")), *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2018 WL 1472506

(S.D.N.Y. Mar. 22, 2018) ("*Nypl*") and *Contant*, 385 F. Supp. 3d 284.

    "The inquiry of whether a forum State may assert specific jurisdiction over a nonresident

defendant focuses on the relationship among the defendant, the forum, and the litigation."  *In re*

*del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) (quoting *Walden v. Fiore*, 571 U.S. 277, 283–84

(2014)).  "[T]here must be an 'affiliation between the forum and the underlying controversy,

principally, [an] activity or an occurrence that takes place in the forum State.'"  *Id.* at 529

(quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017)).  In

other words, "to exercise jurisdiction consistent with due process, the defendant's suit-related

conduct must create a substantial connection with the forum."  *Walden*, 571 U.S. at 284.  A court

conducts this analysis in two steps: (1) "the court must decide if the individual or entity has

'purposefully directed his activities at the forum and the litigation arises out of or relates to those

activities'"  (the "minimum contacts" analysis); and (2) "the court must 'determine whether the

assertion of personal jurisdiction would comport with fair play and substantial justice'" (the

"reasonableness" analysis).  *In re del Valle Ruiz*, 939 F.3d at 528-29 (internal citations, quotation

marks and alterations omitted) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 476

(1985)).

B.      **Minimum Contacts Standard**

Here, Defendants challenge only the minimum contacts part of the analysis, and not the reasonableness prong of the two-part test.

Because Plaintiffs allege a violation of the Sherman Act, the appropriate forum to consider for purposes of the minimum contacts analysis is the entire United States. *See, e.g., S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, . . . the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.") (collecting cases); *accord Commodity Futures Trading Comm'n v. TFS-ICAP, LLC*, 415 F. Supp. 3d 371, 381 (S.D.N.Y. 2019).

Courts have recognized "independent, if conceptually overlapping, methods of demonstrating minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007); *accord Contant*, 385 F. Supp. 3d at 291.  Minimum contacts supporting specific jurisdiction may exist when a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *accord Schwab*, 883 F.3d at 85.  Specific jurisdiction may be premised on a defendant's actions that are "expressly aimed" at the forum state. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984); *accord Schwab*, 883 F.3d at 87 (referring to the "effects test" theory of personal jurisdiction).  Specific jurisdiction may also exist where a defendant's connection to the forum state arises from participation in a conspiracy connected to the forum state by a co-conspirator's acts in furtherance of the conspiracy. *See Schwab*, 883 F.3d at 86–87. To allege conspiracy jurisdiction, a plaintiff must allege "that (1) a conspiracy existed; (2) the

defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* at 87; *see also Contant*, 385 F. Supp. 3d at 292 n.2 (observing that "an out-of-state defendant can be subject to personal jurisdiction in New York [through conspiracy jurisdiction] . . . when that defendant 'has knowledge of the New York acts of his co-conspirators'"). Ultimately, the exercise of jurisdiction comports with due process only if the defendant's conduct and connection with the forum is "such that [the defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *accord U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019).

In *Forex*, specific jurisdiction was found to exist where the complaint plausibly alleged (1) collusive conduct to fix the benchmark rate for profit; (2) participation in that conduct by the individual defendants through specific chatroom discussions; and (3) collusive acts that took place in part in New York and the United States, and that the defendants at issue had extensive FX operations in the United States. *See Forex*, 2016 WL 1268267, at *5-6. Similarly, this Court found specific jurisdiction over defendants in *Nypl*, a related FX case, where the complaint contained plausible allegations (1) tying the alleged unlawful conduct to the United States, and (2) describing plea agreements signed by defendants that established their participation in the conspiracy and their activities and presence in the United States. *See Nypl*, 2018 WL 1472506, at *5-6. Finally, in *Contant*, another FX case, the court found specific jurisdiction over defendants where the complaint plausibly alleged (1) the existence of a conspiracy and the defendants' participation in that conspiracy; (2) co-conspirators' overt acts in furtherance of the conspiracy and connected to New York, as established by citation to various New York State

6

Department of Financial Services ("DFS") and Department of Justice ("DOJ") enforcement actions; and (3) the defendants' admissions either that their employees in New York participated in the conspiracy, or that one of their traders participated in a chat room in which participants discussed coordinating collusive activity with a New York office.  *See Contant*, 385 F. Supp. 3d at 292–95.

## III.    DISCUSSION

Plaintiffs have made a prima facie showing of specific jurisdiction over Standard Chartered, HSBC Bank, UBS AG, RBS and SocGen because the allegations in the Complaint give rise to the reasonable inference that they participated in the alleged conspiracy in the United States.  Plaintiffs have not made a prima facie showing of specific jurisdiction over RBC or MUFG Bank because the allegations in the Complaint do not reasonably lead to the inference that RBC and MUFG Bank participated in the alleged collusive conduct.

