<u>**VIA ECF**</u>                                                                                      May 1, 2020

The Hon. Lorna G. Schofield
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      **Re:**    ***Allianz et al v. Bank of America Corp. et. al.*, 18-cv-10364-LGS**

Dear Judge Schofield,

Pursuant to the Court's April 3, 2020 Order (the "Order"), the parties submit this joint letter to report on their discovery efforts since the last conference and the current remaining disputes to be resolved.  Dkt. 372 at 1.  Per the Order, we provide the following dial-in for the Court and the parties to use for the conference on May 7, 2020 at 10:40 a.m.: **(646) 781-8310 / no pin needed**.

**JOINT UPDATE ON DISCOVERY:**  On April 17, the parties submitted a joint letter regarding the "sampling" production, Dkt. 384, and the BlackRock and PIMCO Plaintiffs proposed custodial lists.  Pursuant to the Order, on April 23 BlackRock filed affidavits regarding TARs and portfolio managers.  Dkts. 385, 386.  In addition, the non-foreign Defendants ("Defendants") have served a Rule 30(b)(6) deposition notice on BlackRock and interrogatories on all Plaintiffs.  Plaintiffs have also served interrogatories on Defendants.  In addition, the parties have further met and conferred and have agreed upon (a) certain custodians for several Plaintiff groups, and (b) certain search terms, for the "sampling" production.  Following multiple meet-and-confer discussions, the parties also respectfully seek guidance from Your Honor on the disputes described below.

**DEFENDANTS' POSITION: 1. The BlackRock Plaintiffs should provide additional information about the apparent destruction of their TARs in 2015/2016 and perform custodial searches to ensure that all remaining TARs are produced**:  TARs are critically relevant documents that contain contemporaneous assertions by the BlackRock Plaintiffs' top traders and portfolio managers ("PMs") that squarely contradict Plaintiffs' allegations.  For example, while Plaintiffs now allege that Defendants' pricing was anticompetitive, even the handful of TARs BlackRock has produced to date say the opposite, with assertions such as: (i) "Goldman Sachs and HSBC show aggressive pricing" in Asian currencies; (ii) "JPMorgan pricing shows significant improvement, especially in Central Europe, the Middle East, Africa and Latin America;" and (iii) "UBS, HSBC offer aggressive and consistent pricing on the spread matrix."  4/2/20 Hr'g Tr. 41:2-12.  In their April 23 affidavit, the BlackRock Plaintiffs revealed for the first time that, beginning in 2015 (two years after the *FOREX* class action was filed), ***they deleted or otherwise failed to preserve the database where <u>all</u> of their hundreds of TARs from the relevant time period "would have been stored."***[1]  Dkt. 386 ¶ 8.  BlackRock believes any surviving reports "likely would have been distributed via email to certain BlackRock employees."  Dkt. 386 ¶ 11.  To secure the prompt production of *all* TARs that were not destroyed in 2015, Defendants respectfully seek an order directing BlackRock to (i) identify those employees who authored the TARs and who "distributed"

---

[1] Plaintiffs were not forthcoming with this information.  Defendants served document requests for the TARs on March 18, 2019, and, for the next year, had numerous extensive meet-and-confer discussions and emails with Plaintiffs about the TARs.  During that year, BlackRock never once mentioned that it had failed to preserve the database containing its TARs.  But for the fact that Credit Suisse retained Dr. Michael Melvin as its expert in *FOREX*—and Your Honor ordering an affidavit from BlackRock on this issue—Defendants might never have learned the truth about the TARs.

them "via email"; (ii) identify all of the "certain BlackRock employees" to whom TARs were distributed; and (iii) perform custodial searches on those employees (*i.e.*, the TARs' authors, distributors, and recipients) so that all TARs that were not destroyed can be recovered.

