**VIA ECF**                                                                                           May 22, 2020

The Hon. Lorna G. Schofield
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:    *Allianz et al v. Bank of America Corp. et al.*, 18-cv-10364-LGS

Dear Judge Schofield,

      Pursuant to the May 5 and May 7, 2020 Orders, the parties provide the following joint report, followed by their positions on current outstanding disputes. *See* Dkts. 391, 393.

      <u>JOINT REPORT</u>: **Custodians and search terms**: The parties have met and conferred, and have identified custodians for certain Plaintiffs for the "sampling" production. Dkt. 372 at 2.

      **Subjects of custodial production**: The parties are continuing to meet and confer about document categories that will be produced in custodial discovery. *See* Dkt. 393 at 2. The parties will address any outstanding disputes in the June 12 letter.

      **BlackRock portfolio managers ("PMs")**: Today, BlackRock will provide the information required in the May 5 Order, and the parties will address any disputes in the June 12 letter.

      <u>DEFENDANTS' POSITION</u>: **BlackRock should search custodial files of the authors and distributors of TARs**: BlackRock continues to obstruct discovery of its trading analytics reports (TARs), which it failed to preserve (and apparently deleted) in 2015 and 2016. Specifically, BlackRock identified 11 "employees who authored and distributed the TARs" in response to Your Honor's Order, but refuses to search any of their files for TARs. Dkt. 391 at 1. BlackRock should conduct targeted searches of these distributors' files for TARs because (i) this is more likely to yield a complete set of lost TARs, rather than relying solely on the handful of recipients who are already custodians;[1] (ii) TARs are highly relevant and discoverable (*see* 4/2/20 Tr. 41:2-12); and (iii) it is neither unduly burdensome to do so nor disproportionate to the needs of this case, particularly given that such targeted searches will be easy to craft. *See* Dkt. 386 ¶ 8.

      **BlackRock should provide 30(b)(6) testimony regarding non-"central" sources of responsive documents and the destruction of TARs**: During the April 2 conference, Defendants explained our struggle to understand Plaintiffs' non-custodial document collection, including Plaintiffs' refusal to explain what they meant by the "centrally-maintained" and "readily-accessible" limitations they have imposed on *all* of their searches. *See* 4/2/20 Tr. 45:8-46:11. As a solution, Your Honor suggested that Defendants take 30(b)(6) testimony about Plaintiffs' collection of documents, including sources of relevant documents "that could be excluded" from their collection to date. Tr. 46:6-15. Accordingly, on April 13, 2020, Defendants noticed a 30(b)(6) deposition of the BlackRock Plaintiffs on these subjects. On May 4, 2020, BlackRock served objections, and during meet and confer calls on May 14 and 19, refused to confirm whether

---

[1] BlackRock provides no basis for its speculation—before any searches have been run—that performing additional targeted searches for TARs on these distributors "will not yield additional TARs."

it will testify on two critical subjects: (i) the locations of relevant documents that were *not* searched because they do not meet BlackRock's unilateral definition of "centrally maintained," or "readily accessible," and (ii) the loss, deletion, or destruction of TARs, or the databases where TARs were held, including the "IQ" platform.  Dkt. 386 ¶ 8.

Both topics are highly relevant and clearly proportional to the needs of this litigation.  As Your Honor confirmed by suggesting this deposition in the first place, Defendants are entitled to know what sources of documents have not been searched because BlackRock unilaterally has dubbed them to be not "centrally maintained" or "readily accessible."  Thus, for example, if BlackRock's FX traders formerly maintained sources of relevant documents that BlackRock no longer considers to be "central" or "readily accessible," Defendants would work with Plaintiffs to determine alternative sources for those documents, such as custodial searches.  Likewise, Defendants are entitled to know the facts surrounding the destruction of TARs and to question BlackRock about the assertions in the TARs affidavit that Your Honor ordered them to produce.  BlackRock should not be permitted to shield those relevant facts from discovery.  Defendants respectfully seek an order directing the BlackRock Plaintiffs to provide testimony on each of the topics described in the prior paragraph.  BlackRock's request to wait until *after* the deposition to resolve this dispute is a transparent attempt to avoid preparing a witness on these topics in the first instance.[2]