### A.    Standard Chartered, HSBC Bank, UBS AG, RBS and SocGen

Plaintiffs have made a prima facie showing of specific jurisdiction over Standard Chartered, HSBC Bank, UBS AG, RBS and SocGen.  First, the Complaint contains plausible allegations of unlawful conduct:

- Beginning at least as early as January 1, 2003, Defendants, who are sixteen of the world's largest banks, worked together to manipulate the FX market by manipulating the benchmark rate and artificially inflating the bid/ask spreads.  The ultimate result of this collusive behavior was the distortion of FX prices in Defendants' favor.

- Defendants effectuated this conspiracy by employing "every anti-competitive tactic – price fixing, direct communications between competitors, sharing of commercially sensitive information (such as client orders), and other coordinated activity. . . This collusion has been thoroughly documented by government regulators from across the globe, who have collectively imposed over ***$11 billion*** in fines on Defendants."  The conspiracy operated largely through the use of numerous multi-bank chatrooms, which was facilitated in part because many of the traders had previously worked together and formed social ties.

The Complaint contains extensive, specific allegations that tie this collusive activity to the

United States, including the following:

- In a DFS consent order, Defendant Barclays Bank PLC admitted that its New York branch "engaged in manipulative conduct and attempted to manipulate" FX benchmarks, and that many of the employees involved in the misconduct were located at Barclays' offices in New York, including a vice president in the New York branch, the head of the FX spot desk in New York, a director on the emerging markets desk in New York, a managing director in FX Hedge Fund Sales in New York, and a director in FX Real Money Sales in New York, among others.

- In a DFS order, BNP Paribas S.A. admitted that "misconduct engaged in by more than a dozen BNP Paribas traders and salespersons was broad; sometimes very deep; involved employees located in both New York and other BNP locations across the globe; and occurred over an extended period of time."

- In a DFS order, Deutsche Bank AG admitted that its New York branch engaged in "unsafe, unsound, and improper conduct" relating to FX trading, and that many of the employees involved in the misconduct were located at Deutsche Bank's offices in New York.

- The DOJ press release announcing the guilty pleas of Citicorp, JPMorgan Chase & Co., Barclays PLC, RBS and UBS AG, linked in the Complaint, stated that the companies agreed to plead guilty to "conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere."

Finally the Complaint also makes plausible, fact-specific allegations that Standard Chartered,

HSBC Bank, UBS AG, RBS and SocGen participated in the alleged unlawful conduct, and that

the conduct took place in the United States:

- As to Standard Chartered, the Complaint links to a DFS consent order[3] which found that Standard Chartered traders based in New York manipulated the FX market by "rig[ging] benchmark prices" and "collud[ing] on spreads quoted to customers."

---

[3] The Court may take judicial notice of public documents such as consent orders.  Federal Rule of Evidence 201 authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned . . . at any stage in the proceeding," including on a motion to dismiss.  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015) ("*Forex*"); *accord Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 n.3 (S.D.N.Y. 2019) ("*Contant*").

- As to HSBC Bank, the Complaint alleges that a person charged by the DOJ in connection with the alleged conspiracy for conduct that occurred in part in New York, Mark Johnson, was found by the Federal Reserve Board to have been operating on behalf of HSBC Bank.[4]

- As to UBS AG, the Complaint alleges that UBS AG admitted in its Plea Agreement with the DOJ that "its FX traders, conspired with other financial services firms acting as dealers in an FX spot market by agreeing to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere.'" The Complaint also alleges that the DFS Order for Deutsche Bank describes the participation of a UBS AG trader in a chat room with traders from Citigroup and JPMorgan in which a participant discussed coordinating trades in furtherance of the conspiracy with Citigroup's New York office.

- As to RBS, the Complaint alleges that RBS entered into a criminal Plea Agreement with the DOJ, in which RBS admitted that it had "entered into and engaged in a conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the EUR/USD currency pair exchanged in the FX Spot Market by agreeing to eliminate competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere," and that many of its "[a]cts in furtherance of the charged offense were carried out within the District of Connecticut and elsewhere" and "substantially affected, interstate and U.S. important trade and commerce." The Complaint also alleges that transcripts of chats were produced in discovery in which RBS traders communicated with New York-based traders employed by other Defendants in furtherance of the conspiracy.