BlackRock complains that it is already searching the documents of "five people that would have prepared, sent, and received additional TARs," but concedes that those five people do not include (i) all authors or distributors of TARs, or (ii) all recipients of TARs—whom BlackRock refuses to identify. Given BlackRock's admitted failure to preserve these critically relevant documents, it is not unduly burdensome for BlackRock to include those limited additional custodians.[2]

**2. BlackRock should add Richard Prager as a custodian**: BlackRock also refuses to search the files of Richard Prager, BlackRock's Global Head of Trading during the relevant period. The record (including Plaintiffs' documents and a whitepaper Mr. Prager co-authored about TARs) establishes that he was intimately involved in BlackRock's (i) production and use of TARs and (ii) internal assessment, as well as external negotiations, of Defendants' FX prices and spreads.[3] BlackRock complains that Mr. Prager, its former employee, is an "apex" witness. But this is far from clear, and while Plaintiffs speculate that Mr. Prager's files will be "duplicative" of other custodians, they do not dispute that his files will, in fact, contain relevant documents. Moreover, Defendants presently only seek Mr. Prager's documents, not a deposition of Mr. Prager.[4]

**3. Plaintiffs' custodians should cover all named Plaintiffs**: Plaintiffs also refuse to agree to custodians that cover all of the BlackRock and PIMCO Plaintiffs, and their proposal fails to cover *hundreds* of those entities. But *each* of those Plaintiffs should provide a "sampling" of discovery (the "Initial Production"), because "each individual plaintiff has discovery obligations." Hr'g Tr. 9:1-5. Their custodians should cover all Plaintiffs in each group.

**4. The BlackRock Plaintiffs should review their own prospectuses to identify their own PMs**: On October 17, 2019, Your Honor ordered "each Plaintiff" to answer a questionnaire setting forth JPM's interrogatory 1, which called for the disclosure of each Plaintiff's PM. Dkt. 314 at 15. In response, more than 500 BlackRock Plaintiffs failed to identify *any* PMs, complaining that they have no pre-existing list of PMs and must "derive the PM information" from prospectuses. Dkt. 385 ¶¶ 3-6. Rather than review their own prospectuses to identify their own PMs, these BlackRock Plaintiffs insist that Defendants should do that work instead. Specifically, they reference *60,000* pages of documents, and argue that Defendants can discern their PMs from those documents "with

---

[2] BlackRock argues that its failure to preserve its TARs was excusable because "the decommissioning of the enterprise-wide storage platform began over three years before this case was filed." Defendants respectfully submit that whether BlackRock's failure to preserve its TARs was excusable or not is not presently before the Court. Defendants note, however, that BlackRock studiously avoids addressing (a) on what date it first anticipated litigation (which may have been as early as 2013) and (b) on what date its backup tapes containing TARs were actually deleted (which may have been long after 2015). As for the cases BlackRock cites, they are entirely inapposite, because none denies a request for discovery from antitrust plaintiffs about the pricing of the transactions at issue.

[3] *See* BR00072672, BR00072674, BR00072676; *see also* https://www.blackrock.com/corporate/literature/whitepaper /viewpoint-disclosing-transaction-costs-august-2018.pdf (TARs whitepaper co-authored by Mr. Prager); https://www.marketsmedia.com/richard-prager-elected-to-marketaxess-board-of-directors/ (showing Mr. Prager's similar prior role at Bank of America.).

[4] *See, e.g., Dyson, Inc. v. Sharkninja Operating LLC*, 2016 WL 1613489, at *2 (N.D. Ill. Apr. 22, 2016); *Shenwick v. Twitter, Inc.*, 2018 WL 833085, at *1 (N.D. Cal. Feb. 7, 2018). Plaintiffs' cases below merely hold that document discovery from any custodian should be governed by relevancy—a test Mr. Prager easily meets.