**Plaintiffs should comply with the April 3 Order to provide discovery about the location of each of the disputed trades**:  During the April 2 conference, Your Honor asked Plaintiffs, "why shouldn't you have to produce communications sufficient to determine the type and location of the trade . . . ?"  Tr. 13:20-22.  The April 3, 2020 Order then directed Plaintiffs to "produce documents or information sufficient to determine the location of the disputed trades."  Dkt. 372 at 1.  Defendants have twice asked Plaintiffs (i) what "documents or information" they will produce to comply with the Order, and (ii) by when Plaintiffs will make their production.  Instead of answering, Plaintiffs insist that *Defendants* should produce documents to "determine the location" of the trades that *Plaintiffs* have put into dispute, and have conditioned their compliance with the Order on Defendants' agreeing to do so.  But Your Honor already has ruled that Plaintiffs must produce this basic information about the transactions they have put at issue, because "each individual plaintiff has discovery obligations."  Tr. 8:24-9:2.  Moreover, Plaintiffs, not Defendants, can more efficiently identify the "location of the disputed trades," including whether Plaintiffs were "*operating abroad*" at the time of each trade, and the locations of *Plaintiffs' own personnel* who engaged in those trades.[3]  *FOREX*, 407 F. Supp. 3d 422, 433 (S.D.N.Y. 2019) (emphasis in original).  Defendants are entitled to this information even if they may be able to determine *other* relevant facts from their own records, such as the location of Defendants' trading desks for some trades.  Defendants respectfully seek an order directing

---

[2] Plaintiffs' premature request for relief on a recently-served 30(b)(6) notice to JPMorgan is a distraction.  Indeed, JPMorgan has not even had the time to serve its initial responses to the notice.  And Plaintiffs' "cut-and-paste" of the same notice back to JPMorgan hardly guarantees that it must provide identical testimony.  Whether Plaintiffs and JPMorgan—which has very different relevant business lines and which, unlike Plaintiffs, has produced nearly 200,000 documents in this case—are similarly situated should be determined on a proper record.

[3] Indeed, only Plaintiffs possess information about the location of the actual trader who participated in the transaction, which is essential to an accurate FTAIA analysis of the transaction.

Plaintiffs to do what the Court ordered and produce documents or information sufficient to determine the location of their personnel responsible for each disputed trade by July 2, 2020.

**Plaintiffs' newfound "tit-for-tat" complaints about Defendants' document production are contrived and, in any case, premature**: Plaintiffs recently have manufactured a handful of "disputes" about the 2.3 million documents Defendants produced to them in 2019. Because these "disputes" are all either contrived or not ripe, Plaintiffs' requests should be rejected:

- **Foreign Defendants**: Your Honor lifted the discovery stay against foreign Defendants on May 7, 2020 (Dkt. 393). Under the rules, foreign Defendants' initial responses are not due until June, as Plaintiffs concede. Foreign Defendants will of course meet and confer with Plaintiffs about their requests at the appropriate times in accordance with the rules.
- **Custodian information**: Because Plaintiffs' discovery requests do not call for dates of employment, titles, or locations of Defendants' custodians, most Defendants first learned of Plaintiffs' new request for such information in *this letter*. In fact, many Defendants identified the names of their custodians to Plaintiffs months ago, at their request. Needless to say, Defendants have never been asked to meet and confer about the new request for more information—which we are happy to do—let alone refused to provide the information.
- **Plaintiff name searches**: There is no dispute about this request. All Defendants have *agreed* to test the Plaintiff name search terms in previously-collected documents, subject to reasonable parameters, such as agreement on custodians. And unlike Plaintiffs, many Defendants are preparing to share the volumes of those search results with Plaintiffs.
- **Affidavit from Credit Suisse**: Nor is there any dispute about Plaintiffs' requests to Credit Suisse. Plaintiffs repeatedly changed their requests over a period of several months, eventually seeking *all* centrally-maintained documents relating in any way to FX. But rather than refusing Plaintiffs' requests, Credit Suisse has (a) sought to clarify exactly what Plaintiffs are seeking, (b) worked diligently to determine whether any such materials exist, and (c) explained that its massive production of documents to Plaintiffs already covers most or all of what Plaintiffs seem to be requesting. To the extent Plaintiffs seek a further reasonable investigation of centralized sources for additional responsive, non-privileged documents that may or may not exist, Credit Suisse will do so as needed after conferring with Plaintiffs to fully understand their requests. As to Plaintiffs' request for an affidavit, Plaintiffs first raised the issue in a May 11 email, and included it in their draft of this letter *before* requesting a meet and confer call—which is now scheduled for next week. Credit Suisse will confer with Plaintiffs as to what additional confirmation may be appropriate, but this issue is premature until the further investigation described above is complete.[4]
- **Documents produced during investigations**: Non-foreign Defendants are actively meeting and conferring or have reached agreement with Plaintiffs about contemporaneous documents previously produced to U.S. and European competition authorities in connection with FX antitrust investigations. Because of factors including privilege, foreign law protections and regulatory restrictions, as well as variations in productions made in relevant actions, each