- As to SocGen, the Complaint alleges that SocGen locates its United States headquarters in New York, where many high level FX personnel were located, and in 2013 reported for its New York operations outstanding FX transactions of over $21.6 billion.[5] The

---

[4] Defendants argue that the Complaint alleges only that Johnson's trading activity more generally (rather than any activity in connection with the alleged illegal conduct) was undertaken on behalf of HSBC Bank, but in fact the Complaint alleges that the Federal Reserve Board found that the activities for which Johnson was indicted -- which were undertaken in part in New York, New York -- were undertaken on behalf of both HSBC Bank and HSBC Holdings. The Notice itself, which was linked in the Complaint, further specifies that Johnson was employed as global head of foreign exchange cash trading at HSBC Bank at the time of the allegedly criminal activity. *See* Notice of Suspension and Prohibition Issued Pursuant to Section 8(g)(1)(A) of the Federal Deposit Insurance Act, as amended at 3, *In the Matter of Mark Johnson and Stuart Scott* (Oct. 5, 2016), https://www.federalreserve.gov/newsevents/pressreleases/files/enf20161006a1.pdf ("In 2011 and during the relevant time period, Respondent Johnson was a managing director at HSBC and was employed as the global head of foreign exchange ("FX") cash trading at [HSBC Bank], in which capacity he supervised FX trading desks for both [HSBC Bank] in London and HBUS in New York.").

[5] The US or New York-based operations of the other Foreign Defendants need not be addressed as part of the analysis because the Complaint sufficiently alleges that Standard Chartered, HSBC Bank, UBS AG and RBS engaged in conspiratorial conduct in the United States. As to SocGen,

Complaint also alleges that SocGen traders participated in multiple multi-bank chats in furtherance of the conspiracy, including at least one chat with a trader based in New York and employed by another Defendant. [6]

These allegations sufficiently plead that at least part of the alleged conspiratorial conduct of Standard Chartered, HSBC Bank, UBS AG, RBS and SocGen took place in, or was directed into, the United States.  *See generally Forex*, 2016 WL 1268267, at \*5-6; *Nypl*, 2018 WL 1472506, at \*5-6.  These allegations are also sufficient to find personal jurisdiction independently through conspiracy jurisdiction, as they establish the existence of the conspiracy, the Foreign Defendants' participation in the conspiracy and co-conspirators' overt acts in the forum.  *See Contant*, 385 F. Supp. 3d 284, 292–95.

Foreign Defendants argue that the Complaint does not allege that the traders who participated in the chats were aware of each other's locations, and therefore the Foreign Defendants' co-conspirators' overt acts in furtherance of the conspiracy in New York cannot subject the Foreign Defendants to personal jurisdiction in New York.  This argument is unpersuasive.  First, this issue is relevant only to a finding of conspiracy jurisdiction, specifically the question of whether a defendant should have anticipated being haled into a court in New York.  Second, this issue is relevant only to SocGen, as SocGen is the only Foreign Defendant

---

because the Complaint "plead[s] collusive conduct within the United States, give examples of [SocGen's] participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown), and provide undisputed averments concerning [SocGen's] extensive U.S.-based FX operations . . . Plaintiffs have made a prima facie showing of specific jurisdiction over [SocGen]."  *Forex*, 2016 WL 1268267, at \*6.

[6] Defendants argue that "the single chat upon which Plaintiffs rely . . .  does not contain any allegedly conspiracy-related discussion such as disclosure of spreads, benchmarks, trading volume, or customer information, but the Complaint identifies multiple chats, including a chat discussing the fix and referring to "play[ing] some spreads," *see* Complaint at ¶ 743, which plausibly refer to unlawful conduct.  The pleadings must be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor . . . *notwithstanding any controverting presentation by the moving party*, to defeat the motion."  *Dorchester Fin. Sec., Inc. v Banco BRJ, S.A.*, 722 F.3d 81, 85-86 (2d Cir 2013) (emphasis in original).

over which the Court finds conspiracy jurisdiction that is not based on allegations of the Defendant's own conspiratorial conduct in the United States.

The Complaint's allegations are sufficient to find conspiracy jurisdiction over SocGen because they support the inference that SocGen traders knew that their coconspirators were based in, and acting out of, New York. The Complaint alleges that FX traders -- particularly those who participated in the alleged chats -- were part of a small community of individuals, many of whom were employed by more than one Defendant during their careers.[7] The Complaint further alleges that the conspiracy-related chats were private, and that membership in the chat groups were "jealously guarded."[8] Drawing all inferences in Plaintiffs' favor as required, *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016), these allegations are sufficient at the pleading stage to infer that the SocGen traders, who participated

---

[7] *See* Complaint at ¶ 4 ("The collusion among Defendants was facilitated in part because many of these traders had previously worked together and formed social ties. Many of the colluding traders lived near each other, attended the same dinner parties, and were members of the same local golf clubs."); *id*. at ¶ 5 ("The people responsible also often were employed by multiple Defendants at different points in their career, which facilitated the collusion as many of the participants were former colleagues."); *id*. at ¶ 264 ("As the market has become more concentrated, the population of FX traders at dealer banks has also shrunk. . . [Defendants' FX trading desks] are typically staffed with only eight to ten traders, many of whom have worked previously with their counterparts in other banks. Thus, the market is dominated by a handful of individuals, who often have strong social ties formed by working with each other at some point in the past."); *id*. at ¶ 498 ("The participants in the chat rooms were often employed by multiple Defendants at different points in their career. This further facilitated the collusion, as many of the participants were former colleagues.").