the same effort as BlackRock." *Id.* ¶ 6.  This response fails to comply with the October order, and should be rejected.  As a matter of law, each Plaintiff must identify its own personnel with relevant knowledge, and courts routinely reject Rule 33(d) objections to doing so.[5]  And bulk-citing 60,000 pages of documents, without *specific* pages that actually identify the PMs for particular Plaintiffs, does not remotely comply with Rule 33(d), especially because the BlackRock Plaintiffs have a "clear superiority of knowledge or familiarity" with their own fund documents and their own PMs.[6] In fact, based on a cursory review, it appears that BlackRock itself has not reviewed these 60,000 pages: many of them appear to concern only *non-parties*, and thus do not identify the BlackRock Plaintiffs' PMs at all.  The need for BlackRock to prepare a "tie-out table" just to tell which documents even relate to Plaintiffs confirms the greater burden for Defendants to ascertain PMs from the documents.  BlackRock also admits that the "list" it references below will not be reliable because it "may not" show the PMs in charge of each fund. Dkt. 385 ¶ 8.  Each BlackRock Plaintiff should be ordered to finally do what Your Honor ordered six months ago: identify its own PM.[7]

**5. Plaintiffs should confirm that they will produce the categories of documents on Defendants' "guidelines" list for review or say which categories they seek to exclude**:  Per the Court's instructions to approach the Initial Production with "a sense of practicality," Defendants created a short bullet-point list of relevant categories of documents that should be produced if they are returned by Plaintiffs' searches and not privileged (the "Guidelines"), which we are happy to provide to the Court.  Hr'g Tr. 33:24.  These categories include, for example, the internal "pricing communications" and discussions of competition in the FX markets addressed during the April 2 conference.  *See id.* 5-13.  But Plaintiffs refuse to say whether they agree to the categories on this page-and-a-half list, which are written in plain English, while incorrectly claiming that purported "agreements" clarify what will be produced.  In fact, Defendants are still struggling to parse Plaintiffs' laundry list of objections and caveats, asserted in legalese over a year of correspondence in more than *80 emails*, to figure out what documents Plaintiffs seek to withhold.  This is the opposite of "practicality."  Hr'g Tr. 33:24.  Defendants proposed the Guidelines to break through these inefficient meet-and-confer discussions, and clarify that concrete examples of responsive documents would be produced.  Defendants respectfully seek an order directing Plaintiffs to (i) agree to produce the categories in the Guidelines, or at least (ii) *tell* Defendants which categories in that short list they seek to exclude—which they can do with little burden.

**6. Plaintiffs should run Defendants' proposed searches and provide hit counts to facilitate further discussions**:  After multiple rounds of negotiations during which both sides made concessions, Plaintiffs now seek to preemptively limit their searches based on their unsupported prediction that some terms will be overbroad or will return false positives.  For example, below, they speculate that hits on the term "inter-bank w/5 chat" among the limited set of custodians for the Initial Production—each of whom was proposed because of his or her involvement in FX

---

[5] *See* S.D.N.Y. L.R. 33.3(a); *see, e.g., Lockheed Martin Idaho Techs. Co. v. Lockheed Martin Advanced Envtl. Sys., Inc.*, No. 98 Civ. 316, 2002 WL 1934134, at *3 (D. Idaho June 6, 2002) (rejecting Rule 33(d) objection to "identify[ing] witnesses for depositions"); *Bonds v. D.C.*, 93 F.3d 801, 806 (D.C. Cir. 1996) (affirming trial court's rejection of Rule 33(d) response and responding party's "failure to identify any witnesses, by name").
[6] *XChange Telecom Corp. v. Sprint Spectrum L.P.*, 2015 WL 773752, at *5 (N.D.N.Y. Feb. 24, 2015).
[7] Contrary to Plaintiffs' assertions, (i) the October order directed "each Plaintiff" to answer a questionnaire to identify witnesses *instead of* ordering Defendants to review documents for that information, and (ii) Your Honor's comments about a sampling of *custodians* did not absolve BlackRock from identifying its own PMs.  *See* Hr'g Tr. 18:21-19:10.