---

[4] Plaintiffs are wrong that other Defendants only "belatedly confirmed" that they will undertake a reasonable investigation. Until recently, Plaintiffs had either (i) requested *all* documents from central sources in any way related to FX—a plainly disproportionate request—or (ii) reached compromises with some Defendants on which they have since reneged. Plaintiffs now seek a new set of theoretical categories of documents, while conceding they have no basis to believe that any such documents exist. All non-12(b)(2) Defendants (including Credit Suisse) have agreed to consider Plaintiffs' new categories and undertake a reasonable investigation of their central sources.

3

Defendant is differently situated and should complete their meet and confers to understand the basis and scope of Plaintiffs' potentially expanded request and to determine if there is a dispute for the Court to resolve. Thus, contrary to Plaintiffs' request for a blanket order of production for all Defendants, there is no "one size fits all" approach for requests for prior productions to competition authorities in connection with FX antitrust investigations and no ripe dispute with any non-foreign Defendants.

**PLAINTIFFS' POSITION ON ISSUES RAISED BY DEFENDANTS:** *Defendants argue that, for purposes of the initial sample production, <u>all</u> "authors and distributors" of TARs (16 people) should be added as BlackRock custodians.* Defendants are once again simply trying to circumvent the Court's prior orders. Twice before when the issue of Plaintiffs' custodial obligations were discussed, the Court directed that Plaintiff groups (including BlackRock) need only search 10 custodians as to inform further discussion about the (ir)relevance of Plaintiffs' materials. *See* Dkts. 372, 391. BlackRock has already gone beyond 10 custodians, agreeing to search the files of 14 custodians, including five of the 16 TAR-related custodians requested by Defendants. After the sample is run, the parties can confer about any perceived need for additional efforts, based on the results of the initial production.

There is also no reason to revisit the Court's prior orders, or the agreed-upon 14-person list, because adding even more custodians will not yield additional TARs. BlackRock has already made an extensive search for TARs and filed an affidavit (Dkt. 386). BlackRock's agreed-upon list already includes five custodians that were among the group that sent and received all TARs. If Defendants wish to substitute some of the five agreed-upon TAR-related custodians for some different TAR-related custodians, BlackRock would consider it. Instead, Defendants demand BlackRock simply *add 11 more* TAR custodians. Adding 11 additional TAR custodians to the five already proffered would result in 16 TAR-specific custodians. It would also result in 25 overall custodians for the sample test—more than *double* what the Court envisioned. Searching the files of 16 people to find identical copies of one (irrelevant)[5] periodic report would not be proportional to the needs of any case. Collecting all the custodial documents of 11 additional people—even if the search itself is limited to TARs—would still impose significant additional burden. And it is certainly inconsistent with the "sampling" approach envisioned by the Court for this case.