[8] *See id*. at ¶¶ 3, 289, 295, 321, 806 (referring to chatrooms as "private); *id*. at ¶ 499 ("The transcripts reveal that the Defendants jealously guarded the membership of the chat rooms and continually discussed protecting the secrecy of the chat rooms."); *id*. at ¶ 499-500 (describing a chat transcript in which participant traders debated whether to invite another trader to join based on the value the trader could bring and whether the trader would "protect" the current participants); *id*. at ¶¶ 502, 513 (discussing how chat room participants would monitor each other's trading activity to ensure compliance with the conspiracy); *id*. at ¶ 806 ("The chatrooms were operated by high-ranking traders, and Defendants strictly limited access to the chatrooms.").

in the alleged chats with New York-based traders in furtherance of the conspiracy, had knowledge that their co-conspirators were based in New York.  On that basis, SocGen should have anticipated being haled into court in the United States.

Defendants argue that Plaintiffs' unjust enrichment claim against the Foreign Defendants should be dismissed as it is based on entirely foreign transactions.  This argument overlooks that the Court may exercise pendent personal jurisdiction over a defendant "where a federal statute authorizes nationwide service of process, and the federal and state law claims derive from a common nucleus of operative fact . . . even if personal jurisdiction is not otherwise available." [9] *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (internal quotation marks and citation omitted); *accord Schwab*, 883 F.3d at 88; *see generally* § 1069.7 Application of Modern Jurisdictional Principles—Pendent Personal Jurisdiction, 4A Fed. Prac. & Proc. Civ. § 1069.7 (4th ed.).  Here the federal antitrust claim authorizes nationwide service of process, and that claim and the state unjust enrichment claim derive from the same alleged facts.  Therefore, the Court may, and does elect to, exercise pendent personal jurisdiction over Standard Chartered, HSBC Bank, UBS AG, RBS and SocGen as to the state law claim.

### B.    MUFG Bank and RBC

The Complaint does not plead sufficient facts to support personal jurisdiction over MUFG Bank and RBC.  The Complaint asserts generally that both of these defendants participated in the conspiracy, and that Plaintiffs have already identified in discovery

> many instances where traders from [MUFG Bank and RBC] participated in chats with United States and New York-based traders from other Defendants.  That includes many chats in which the participants exchanged sensitive customer information, coordinated their trading activities, or otherwise committed acts in

---

[9] For the same reason, Foreign Defendants' argument that conspiracy personal jurisdiction is not available for unjust enrichment claims is unavailing.

> furtherance of the conspiracy with United States and New York-based traders
> and/or the banks' United States and New York offices.

But, in support of the allegation that MUFG Bank and RBC were engaged in unlawful conduct, the Complaint alleges only a single chat in which traders from MUFG Bank[10] participated, *see* Complaint at ¶ 747, and a single chat in which traders from RBC participated, *see* Complaint at ¶ 203 at n.64. Although these chats may disclose certain trading information, they do not seem to discuss fixing the benchmark rate or manipulating spreads. The Complaint alleges other chats in which traders from "MUFG" participated, and alleges "MUFG's" involvement in governmental investigations and subsequent fines. But per the Complaint, this term includes both MUFG Bank, Ltd. (the Foreign Defendant at issue here) and a separate entity, MUFG Securities Americas, Inc. Without greater specificity, the Complaint lacks sufficient "non-conclusory and fact-specific" allegations regarding the participation of MUFG Bank and RBC in the alleged conspiracy. *See Jazini*, 148 F.3d at 185; *accord Schwab*, 883 F.3d at 86.

## IV.   CONCLUSION

For the foregoing reasons, the Foreign Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(2) is GRANTED as to MUFG Bank and RBC, and is DENIED as to the other Foreign Defendants. The Clerk of Court is respectfully directed to close the motion at Docket No. 237.

Dated: April 30, 2020
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

---

[10] The Court was found to have personal jurisdiction over MUFG Bank (then Bank of Tokyo-Mitsubishi UFJ, Ltd.) in the *In re Forex* action. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016). But there, the complaint alleges with more specificity the chats in which MUFG Bank traders were involved.