trading or related activities—will be irrelevant to *any* disputed issue. In the event that Plaintiffs' actual hit counts and responsiveness rates substantiate their concerns, Defendants stand ready to meet and confer. But Plaintiffs should not prematurely restrict their review population based on unsubstantiated predictions. Plaintiffs also demand yet another round of meeting and conferring about relevance—prolonging discussions that began in November 2019. Given the purpose of the Initial Production and the discrete set of custodians Plaintiffs will use, Defendants respectfully request that the Court direct Plaintiffs to run Defendants' searches and provide hit counts, so that the parties can meaningfully evaluate any overbreadth concerns.[8]

**PLAINTIFFS' POSITION:**   *1. TAR custodians.*   Defendants suggest BlackRock wrongfully destroyed relevant materials. But the decommissioning of the enterprise-wide storage platform began over *three years* before this case was filed. Defendants nonetheless question the chronology, but telling present no evidence—only unsupported aspersions. More basically, Defendants' quotes from TARs confirm that these documents are irrelevant. Even if Defendants had accurately characterized the TARs (which they do not), what BlackRock *thought* or *knew* about Defendants' conspiracy is not a defense in an antitrust case. Courts have repeatedly denied discovery on such grounds.[9]   Finally, Defendants' accusation that BlackRock was "not forthcoming" is incorrect. BlackRock exhaustively searched for these materials, and honestly reported that they could not be found. *See* Dkt. 386. It was only Defendants' attempt to wait in ambush with (outdated) information from a (former) employee that has hampered the conferral process. In any event, ultimately Defendants admit that BlackRock's preservation efforts are "not presently before the Court," because the only issue is whether to include even more TAR-related custodians. But Plaintiffs intend to search the documents over *five* people that would have prepared, sent, and received additional TARs. If BlackRock generated additional TARs, these proposed custodians should have them. There is thus no reason to add still-more people.

*2. Mr. Prager as a custodian.*   Despite months of negotiations, Defendants first contended Mr. Prager should be a custodian just days ago. Defendants' request is simply another attempt to harass BlackRock, here by way of a senior executive. Mr. Prager was not a trader or portfolio manager likely to have any of the pricing communications Defendants seek. And contrary to Defendants' assertion, he was not "intimately involved" in BlackRock's "production and use of TARs" (which are in any event irrelevant), and played no unique role in "internal assessment" or "external negotiations" of Defendants' prices. The documents Defendants cite do not show otherwise. For instance, Mr. Prager did not actually draft the white-paper Defendants rely upon. The paper was co-written by Mr. De Jesus, who is a custodian already. Finally, to the extent Mr. Prager has documents pertaining to BlackRock's FX trading, they would be duplicative of those of another custodian, Chris Vogel, who was Head of FX Trading. Courts routinely reject requests to subject high-level "apex" executives like Mr. Prager to discovery requests.[10]

---

[8] Plaintiffs' complaint about Defendants' document production is baseless for multiple reasons that Defendants are happy to explain on May 7, including that numerous Defendants (i) have already produced or agreed to produce many requested documents, and (ii) have meet and confer calls scheduled with Plaintiffs *next week*—calls necessary because Plaintiffs' explanations for what documents they want, and how they are relevant, have changed multiple times.

[9] *See, e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, at *8 (E.D. Pa. May 26, 2006); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 214 (1951).

[10] *See, e.g.*, *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 2002 WL 818061, at *7 n.2 (D. Del. Apr. 30, 2002)

***3. Custodians for every Plaintiff.*** Defendants contend every Plaintiff should provide custodians. But the gathering burden Defendants previously tried to place on Plaintiffs was disproportional to the needs of the case. This was in part because Plaintiffs, as Defendants' customers and victims, do not have relevant materials. Dkt. 361 at 4-5. The Court ordered the use of 10 custodians "*per Plaintiff 'group*'" to test the parties' respective arguments. Dkt. 372. The Court thus recognized that testing whether a trader is likely to internally discuss how Defendants priced Defendants' trades, for instance, did not require discovery from literally every Plaintiff fund. *See* Dkt. 384 at 3-4. The relevant Plaintiff groups have already proffered more than 10 custodians each; those custodians cover 98% of PIMCO Plaintiff funds, 70% of BlackRock Plaintiff funds, and 100% of BlueCrest Plaintiff funds. The Court should uphold the text and purpose of its prior order, rejecting the conclusory request for every Plaintiff fund to participate in custodial discovery at this time.