***Defendants purport to need an order setting the scope of forthcoming specific Rule 30(b)(6) testimony.*** But here, there is no live dispute for the Court to resolve. The parties had their first conferral regarding the scope of Defendants' notice only last Thursday. Defendants are aware counsel has not yet been able to consult with their client and formulate a response. The parties are thus not at impasse on the scope of topics to be covered. More basically, Defendants' complaint is too vague and premature to be resolved by the Court. BlackRock will make a witness available to testify about its gathering efforts, including as to non-custodial documents, TARs, and other documents. If the witness is unable to answer a question to Defendants' satisfaction, the

---

[5] Defendants' presumption that these internal reports—generated periodically for one group for a small part of the relevant period—are of central importance is misplaced. What Plaintiffs thought about the market generally does not make Defendants' conspiracy to fix Defendants' prices any less illegal. Defendants' attempt to suggest there is a spoliation question is also baseless because, as explained in BlackRock's affidavit, an enterprise-wide document platform was migrated out of regular use *three years before* the filing of this case. Dkt. 386. Defendants spurious "spoliation" mantra is nothing more than a transparent litigation tactic.

parties will then meet and confer. If that does not resolve the dispute, Defendants can then raise the issue with the Court in the context of a specific question and answer that can be ruled upon. By contrast, as of now, it is not clear what Court relief Defendants are seeking, as Plaintiffs do not intend to block BlackRock witnesses from responding to standard document-gathering questions on all relevant topics.[6]

The Court should be aware that Plaintiffs have also served a Rule 30(b)(6) notice on JPMorgan, seeking testimony concerning its document collection efforts. To the extent the Court orders any relief on this issue, Plaintiffs request the Court confirm the same rule will apply to Defendants, all of whom are also purportedly searching undefined "centrally maintained" sources. *See, e.g.*, *E.E.O.C. v. Original Honeybaked Ham Co. of Ga., Inc.*, 2013 WL 435511, at *1 (D. Colo. Feb. 4, 2013) (noting that defendants had previously objected to similar topics and thus the argument for a protective order "is well taken if for no other reason than the Goose and Gander rule"); *Crowley v. Chait*, 2005 WL 8165115, at *5 (D.N.J. Feb. 22, 2005) (adopting "a Solomon-like approach" by granting defendant's request to take depositions with the caveat that plaintiff also be permitted to do so).

***Defendants argue that Plaintiffs should be ordered to provide trader-location information.*** But Plaintiffs have already agreed to do so, and in fact many such documents have already been produced. For example, for PIMCO and others, the already-produced data itself contains the information. For other Plaintiffs, such as the AP Funds, Plaintiffs' interrogatory responses identify the location of all members of the trading desks during the relevant period. Plaintiffs are undertaking reasonable efforts to complete their location-related productions. There is thus no dispute as to whether the requested information has been, is being, and will be produced.

Defendants insist the Court impose a deadline, because Plaintiffs can only represent that reasonable efforts are ongoing. But that is the *exact representation* Defendants make as to their own efforts to produce the location-relevant information in their possession.[7] Defendants cannot deny they have relevant information about the location of Plaintiffs' traders and about whether Defendants' trades were executed with a "foreign desk of a Defendant." *FOREX*, 2016 WL 5108131, at *11 (S.D.N.Y. Sept. 20, 2016). Defendants have not committed to a deadline for production of their location information, only recently stating they are making "reasonable efforts." If that representation suffices for Defendants' production, it suffices for Plaintiffs'. If instead the Court finds a date-certain order necessary, it should be applied to all parties, taking into consideration the Court's forthcoming decision on Defendants' Rule 12(b)(6) motion.

**PLAINTIFFS' ISSUES WITH DEFENDANTS' DISCOVERY**: ***Defendants' failure to produce centrally maintained FX documents.*** Following the Court's order, the parties held several discussions on Defendants' refusals to search for reasonably accessible, centrally maintained

---

[6] Defendants suggest special attention is required because Plaintiffs did not search literally every place a document could possibly exist. But we suspect Defendants similarly did not search every office, box, file cabinet, warehouse, computer, and database in their possession, custody, and control. Plaintiffs' non-custodial searches, and their descriptions thereof, follow well-established and well-known practices; indeed, Defendants deployed the same "centrally maintained" and "readily-accessible" terms and concepts in their own discovery responses.