***4. BlackRock's portfolio managers ("PMs").*** Defendants want BlackRock to review already produced documents to assist in the identification of additional PMs. But Defendants' request is premature because, as explained in its affidavit (Dkt. 386), BlackRock is preparing an additional list of PMs associated with the Plaintiff funds using trade data. It is also legally misplaced because Defendants made the same Rule 33(d) argument over six months ago and the Court rejected it, requiring only the (completed) questionnaires. *See* Dkt. 266. There is no reason to revisit that ruling. Defendants have still failed to explain what possible use they have for still-more names on top of those already provided. 04/03/20 Tr. at 19:8-9 ("That is overbroad. You don't want to hear from those thousand people."). And Plaintiffs are still entitled to invoke Rule 33(d) where the burden of ascertaining information from documents would be "substantially the same" for either side. BlackRock identified by Bates number the industry-standard filings, like prospectuses, where additional PMs may be found. Defendants are well-equipped to flip through these standard documents to extract the PM names. Defendants must "make a prima facie showing that the use of Rule 33(d) is somehow inadequate . . . because it is too difficult to extract." *Sadosfky v. Fiesta Prod., LLC*, 252 F.R.D. 143, 148 (E.D.N.Y. 2008). To do so, Defendants accuse Plaintiffs of identifying the wrong materials, and complain they cannot know which prospectus goes with which named Plaintiff. But Plaintiffs have already agreed to provide a simple tie-out table matching the documents to specific named Plaintiffs. Defendants' only other argument is that BlackRock is more familiar with the documents. But courts recognize that is true of nearly every party who invokes Rule 33(d).[11] For all these reasons, the Court should refuse to reconsider its approval of BlackRock's invocation of Rule 33(d) here.[12]

---

(denying discovery into executive emails); *BlackBerry Ltd. v. Facebook, Inc.*, 2019 WL 4544425, at *6-7 (C.D. Cal. Aug. 19, 2019); *Lutzeier v. Citigroup Inc.*, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015) (denying ESI discovery into senior executes and citing the "apex" doctrine); *Assured Guar. Mun. Corp. v. UBS Real Estate Secs., Inc.*, 2013 WL 1195545, at *2-3 (S.D.N.Y. Mar. 25, 2013). Defendants' cases, *Dyson, Inc. v. Sharkninja Operating LLC*, 2016 WL 1613489 (N.D. Ill. Apr. 22, 2016) and *Shenwick v. Twitter, Inc.*, 2018 WL 833085 (N.D. Cal. Feb. 7, 2018), are inapposite because, unlike here, it was undisputed that the senior executives were key players in the case.
[11] *See Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 44 (S.D.N.Y. 1984); *Saddler v. Musicland-Pickwick Int'l, Inc.*, 31 Fed. R. Serv. 2d 760 (E.D. Tx. 1980) ("If a disparity in familiarity necessarily created an inequality in the ease of discovery, the procedure provided by Rule 33[d] would rarely, if ever, be utilized.").
[12] Defendants' reliance on *Xchange Telecom Corp. v. Sprint Spectrum L.P.*, 2015 WL 773752 (N.D.N.Y. Feb. 24, 2015), *Lockheed Martin Idaho Techs. Co. v. Lockheed Martin Advanced Envtl. Sys.*, 2002 WL 1934134, at *1 (D. Idaho 2002), and *Bonds v. Dist. of Columbia*, 93 F.3d 801 (D.D.C. 1996), is misplaced. In each case, the