[7] Defendants' complaints as to the timing of production also ignores that they are constantly shifting demands as to what they want prioritized (e.g., TARs, PMs, custodial documents, Rule 30(b)(6) depositions, etc.).

documents, despite Defendants' similar demands on Plaintiffs. With the exception of Credit Suisse and the Rule 12(b)(2) Defendants (as to whom the discovery stay was only recently lifted), Defendants have belatedly confirmed they will undertake a reasonable investigation for these documents. As to Credit Suisse, it has implausibly claimed it has no centrally maintained sources containing the types of documents Plaintiffs have requested, namely, FX trade analyses, pricing documents for FX trades, and documents relating to the impact of Credit Suisse's alleged activities on the FX markets. It is not credible that an international bank of Credit Suisse's size and sophistication does not have the ability to locate these important documents except by word-searching people's e-mail files. While Credit Suisse has only just yesterday—faced with the threat of Court action—offered to provide more information, its constantly changing excuses and delays over several months raise serious doubts about its compliance with its discovery obligations. Accordingly, Plaintiffs respectfully request that Credit Suisse be required to submit an affidavit to explain its investigation of non-custodial documents.

***Many foreign Defendants have been withholding some or all of their previously produced FX materials***—including chats and trading data produced in *FOREX*—based on their personal jurisdiction defense. With the stays lifted, documents that have been produced elsewhere should be produced by June 5. The Court has previously recognized there is no reason to delay the inevitable while waiting for these Defendants to serve formal objections as to *other* materials. *See* Dkt. 143 (requiring Defendants to re-produce documents prior to service of formal document requests).

***Defendants should provide custodian information.*** All of Defendants' custodial productions to date consist of re-productions of materials from other cases. To assist in discussions as to what additional documents need to be gathered and produced for *this* case, Defendants should provide the same information regarding their custodians as Plaintiffs have agreed to provide for their own: (i) name, (ii) job title, (iii) dates of employment, and (iv) location. Given Defendants certainly have this information at their ready disposal, it should be provided by June 5.

***There are still FX-related materials that were produced to regulators, but not to Plaintiffs.*** Contrary to Defendants' attempt to overcomplicate the issue, this *is* a "one size fits all" situation. These are *all* discrete collections of already-gathered, FX-conspiracy-related materials that can be quickly re-produced. And confidentiality considerations are universally covered by way of the Protective Order. Each Defendant should be required to confirm by June 5 they have reproduced *all* documents previously given to any other FX plaintiff or regulator in connection with the scandal.

***Plaintiff name searches.*** As Defendants' custodial productions consist exclusively of materials gathered for other purposes, Defendants have made no effort to gather materials specific to Plaintiffs. Certain Defendants are refusing to even run Plaintiff-name searches without additional negotiations over limiting "parameters." This refusal to even run the searches and provide hit-counts is flatly inconsistent with Defendants' prior arguments to this Court. At the last hearing, Defendants stressed how "there is no burden in simply getting a hit count." 05/07/20 Hrg. Tr. at 21:11. According to counsel, "you get hit counts; you negotiate off those. That's how it works." *Id.* at 21:12-13. Just as the Court ordered Plaintiffs to do, Dkt. 393, all Defendants should be required to run searches for Plaintiffs' names, without restrictions, so that conferrals can be informed by resulting "hit count" reports.

| DONTZIN NAGY & FLEISSIG LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
|---|---|
| By:/s/ Tibor L. Nagy, Jr. | By:/s/ Daniel L. Brockett |
| Tibor L. Nagy, Jr.<br>980 Madison Avenue, 2nd Floor<br>New York, New York 10075<br>212-717-2900<br>tibor@dnfllp.com | Daniel L. Brockett<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>danbrockett@quinnemanuel.com |
| Counsel for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC | Counsel for Plaintiffs |

cc: All counsel of record (via ECF).