**5. "Reviewer guidelines."**   Defendants argue that Plaintiffs should either agree to a list of "guidelines" they created for Plaintiffs to use in reviewing documents, or engage with them to identify specific problems with their proposal.  This is another attempt to open a long-settled issue, and is not the way document discovery is done.  The parties spent three months negotiating the subjects for which Plaintiffs would conduct custodial searches.  Those negotiations resulted in a series of agreements, summarized in a simple list Defendants have known about for months.  Just last week, Defendants sent a *completely different* set of "guidelines" that is inconsistent with the parties' agreement.  For example, Defendants' new list broadly requests "information about Plaintiffs' multi-party chat rooms."  That "guideline" was nowhere in the parties' agreed-upon list and is completely irrelevant to the case because, as discussed above, Plaintiffs' beliefs about Defendants' price fixing is not a defense.  Plaintiffs should not be forced to throw out three months of negotiations by having to identify all the ways Defendants' last-minute re-write departs from the agreed-upon original and re-visit settled issues.  If Defendants want a formal list of "guidelines" in effect beyond Plaintiffs' obligations to act in good faith, those review guidelines should be limited to those actually agreed upon, in the exact form they were agreed upon, during the prior three months of negotiations.  In lieu of the Court's rules barring the use of attachments, Plaintiffs do not provide the actually agreed-upon list herein, but can provide it at the Court's request.

**6. Search terms.**   Defendants proposed 44 search strings, often consisting of multiple words, phrases, and parts.  Plaintiffs have agreed to 38 of them (86%).  Defendants contend that Plaintiffs should run the six disputed strings, without even identifying them for the Court.  They are, in fact, facially overbroad and irrelevant.  For example, Defendants demand:  (interbank OR "inter bank" OR inter-bank*) w/5 (chat* OR comm*).  But the fact Plaintiffs may have known banks communicated with each other *in the abstract* about *literally any topic on Earth* cannot possibly be relevant to any issue in the case.  Defendants have never argued otherwise, yet they have refused to modify the string in any way.  Similar problems exist with the other five disputed strings.  It should go without saying that search terms should reasonably relate to the needs of the case.  More terms means more burden, even as a test.  Searches will take longer, more documents will need to be reviewed for false positives, and more conferrals will be needed.  Defendants say the time for negotiation is over.  But Defendants' request for the Court to blindly impose *every term they want*, based on the logic that this is "only" a test, should be rejected.

**7.  Defendants should produce materials from the same types of sources they have demanded Plaintiffs search.**   For months, Plaintiffs have asked Defendants to investigate whether there are any reasonably accessible, centrally maintained analyses, reports, studies, summaries, board minutes, and presentations relating to Defendants' FX trading activities, as distinct from the trading data and custodial files.  Defendants have variously not produced any FX centrally maintained materials in response to Plaintiffs' request, refused to explain what they did to look for such materials, or (in the case of JPMorgan) disingenuously claimed to not understand what the requests are despite asking Plaintiffs to do the same thing.  Defendants should be required to complete, in a timely manner, a diligent investigation of reasonably accessible central sources, and to produce any non-privileged analyses, reports, studies, summaries, minutes, or presentations relating to Defendants' FX trading activities.

---

interrogatories sought more than just objective information, such as why billing practices were objectionable (*Xchange*) and the subjects of witness knowledge (*Lockheed; Bonds*).  In contrast, Defendants here seek only names, which Defendants can just as easily glean from the documents.

| DONTZIN NAGY & FLEISSIG LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
|---|---|
| By:/s/ Tibor L. Nagy, Jr. | By:/s/ Daniel L. Brockett |
| Tibor L. Nagy, Jr.<br>980 Madison Avenue, 2nd Floor<br>New York, New York 10075<br>212-717-2900<br>tibor@dnfllp.com | Daniel L. Brockett<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>danbrockett@quinnemanuel.com |
| Counsel for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC | Counsel for Plaintiffs |

cc:  All counsel of record (via ECF).