UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
ALLIANZ GLOBAL INVESTORS GMBH, et                            :
al.,                                                         :
                                          Plaintiffs,        :          18 Civ. 10364 (LGS)
                                                             :
                          -against-                          :          **OPINION AND ORDER**
                                                             :
BANK OF AMERICA CORPORATION, et al.,                         :
                                        Defendants.          :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

This case concerns an alleged conspiracy among the world's largest banks to fix prices in

the foreign exchange ("FX") market.  Plaintiffs[1] bring this action against sixteen banks and their

affiliates[2], alleging that Plaintiffs transacted in the FX market during the period that the market

was purportedly being distorted in Defendants' favor and were therefore harmed.  Plaintiffs'

Second Amended Complaint (the "Complaint") alleges a violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1, *et seq.* and unjust enrichment.

---

[1] Plaintiffs are almost 1,300 investment firms and government entities that opted out of the *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789 (LGS) (S.D.N.Y. 2013) ("*In re Forex*") class action.

[2] Defendants include Bank of America Corporation, Bank of America, N.A., Barclays Bank PLC, Barclays PLC, Barclays Capital, Inc., BNP Paribas Group, BNP Paribas USA, Inc., BNP Paribas S.A., BNP Paribas Securities Corp., Citigroup, Inc., Citibank, N.A., Citigroup Global Markets, Inc., Credit Suisse AG, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., The Goldman Sachs Group, Inc., Goldman Sachs & Co., LLC, HSBC Bank plc, HSBC North America Holdings, Inc., HSBC Bank USA, N.A., HSBC Securities (USA) Inc., J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley, Morgan Stanley & Co., LLC, Morgan Stanley & Co. International PLC, NatWest Markets Securities Inc., RBC Capital Markets, LLC, The Royal Bank of Scotland plc, SG Americas Securities, LLC, Société Générale, Standard Chartered Bank, UBS AG, and UBS Securities LLC (collectively, the "Defendants").  Defendants Credit Suisse Group AG, Credit Suisse International, HSBC Holdings PLC, MUFG Securities Americas Inc., Standard Chartered Securities (North America), Inc. and UBS Group AG were voluntarily dismissed.  MUFG Bank, Ltd. and the Royal Bank of Canada were dismissed for lack of personal jurisdiction.

Defendants move to dismiss the Complaint in accordance with Federal Rules of Civil Procedure 12(b)(1), 12(b)(3) and 12(b)(6).  For the reasons discussed herein, Defendants' motion is granted in part and denied in part.  This Opinion holds as follows: (1) the Complaint sufficiently pleads antitrust injury, except for claims premised on transactions with non-defendants that are not based on the benchmark rate; (2) Plaintiffs are efficient enforcers as to transactions on Defendants' single-dealer trading platforms, with the exception of algorithmic-based trades where the algorithm used trading data that was purportedly corrupted by the alleged manipulation of other trades; (3) Plaintiffs are efficient enforcers as to transactions in exchange-traded FX instruments; (4) Plaintiffs' claims based on transactions between Plaintiffs domiciled or operating abroad and Defendants domiciled or operating domestically fall within the imports exclusion under the Foreign Trade Antitrust Improvements Act ("FTAIA"); (5) Plaintiffs' Sherman Act claims are timely, with the exception of claims against Barclays PLC, J.P. Morgan Securities LLC, Royal Bank of Canada and SG Americas Securities, LLC (the "New Defendants") premised on benchmark manipulation, and claims based on transactions with non-defendants; (6) the Complaint sufficiently pleads that the conspiracy began as early as 2003; (7) the Complaint sufficiently pleads a timely unjust enrichment claim; (8) none of Plaintiffs' claims are dismissed on the basis of *forum non conveniens*; (9) Allianz Funds, Allianz Funds Multi-Strategy Trust, AllianzGI Institutional Multi-Series Trust and Carne Global Fund Managers (Ireland) Limited are dismissed for failure to opt-out of the *In re Forex* class action; and (10) SG Americas Securities LLC is dismissed.

## I.    BACKGROUND

The following facts relevant to Defendants' motion are taken from the Complaint and supporting exhibits, and are accepted as true for purposes of this motion.  *See Hu v. City of New*

*York*, 927 F.3d 81, 88 (2d Cir. 2019).

The Complaint alleges that Defendants -- banks that, at times, held an aggregate market share of over 90% -- engaged in a multi-year conspiracy to manipulate both the FX benchmark rates (to which "[i]nvestors often decide to tie an FX transaction") and the bid/ask spreads offered to customers.  The impact of this manipulation was "pervasive throughout the relevant period" and "had a significant impact on all FX transactions" in the market.  The Complaint alleges that "Plaintiffs were participants in the market for FX instruments" and that all Plaintiffs suffered an injury due to Defendants' manipulation of benchmark rates on FX transactions and due to "paying artificially high prices when buying, and getting artificially low prices when selling, FX transactions due to the conspiracy to inflate bid-ask spreads."

## II.    DISCUSSION

### A.    Standard

Defendants' arguments for dismissal (except for *forum non conveniens*) are based on the alleged failure of the Complaint to state a claim, and accordingly are brought under Rule 12(b)(6).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a

right to relief above the speculative level.'" *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016) (internal quotation marks omitted).

### B.   Sherman Act Claims

#### 1.   Antitrust Standing

"To satisfy antitrust standing at the pleading stage a plaintiff must plausibly allege two things: (1) that it suffered a special kind of antitrust injury, and (2) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 62 (2d Cir. 2019) (quotation marks omitted).  Defendants argue that the Complaint fails to plead an injury sufficient to support a claim under the Sherman Act, and that Plaintiffs are not efficient enforcers as to claims arising from certain categories of transactions.  Defendants' motion to dismiss based on a failure to plead antitrust injury is granted for claims premised on transactions with non-defendants that are not based on the benchmark rate, and is otherwise denied.  Defendants' motion to dismiss based on lack of efficient enforcer status is granted as to claims premised on algorithmic-based trades on Defendants' single-dealer platforms where the algorithm used trading data that was corrupted by the alleged manipulation of other trades, and is otherwise denied.

#### a.   Antitrust Injury

The Complaint sufficiently pleads antitrust injury.  To determine whether a Plaintiff has suffered antitrust injury, the Second Circuit uses a "three-part test":

> (1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive; (2) the court must identify the actual injury

4

the plaintiff alleges which requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct; and (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

*IQ Dental Supply, Inc.*, 924 F.3d at 62–63 (quotation marks and alterations omitted).  "Injury must be plausible, not just colorable."  *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104, 112 (2d Cir. 2018).  Defendants do not dispute the sufficiency of the allegations regarding anticompetitive practices.  Rather, Defendants argue that the Complaint does not sufficiently establish that Plaintiffs were harmed by Defendants' alleged conduct.

The injury here is alleged with greater specificity than the injury alleged in the *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789 (LGS) (S.D.N.Y. 2013) ("*In re Forex*") class action, from which Plaintiffs opted-out and in which this Court twice found the allegations of injury to be sufficient for antitrust standing.  *See In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*Forex I*"), 74 F.Supp.3d 581, 595 (S.D.N.Y. 2015) (finding antitrust injury where the complaint "alleges that [d]efendants, who are horizontal competitors, engaged in price-fixing, which caused [p]laintiffs to pay supra-competitive prices.");[3] *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*Forex II*"), 2016 WL 5108131, at *6 (S.D.N.Y. 2016) (finding the allegation that "the defendants engaged in horizontal price fixing resulting in [p]laintiffs' paying higher prices in the FX market" to be sufficient to plead antitrust injury where "[s]uch an injury plainly is of the type the antitrust laws

---

[3] Defendants argue in their Reply that *Forex I* addressed only the injury-in-fact requirement for constitutional standing, and not the actual injury requirement for antitrust claims.  This is incorrect; *Forex I* also addresses antitrust injury.  *See In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*Forex I*"), 74 F.Supp.3d 581, 595 (S.D.N.Y. 2015) ("[T]his Opinion evaluates . . . whether the U.S. Complaint plausibly alleges that Plaintiffs suffered antitrust injury.").

were intended to prevent." (internal quotation marks omitted)).[4]

Defendants are incorrect that an antitrust injury requires pleading the "actual transactions" that harmed Plaintiffs. *See Total Gas*, 889 F.3d at 112. Rather, the Second Circuit has made clear that there are other avenues by which a plaintiff can plead antitrust injury, such as alleging that a trade was made based on a contract price that the defendant "plausibly manipulat[ed]." *Id*. at 113 (citing *Forex II*). Here, the Complaint plausibly alleges that Plaintiffs traded to their detriment in currencies the prices of which were tied to artificially manipulated benchmark rates and bid/ask spreads.[5] This is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," and is therefore sufficient to establish antitrust injury. *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 688 (2d Cir. 2009); *accord Forex I*, 74 F.Supp.3d at 596; *Forex II*, 2016 WL 5108131, at *6.

Defendants' argument that Plaintiffs have failed to plead facts that, if true, would demonstrate that they did not benefit from the alleged manipulation also fails for the same reason. As Defendants note repeatedly in their motion, Plaintiffs are some of the largest FX trading firms in the world, and the Complaint alleges that Plaintiffs "entered into a significant

---

[4] Defendants argue that Plaintiffs cannot rely on class action pleading strategies to state their individual claims of antitrust injury. Defendants are correct, but Plaintiffs do not do so here; rather, they allege injuries for each Plaintiff that are consistent with, and in most cases more specific than, those injuries alleged by the named claimants in *In re Forex*.

[5] Defendants' reliance on *In re SSA Bonds Antitrust Litigation* is misplaced. In that case, the court found that the plaintiffs had not sufficiently pleaded antitrust injury because they had "not alleged any specific transactions that had an artificially unfavorable price that injured them" nor had they provided any other basis, such as statistical analysis, from which injury could be plausibly inferred. 2018 WL 4118979, at *1-2, 7 (S.D.N.Y. 2018) (contrasting *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*Forex II*"), 2016 WL 5108131, at *20 (S.D.N.Y. 2016)). In contrast here, Plaintiffs plausibly allege antitrust injury relying in part on statistical analysis and reports that support allegations of pervasive market manipulation and impacts that injured Plaintiffs. *See* SAC ¶¶ 769-773, 518 *et seq.*

number of FX transactions during the relevant period." Even if any specific transaction may have benefited a particular Plaintiff, a cognizable allegation of an antitrust injury can exist where Defendants conspired to take actions that generally profited themselves at the expense of Plaintiffs, and the Complaint "need plead no more to withstand dismissal." *Forex I*, 74 F.Supp.3d at 597; *see also Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 163–64 (S.D.N.Y. 2018) ("[T]he allegations in the amended complaint here do not assert that BBSW was consistently moved in the same direction by defendants[, b]ut this is of no import with respect to the issue of antitrust standing. Plaintiffs allege that defendants each made a regular practice of determining the optimal BBSW rate that would maximize their profits on BBSW-Based Derivatives and that they then worked together to move BBSW to that spot. . . They have plausibly alleged antitrust injury."); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*, 277 F.Supp.3d 521, 560 (S.D.N.Y. 2017) ("Moreover, if some of the plaintiffs happened to benefit from the manipulation as to certain transactions, that amount could be netted against the losses. . . .").

Defendants also argue that Plaintiffs fail to plead injury arising specifically from Defendants' alleged manipulation of the benchmark rates or widening of the spreads because Plaintiffs' data models show no benchmark manipulation on more than half of the trading days during the relevant period, and no instances of artificial spread-widening on the vast majority of trading days during the relevant period. But the Complaint does not allege that the data analyses identify every instance of manipulation; rather, they allege that the analyses are based on "conservative assumptions" and publicly available pricing data such that "[i]t is likely Defendants' conspiracy was active with even greater consistency, just that its effects may not stand out *enough* from the noise in the data to be seen through Plaintiffs' preliminary, highly

conservative model."  That Plaintiffs conducted these analyses will not serve to heighten

Plaintiffs' pleading standard.  The Complaint made sufficient factual allegations, and those are

merely buttressed by the economic analyses.[6]  Accordingly, Defendants' argument that Plaintiffs

failed to plead antitrust injury is rejected.

     However, the Complaint fails to plead injury premised on transactions with non-

defendants that are not based on the benchmark rate.  The allegation that Defendants'

"manipulations of . . . bid-ask spreads harmed all FX transactions in the marketplace, regardless

of who the counterparties were to any particular trade," *see, e.g.*, SAC at ¶ 93, is insufficient to

allege injury.  The Complaint alleges that individuals at different Defendant firms colluded with

other individuals at other firms to avoid competition and keep spreads wide, but this would not

have affected the spreads offered by non-defendant firms who were not involved in the collusion.

Indeed, the Complaint alleges that "OTC transactions are customized to the needs of the

transaction participants," SAC at ¶ 248, and the Complaint's economic analyses found

Defendants' spreads were proportionately larger than non-defendants' spreads prior to the FX

scandal breaking.  *See* SAC at ¶ 625.  The Complaint accordingly does not plead injury based on

transactions with non-defendants that were not based on the benchmark rate.  Claims premised

on those transactions are dismissed.

### b. Efficient Enforcer

The efficient enforcer inquiry turns on

> (1) the directness or indirectness of the asserted injury, (2) the existence of an
> identifiable class of persons whose self-interest would normally motivate them to
> vindicate the public interest in antitrust enforcement, (3) the speculativeness of the
> alleged injury, and (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative recoveries.

---

[6] Because the Complaint's factual allegations are sufficient to allege antitrust injury, the Court
need not reach Defendants' arguments regarding the sufficiency of Plaintiffs' economic analyses
to "cure Plaintiffs' pleading deficiencies."

*IQ Dental Supply, Inc.*, 924 F.3d at 65 (quotation marks omitted).  "The relative significance of each factor will depend on the circumstances of the particular case."  *Id*.  "[N]ot every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced."  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 779 (2d Cir. 2016).

Defendants argue that Plaintiffs are not efficient enforcers with respect to the following types of transactions: (1) transactions with non-defendant dealers; (2) transactions on Defendants' algorithmic trading platforms; and (3) transactions in exchange-traded FX instruments.  Claims based on transactions with non-defendants are not discussed here because they are dismissed as untimely and insufficiently pleaded.  Claims based on transactions on Defendants' trading platforms are dismissed only as to claims based on transactions on trading platforms where the algorithm was allegedly corrupted by the manipulation of other trades.  The efficient enforcer argument is otherwise rejected.

### i.   Transactions on Defendants' Single-Dealer Trading Platforms

Defendants argue that Plaintiffs are not efficient enforcers for transactions on Defendants' single-dealer trading platforms because the Complaint does not allege a sufficiently direct chain of causation between those platforms, which purportedly use complex, proprietary algorithmic pricing engines, and the alleged conspiracy involving Defendants' voice traders.[7] This is true only in limited circumstances.

Defendants argue that the Complaint fails to allege any direct manipulation of trades on Defendants' platforms or explain how the manipulation alleged could have affected pricing on

---

[7] Defendants' single-dealer platforms are distinct from interdealer platforms.  Defendants do not challenge Plaintiffs' efficient enforcer status for transactions on interdealer platforms.

Defendants' platforms.  But, in fact, the Complaint alleges direct manipulation of trades on Defendants' single-dealer platforms: it alleges first that these trades "typically have the same basic steps as voice trades.  On the single dealer platforms, the customer asks about a trade, the dealer provides a price, and the parties agree to and execute the trade on the platform," SAC at ¶ 779; and second that Defendants manipulated those trades in the same way that they manipulated voice trades: "Like they did with voice trades, Defendants also frequently used electronic trades to carry out their conspiracy to manipulate FX prices, benchmark rates, and bid-ask spreads.  For instance, on the single-dealer platforms that they operated, Defendants coordinated to set the spreads that they each charged on those platforms at artificially high levels . . ."  SAC at ¶780. The Complaint quotes a December 2006 chat transcript between traders at Barclays and UBS that can be reasonably interpreted to illustrate this coordination.  *See* SAC at ¶ 791.

The Complaint also alleges that Defendants directly manipulated the algorithms: "Defendants even used the algorithms themselves to manipulate the transactions occurring, and prices charged, on their electronic platforms."  SAC at ¶ 802.

Where the algorithms were not directly manipulated, the Complaint alleges that the data used by the algorithms was corrupted by the ongoing manipulation:

> [e]ven for electronic trades that did involve the use of algorithms, it was still the dealer banks who ultimately determined the prices that were charged.  The inputs to those algorithms included transactions occurring on those electronic platforms, which included Defendants' manipulative trades.  Those algorithms also often used as inputs transactions occurring on other electronic platforms, or by voice, which again included Defendants' manipulative trades.  Thus, the prices on electronic platforms were directly impacted by Defendants' manipulative trades, even when set by an algorithm . . .

SAC at ¶ 799.

The Complaint thus alleges three distinct types of transactions on Defendants' platforms that were manipulated or otherwise corrupted: (1) trades that, similar to voice trades, were

directly manipulated or linked to a manipulated benchmark rate; (2) algorithmic-based trades where the algorithm itself was manipulated; and (3) algorithmic-based trades where the algorithm used trading data that was corrupted by the alleged manipulation of other trades. The first two types of transactions are "close in the chain of causation," *IQ Dental Supply, Inc.*, 924 F.3d at 65, because the injuries to Plaintiffs were caused directly by Defendants' anti-competitive conduct. There is also no concern as to the other three factors required to be efficient enforcers -- Plaintiffs are identifiable, the injury is not speculative and damages should not be difficult to ascertain. *Id*.

The third type of transaction, however, is one step removed because the purported injury is caused only by way of injuries suffered by other parties -- i.e. the algorithm was not directly manipulated, but instead was affected because its inputs included data from transactions manipulated by Defendants. This is too indirect to meet the standard necessary for efficient enforcers.[8] *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (finding the plaintiff's injury too indirect when it "flowed from the injuries" suffered by other parties). The damages suffered also would be overly speculative, as any calculation would require a hypothetical construction of input data not corrupted by manipulation. *See In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F.Supp.3d at 910 (S.D.N.Y. 2018) (finding damages overly speculative where, "[i]n order to determine damages, the parties would be required to reconstruct a hypothetical market in which the Non-Fixing Banks did not engage in

---

[8] *Alaska Electrical Pension Fund v. Bank of Am. Corp.* does not dictate otherwise. There, unlike here, plaintiffs' alleged theory of injury applied equally to the two types of transactions at issue. 306 F.Supp.3d 610, 623 (S.D.N.Y. 2018) ("Here, Plaintiffs' theory of injury—that Defendants' efforts to manipulate the swaps market in order to move the ISDAfix rate in the desired direction resulted in higher payments for Plaintiffs—would seem to apply equally to both interdealer and non-interdealer swaps, and Defendants concede that Plaintiffs who traded in interdealer swaps were 'directly affected' by the alleged conspiracy." (citation omitted)).

episodic manipulation of the silver market").  Therefore, Plaintiffs are not efficient enforcers to

challenge algorithmic transactions on Defendants' single-dealer trading platforms, where the

trades were not directly manipulated or linked to a manipulated benchmark rate, or where the

algorithms themselves were not directly manipulated.

### ii.    Transactions in Exchange-Traded FX Instruments

Defendants argue that Plaintiffs are not efficient enforcers as to transactions in exchange-

traded FX instruments (i.e. futures and options on futures) because (1) the Complaint does not

adequately plead that exchange-traded FX instruments were the target of the conspiracy and (2)

the Complaint does not plead a direct relationship between the price at which Plaintiffs

purchased exchange-traded FX instruments and the spot price that Defendants allegedly

manipulated.  Defendants' arguments are rejected.

First, the Complaint pleads a direct relationship between the price at which Plaintiffs

purchased exchange-traded FX instruments and the spot price that Defendants allegedly

manipulated:

> The prices for FX futures and options on futures are highly dependent upon, and
> move together with, the FX spot rate. That is because the FX spot rate is a major
> component of the fair value of FX futures contracts. Changes in spot prices will
> thus directly impact prices in corresponding futures. The value of options on FX
> futures, which are directly linked to the prices of the underlying futures contracts,
> are thus similarly dependent on the underlying spot prices.

SAC at ¶ 268.  The Complaint specifically references Plaintiffs' economic analysis, which shows

a 99.98% or higher correlation between futures and spot prices on the one hand and spot prices

on the other hand for two different currency pairs over a ten-year period.  *See* SAC at ¶ 270.

This is sufficient to plead efficient enforcer status, as it was in *Forex II* where Plaintiffs who

traded in FX futures and FX futures options were found to be efficient enforcers because the

complaint "illustrate[d] how the prices of FX futures contract track spot rates at near parity"

which "undermine[d] the [defendants] arguments concerning the [indirectness] of the . . . injury."
2016 WL 5108131, at *9.

Defendants argue that *Forex II* is inapplicable because the Complaint includes economic
analysis showing statistically significant differences between spot and future prices over time.[9]
Defendants' argument is unpersuasive because the allegations made in the Complaint are not
necessarily inconsistent.  As Plaintiffs accurately observe, "[t]hat some studies show
relationships changing in a measurable way does not undermine the (data-supported) allegation
that futures prices were, in fact, being impacted by the alleged conspiracy."  Accepting all
allegations as true, as the Court must at this stage, the Complaint adequately pleads that the
market for exchange-traded FX instruments is directly linked to the manipulated benchmark rate.
*See In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 544 (S.D.N.Y. 2016)
("[T]his simply raises a question of fact . . . that cannot be resolved at the pleading stage.");
*Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139, 2018 WL 5292126, at *6 (S.D.N.Y. Oct. 25,
2018) ("Plaintiffs are not required to provide expert analysis at the pleading stage, much less
rebut anticipated counterarguments.").  Defendants' caselaw, which involves general allegations

---

[9] The Complaint asserts that, "[t]hroughout 2003 to 2013, spot spreads were consistently larger
than futures spreads.  However, after 2013, the relationship between futures spreads and spot
spreads changed, with spot spreads decreasing significantly. . . Significantly, the size difference
[between spot spreads and futures spreads] was even greater in 2003 to 2007, than it was in 2008
to 2013 . . .  Across the major currency pairs studied, the spot spreads were significantly less
dispersed (i.e., more closely clustered) than futures spreads, throughout the 2003 to 2013 period.
. . From 2013 to 2018, not only did the total variability of spot spreads increase, but also the
differences between the variability of spot and futures lessened, becoming more similar to each
other."  SAC at ¶¶634-642.  The Complaint further asserts that while, "[i]n a normally
functioning market, one would expect the ability of futures prices to predict spot prices to stay
roughly the same across time periods. Instead, the data show that futures prices were
significantly less predictive of spot prices during the 2003 to 2013 period than they were in 2014
to 2018 . . ." SAC at ¶ 646.  In an analysis specifically of the AUD/USD currency pair, the
predictive model shows that "spot prices for this currency pair moved far more in line with future
prices after the FX scandal broke, than they did before."  SAC at ¶ 648.

contradicted by more specific allegations, is inapplicable.  *See, e.g., DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151–52 (2d Cir. 2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." (internal quotation marks and citation omitted)).  Here, in contrast, the Complaint's allegations regarding the correlation between the spot and futures pricing are quite specific, and accordingly Defendants' argument is rejected.

Second, and in light of the above, also unpersuasive is Defendants' argument that plaintiffs' injuries from transactions in exchange-traded FX instruments are not sufficiently direct.  Defendants argue the Second Circuit's observation in *IQ Dental Supply, Inc.* that the plaintiff was not an efficient enforcer where the plaintiff was "not the target of annihilation; it was simply collateral damage," 924 F.3d at 65-66, precludes a finding that plaintiffs here are efficient enforcers for transactions in exchange traded FX instruments.  But requiring a plaintiff to have been intentionally "targeted" to determine the directness of an injury in the antitrust context is directly at odds with Supreme Court precedent.  *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982) ("The availability of the § 4 [of the Clayton Act] remedy to some person who claims its benefit is not a question of the specific intent of the conspirators.").  And in any event nothing in the holding of *IQ Dental Supply, Inc.* indicates the Court's intent to overturn years of precedent.  Rather, "[d]irectness in the antitrust context means close in the chain of causation."  *IQ Dental Supply, Inc.*, 924 F.3d at 65; *accord 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 771 F. App'x 498, 502 (2d Cir.), *cert. denied*, 140 S. Ct. 71, 205 L. Ed. 2d 133 (2019) (summary order) ("Our directness inquiry employs 'familiar principles of proximate causation.'" (quoting *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 411–12 (2d Cir.

2014)); *Gelboim*, 823 F.3d at 779 (declining to preclude, in action alleging manipulation of the LIBOR, claims brought by plaintiffs that did not transact directly with defendants as insufficiently direct under the efficient enforcer inquiry, and instead observing that "[a]t first glance, here there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks.").[10]

As discussed above, as in *Forex II,* Plaintiffs here "plead a [] direct (and nearly mechanical) relationship viewed in light of the 'chain of causation' between the prices in the FX spot and futures markets." *Forex II*, 2016 WL 5108131, at *10. Unlike *IQ Dental Supply, Inc.* where "the harm to [the plaintiff] resulted from injury to [the targets of the conspiracy]," 924 F.3d at 65, here Plaintiffs' injuries spring directly from Defendants' collusive activity. Therefore, "[t]he harm to [plaintiffs trading in exchange-traded FX instruments] was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *McCready*, 457 U.S. at 479 (analyzing directness in the context of antitrust injury). Defendants could not manipulate the benchmark rate without directly affecting all transactions that are linked to the benchmark rate. This injury is accordingly sufficiently direct, and Defendants' argument that Plaintiffs are not efficient enforcers is rejected. *See Forex II*, 2016 WL 5108131, at *9-10 (finding the injury alleged here to be sufficiently direct where the injury

---

[10] Without clear language further restricting those who can bring a Sherman Act claim, it would be inappropriate to do so here. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) ("[O]n its face, § 4 contains little in the way of restrictive language. And the lack of restrictive language reflects Congress' expansive remedial purpose in enacting § 4 . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated. Consistent with the congressional purpose, we have refused to engraft artificial limitations on the § 4 remedy." (citations and alterations omitted)).

"flow[ed] directly from Defendants' manipulation of the FX spot prices, since the two prices move virtually in tandem" and therefore "Plaintiffs here are not more than one level removed from the alleged conspiracy in the spot market, and their claims are not derivative of the [spot market] claims").

### 2.   FTAIA Exceptions

Defendants argue that Plaintiffs' claims fall outside the reach of the Sherman Act where foreign-domiciled or operating Plaintiffs transacted with domestically-operating Defendants. The argument fails because these transactions fall within the FTAIA imports exception.  "[T]he FTAIA creates two exceptions to the general bar on the extraterritorial application of the Sherman Act: (1) the import exclusion, which applies to 'conduct involving . . . import trade or import commerce,' 15 U.S.C. § 6a; and (2) the domestic effects exception, which applies to other foreign conduct that has a direct, substantial, and reasonably foreseeable effect on import or domestic commerce and that gives rise to a Sherman Act claim, *id.* § 6a(1)-(2)."  *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 94 (2d Cir. 2019).

As an initial matter, the Complaint states that Plaintiffs do not seek to relitigate the Court's previous holding that the following types of transactions are barred by the FTAIA: (1) transactions conducted on a foreign exchange; (2) transactions between a foreign plaintiff and a defendant's foreign desk; and (3) transactions between a U.S. plaintiff operating abroad and a defendant's foreign desks.  *See* SAC at ¶ 1 n.1.  Accordingly, to the extent any claims in the Complaint encompass these transactions, they are dismissed.

Here, the Complaint organizes Plaintiffs into categories and alleges that each category "had relevant FX transactions that occurred in the United States, by way of the Plaintiffs and/or its counterparty operating in the United States."  *See* SAC ¶¶ 20, 48, 52, 64, 74.  The issue in

dispute is whether a claim brought by a Plaintiff operating abroad -- regardless of domicile -- is barred by the FTAIA if the Plaintiff was transacting with a Defendant counterparty that was operating domestically.  The answer is that the claim is not barred because of the FTAIA's imports exclusion.

Foreign exchange transactions where one of the parties is operating in the United States directly affect "import commerce" because a party in the United States is importing currency. The Complaint alleges that "[a] spot transaction is the exchange of two currencies between counterparties at an agreed-to rate for immediate delivery.  A forward contract, like a spot transaction, also involves the exchange of two currencies between counterparties at an agreed-to rate at the time of the contract, but with delivery at some time in the future."  SAC at ¶ 245. Accordingly, in an FX transaction, Defendants act as both buyers and sellers.  *Cf. In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 355 (2d Cir. 1992) (observing in dicta that, "[s]ince currency exchanges involve the simultaneous trading of money *qua* goods, a participant in such an exchange is both a *seller* with respect to the currency it is delivering, and a *buyer* with respect to the currency it is receiving"); *see also* SAC ¶ 25 ("[Plaintiffs] suffered injury to their business or property as a direct and proximate result of . . . paying artificially high prices when *buying*, and getting artificially low prices when *selling*." (emphasis added)).

The Second Circuit has stated that "Congress had in mind a simple, bright-line exception for import trade," *Biocad JSC*, 942 F.3d at 98: "conduct involving . . . import trade or import commerce," 15 U.S.C. § 6a, where "involved" means "including (or having) as a necessary feature, accompaniment, or consequence."  *Id.* at 96; *see also id*. at 98 ("constitutes, includes, or has as a necessary consequence the movement of goods into the country.").  Based on this definition, Defendants are incorrect that a claim premised on FX transactions including

Defendants' domestic desks does not involve import trade, because the transactions themselves involve import transactions.  As the nature of currency exchanges is distinct from other transactions that do not involve the "trading of money qua goods," *In re Koreag, Controle et Revision S.A.*, 961 F.2d at 355, Defendants' argument that by this logic any cash payment into the U.S. would qualify as import commerce under the FTAIA is unpersuasive.

Defendants argue that finding a claim premised on these transactions to fall within the imports exclusion runs counter to the FTAIA's express purpose of immunizing U.S. exporters from U.S. antitrust liability when their conduct causes solely foreign harm.  But this argument does not apply to the transactions at issue here because Defendants were acting as importers doing business domestically.  *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) ("The FTAIA seeks to make clear to American *exporters* (and to *firms doing business abroad*) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." (emphasis added)); *Forex II*, 2016 WL 5108131, at *13 (S.D.N.Y. Sept. 20, 2016) ("'Import trade and commerce are excluded at the outset from the coverage of the FTAIA . . .'" (quoting *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc)).  And Defendants' argument that the alleged anticompetitive conduct at issue targets export commerce rather than import commerce also fails for the same reason; where a manipulated transaction involves both import and export commerce, the manipulation targets both import and export commerce.  In any event, the Second Circuit has rejected an intent-based test in this context.  *See Biocad JSC*, 942 F.3d at 100 ("Accordingly, we hold that 'conduct . . . involving import trade or import commerce' is not determined by reference to a defendant's subjective intent to affect import commerce.  Rather, the import

exclusion applies to conduct by a defendant that has a direct or immediate effect on import commerce." (quoting 15 U.S.C. § 6a)); *cf., Forex II*, 2016 WL 5108131, at *13 ("Those transactions . . . *are* the import commerce of the United States in this sector." (quoting *Minn-Chem, Inc.*, 683 F.3d at 854)).

Consequently, FX transactions between Plaintiffs operating abroad and Defendants operating domestically fall within the FTAIA imports exclusion, and such transactions are not barred. *See Chan Ah Wah v. HSBC N. Am. Holdings Inc.*, No. 15 Civ. 8974, 2017 WL 2417854, at *2 (S.D.N.Y. June 5, 2017) (finding amendment of the complaint would not be futile where foreign-domiciled plaintiff sought to sue based on transactions that "were executed on a U.S. exchange or with a U.S. trading desk").

### 3.   Timeliness of the Sherman Act Claims

Defendants assert that certain sub-categories of claims are time barred.  Defendants are correct that claims against the New Defendants premised on benchmark manipulation and claims based on transactions with non-defendants linked to benchmark manipulation are untimely. Plaintiffs' claims are otherwise timely.

"The lapse of a limitations period is an affirmative defense that a defendant must plead and prove.  However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (citation omitted).

A four-year statute of limitations applies to private anti-trust actions, *see* 15 U.S.C. § 15b, beginning "when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *accord World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 698 (2d Cir. 2009) (summary order).  "[I]n the case of

19

a continuing violation, . . . each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted); *accord Forex II*, 2016 WL 5108131, at *15.  Here, Plaintiffs filed their initial complaint on November 7, 2018.  Absent tolling, the statute of limitations would bar Plaintiffs' claims that arise from acts before November 7, 2014.

Two types of tolling are potentially applicable.  First, because Plaintiffs opted-out of the *In re Forex* class action, the *American Pipe* tolling doctrine applies to suspend the applicable statute of limitations as to all asserted members of the class while they were putative class members until "they cease[d] to be members of the class."  *In re WorldCom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007); *accord Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 115 (2d Cir. 2013) (quoting *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)).

Under the separate doctrine of equitable tolling, the statute of limitations may be tolled if a plaintiff establishes "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part."  *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *see Benzemann v. Houslanger & Assoc., PLLC*, 924 F.3d 73, 82 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 82 (2019) ("As a general matter, equitable tolling 'pauses the running of, or tolls, a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.'").  As in *Forex II*, the Complaint's allegations of secret communications and private chat rooms sufficiently provide the basis for equitable tolling.  *See Forex II*, 2016 WL 5108131, at *16.  The issue is

therefore the date at which Plaintiffs were put on inquiry notice of the various claims, and the extent to which the claims were tolled by the class action in *In re Forex*.

### a.   Claims Based On Pre-2007 Transactions

First, Defendants argue that Plaintiffs' Sherman Act claims based on any transactions executed prior to December 1, 2007 that are (1) based on allegedly widened spreads; or (2) brought against Defendants Standard Chartered Bank, Société Générale, MUFG Bank, Ltd. and RBC Capital Markets, LLC should be dismissed as untimely.  These claims and Defendants were added to the *In re Forex* class action on July 31, 2015, and dismissed on September 20, 2016. *See Forex II*, 2016 WL 5108131 at *17.[11]  The claims are timely.

Defendants argue that Plaintiffs were on inquiry notice of the alleged collusive conduct by at least June 12, 2013, which is the publication date of a Bloomberg article in which, as the Complaint alleges, the "possibility that Defendants were rigging currency rates" was first reported.  *See* Liam Vaughan, Gavin Finch, & Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG, Jun. 12, 2013, https://www.bloomberg.com/news/articles/2013-06-11/traders-said-to-rig-currency-rates-to-profit-off-clients.  The article asserts that Bloomberg news interviewed five anonymous current and former traders, who claimed that "[t]raders at some of the world's biggest banks manipulated benchmark foreign-exchange rates used to set the value of trillions of dollars of investments," but "declined to identify which banks engaged in manipulative practices and didn't specifically allege that any of the top four firms [Deutsche Bank, Citigroup, Barclays and UBS] were

---

[11] Defendants also argue that Sherman Act claims based on allegedly widening spreads with respect to "foreign transactions," and claims asserted against these defendants with respect to "foreign transactions," are barred, but fail to define "foreign transactions."  Since it appears from Defendants' motion that these "foreign transactions" claims are based on allegedly widening spreads and are asserted against the same set of defendants, the analysis in the text applies to them as well, and the claims are timely.

involved." *Id*.  The article also stated that State Street Corp., the parent company of the company that collects and distributes the WM/Reuters rates data, had not at the time of publication "been alerted to any allegations of wrongdoing involving the rate" and quotes a finance professor who expressed skepticism about "the ability of traders to manipulate the major currencies in a meaningful way given the massive size of this market."  *Id*.

As established in *Forex II*, the article does not allege facts that are sufficient to have triggered inquiry notice of claims against Defendants that are not named in the article.  *See Forex II,* 2016 WL 5108131, at *27 ("The article did not, however, identify the traders that served as sources for the article or the banks that were involved . . . Given the dearth of specific information in the Bloomberg article, it cannot be said that a person of ordinary intelligence would have understood on June 12, 2013, the probability that she was defrauded by any of the [banks not named in the article].").[12]  Assuming, as this Court did in *Forex II*, that Plaintiffs were on inquiry notice of these Defendants' alleged participation in the conspiracy as of November 2013 based on media reports,[13] *id.,* the claims are timely due to *American Pipe* tolling between July 31, 2015, and September 20, 2016, when these claims were added and dismissed, respectively, from the *In re Forex* class action.  *See Forex II*, 2016 WL 5108131 at *17.[14]

---

[12] Defendants assert that company-specific information is not required to trigger inquiry notice, citing *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).  This misunderstands the holding in *Staehr*.  While the Court stated that company-specific information may be unnecessary to trigger inquiry notice "in *some* cases . . . the District Court's application of the principle to the facts of this case is erroneous," and vacated the dismissal.  *Id*. at 429, 436 (emphasis in original).

[13] Defendants argue without support that "Plaintiffs cite other news reports that informed them of potential wrongdoing."  Lacking citation, this argument is rejected.  Defendants also argue that Bloomberg's publication of further data in support of the conspiracy on August 27, 2013, put Plaintiffs on inquiry notice, if the earlier article did not.  But the Complaint does not allege that the August 27, 2013, report named any participating banks that would have resulted in inquiry notice of these Defendants' participation.  *See* SAC at ¶ 516-517.

[14] There are 625 days between November 13, 2013 (the first media report) and July 31, 2015, and 778 days between September 20, 2016 and November 7, 2018, when this action was

Defendants argue that the Bloomberg article put Plaintiffs on inquiry notice of Defendants' alleged manipulation of the spreads because Plaintiffs allege a single conspiracy, not two separate conspiracies.  This argument is unavailing.  The article refers only to a possible conspiracy to manipulate the benchmark rate, and does not make mention of any possible manipulation of the bid/ask spreads.  The article is insufficient to put Plaintiffs on inquiry notice of such activity.  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) ("[I]nquiry notice is triggered by awareness of *facts* which a reasonable person would investigate; it is not triggered by unfounded suspicions."); *Staehr*, 547 F.3d at 427 ("For inquiry notice to exist, the triggering information must relate [ ] directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants." (internal quotation marks omitted)).[15]  The earliest DFS Consent Order publicly finding manipulation of bid/ask spreads -- against Barclays Bank PLC -- was released in May 2015.  *See* SAC at ¶ 347.  As Defendants point to nothing other than the Bloomberg article to show inquiry notice on an earlier date, this claim is timely.[16]

---

commenced.  Together, that adds up to 1,403 days, which is less than the 1,460 days that make up four years.

[15] Defendants also argue that Plaintiffs' access to the data on which the economic analyses used in the Complaint are based amounts to inquiry notice.  But the only case cited to support this argument refers to "voluminous news articles and other public sources," *see In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 489 (S.D.N.Y. 2017), not the public accessibility of data that, if analyzed, would have revealed the alleged conspiracy.  That the data was public alone is insufficient.  *See In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 367–68 (S.D.N.Y. 2019) "([R]equiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd.").  Defendants' attempt to distinguish *In re GSE Bonds Antitrust Litig.* is also unavailing; that plaintiffs in that case "acknowledged they were on inquiry notice as soon as investigations into the alleged conspiracy were publicly reported" is irrelevant where the publicly reported investigation was a DOJ investigation, not a vague news article.  *See id.* at 368.

[16] There are 72 days between March 20, 2015, (the first DFS order) and July 31, 2015, and 778 days between September 20, 2016 and November 7, 2018, when this action was commenced.  Together, that adds up to 850 days, which is less than the 1,460 days that make up four years.

### b. Claims Against New Defendants

Defendants argue that Plaintiffs' claims against Barclays PLC, J.P. Morgan Securities LLC and SG Americas Securities, LLC are untimely because these Defendants were not named in *In re Forex*. Defendants are correct as to claims brought with respect to benchmark manipulation, and as to those claims Defendants' motion is granted. Defendants' arguments with respect to claims based on the alleged manipulation of the bid/ask spread, however, are rejected and, as to those claims, the motion is denied.

Plaintiffs argue that, even though the New Defendants were not named in *In re Forex*, each of the New Defendants is an affiliate of a named defendant in *In re Forex*, and was left out "merely because of the difficulty of figuring out which hat people were supposedly wearing at the time they engaged in (hidden) chat-room misbehavior." Plaintiffs assert that therefore tolling should apply. But affiliation with a named defendant is not sufficient to trigger *American Pipe* tolling. The Second Circuit has held that "nothing in *American Pipe* suggests that the statute be suspended from running in favor of a person not named as a defendant in the class suit, and we decline so to extend the rule." *Arneil v. Ramsey*, 550 F.2d 774, 782 n.10 (2d Cir. 1977); *accord Holland v. JPMorgan Chase Bank, N.A.*, No. 19 Civ. 00233, 2019 WL 4054834, at *12 (S.D.N.Y. Aug. 28, 2019) ("It is well established in this Circuit that the statute of limitations cannot be suspended from running in favor of a person not named as a defendant in [a] class suit." (internal quotation marks omitted)); *Santiago v. Fischer*, No. 09 Civ. 1383, 2017 WL 4349378, at *5 (E.D.N.Y. Sept. 29, 2017) (same). Plaintiffs cite no binding precedent to the contrary. Benchmark manipulation claims against the New Defendants are untimely.

However, spread manipulation claims are timely against the New Defendants because, as discussed above, disclosures regarding manipulation of the bid/ask spread were not made, nor

were Plaintiffs on inquiry notice, until 2015.  This lawsuit was commenced less than four years later.

### c.  Claims Involving Non-Defendants and Foreign-Domiciled Plaintiffs

Defendants argue that claims based on transactions with non-defendants and foreign-domiciled Plaintiffs were not brought in *In re Forex*, and therefore tolling does not apply. Defendants are correct as to claims premised on transactions with non-defendants linked to benchmark manipulation.  Those claims are dismissed.

*American Pipe* tolling is properly applied to claims of absent class members that involve the same or similar evidence and witnesses as were involved in the initial putative class action. *Benfield v Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir 1994); *accord Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge & Iron Co. N.V.*, No. 18 Civ. 9927, 2019 WL 3996519, at *2 (S.D.N.Y. Aug. 23, 2019).  Plaintiffs assert claims based on transactions with non-defendants, and acknowledge that these transactions were not a part of the *In re Forex* class action.  *In re Forex* involved claims based on transactions only with the defendants in that action, who are largely the same as Defendants in this action.  Because claims based on transactions with non-defendants would require different proof than claims based on transactions with Defendants, tolling these claims would be prejudicial to Defendants due to lack of notice.  *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354-55 (1983) ((Powell, *J.,* concurring, joined by Rehnquist and O'Connor, *JJ.*) ("The rule should not be read as leaving a plaintiff free to raise different or peripheral claims following denial of class status . . . . [T]he district court should take care to ensure that the suit raises claims that concern the same evidence, memories, and witnesses as the subject matter of the original class suit."); *see also Am. Pipe & Const. Co.*, 414 U.S. at 555 ("Within the period set by the statute of limitations, the defendants have the

essential information necessary to determine both the subject matter and size of the prospective litigation[.]").[17]

In contrast, the statute of limitations is properly tolled as to claims brought by foreign-domiciled Plaintiffs -- claims that the Complaint expressly states do not include transactions on a foreign exchange, transactions between a foreign plaintiff and a Defendant's foreign desk, and trades in Europe. *See* SAC at ¶ 1 n.1. The claims in *In re Forex* similarly include in the putative class plaintiffs domiciled outside of the United States who transacted in the United States. *See In re Forex*, Complaint, Dkt. No. 1 at ¶ 23 (defining the class as "All persons who traded foreign currency directly with a Defendant in the United States . . ."); Amended Complaint, Dkt. No. 172 at ¶ 43 (defining the class to include persons "domiciled outside the United States or its territories" that "transacted in the United States or its territories"); Second Amended Complaint, Dkt. No. 368 ¶ 67, 68 (defining the Over-the-Counter ("OTC") class to include persons "domiciled outside the United States or its territories" that "transacted one or more FX instruments in the United States or its territories" and the Exchange Class to include the same persons that "entered into one or more FX Instruments on a U.S. exchange"); Third Amended Complaint, Dkt. No. 619 at ¶ 67, 68 (same). Because the *In re Forex* class action involved similar claims based on similar evidence, *American Pipe* tolling as to those claims is appropriate.[18]

---

[17] Because claims based on transactions with non-defendants where Plaintiffs were allegedly injured due to Defendants' manipulation of the bid-ask spreads were dismissed in section II.B.1.a, this Opinion does not address whether claims based on those transactions are timely.

[18] Defendants assert in their reply that claims brought by foreign-domiciled Plaintiffs not transacting in the U.S. are time-barred because they were not asserted in *In re Forex*. Defendants are correct that *In re Forex* has not included such trades. But the "location" of a transaction is ambiguous, see *Forex II*, 2016 WL 5108131, at *12, and Defendants fail to explain to what transactions they are referring in light of Plaintiffs' exclusion of claims premised on transactions on a foreign exchange, transactions between a foreign plaintiff and a Defendant's foreign desk, and trades in Europe. *See* SAC at ¶ 1 n.1.

### C.  Claims Based on Pre-December 2007 Transactions

Defendants argue that the Complaint's allegations that the conspiracy was ongoing before December 2007 -- and as early as 2003 -- are insufficiently pleaded because the Complaint alleges no interbank communications at all prior to 2005, and the communications that allegedly occurred between January 4, 2005 and November 2007 do not support that the conspiracy existed during that time. These arguments are without merit. The Complaint alleges extensive economic analyses and sufficient chats that, in combination with the allegations regarding a conspiracy existing between 2008-2013, support a reasonable inference that the conspiracy began as early as 2003.

To plead a conspiracy in violation of Section 1 of the Sherman Act, a complaint must allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 550 U.S. at 556. This does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. When pleading an antitrust conspiracy, a plaintiff may (1) "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws"; or (2) "present circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original). Under the latter method, "a bare allegation of parallel conduct is not enough to survive a motion to dismiss," and where "a plaintiff alleges additional facts or circumstances—what we have previously called 'plus factors'—these facts must still lead to an inference of conspiracy." *Id*. at 137.

The Complaint sufficiently alleges collusive conduct between 2003 and 2007. First, the Complaint describes fifteen chat transcripts from between January 2005 to 2007 obtained in

discovery "that managed to slip into the production" despite discovery having been limited to documents that post-date December 2007. Defendants challenge five of these chats as inaccurately characterized and not supportive of Plaintiffs' alleged conspiracy. However, the alleged chats taken together plausibly suggest "that more than a harmless exchange of information was occurring. . . Even if these conversations themselves did not set spreads or fixes, the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage." *Forex II*, 2016 WL 5108131, at *4. The Complaint also includes roughly fifty pages of economic analysis that purports to analyze different types of data across different time periods and demonstrate that as far back as 2003, a conspiracy existed to manipulate both the benchmark rate[19] and the bid/ask spreads.[20]

---

[19] Examples of the analysis relating to alleged benchmark manipulation include (1) analysis of the price movements of twenty-eight of the most frequently traded currency pairs between 2003-2013 around the setting of the WM/Reuters Closing Rate (519) that purports to show manipulation of the rate over 35% of the time both between 2007-2013 and 2003-2007, *see* SAC at ¶¶ 519-529; and (2) analysis comparing the coefficient of variation of FX spot quotes for the two minute period around the WM/Reuters Closing Rate fixing (i.e., between 3:59 p.m. and 4:01 p.m. London time) between Defendants and everyone else that purports to show that Defendants' quotes were significantly more clustered together than non-defendants' quotes from 2003 to 2013, and that the relatively high level of clustering of Defendants' quotes was even higher in the 2003 to 2007 period than it was during the 2008 to 2013 period, *see* SAC at ¶¶ 530-35.

[20] Examples of the analysis relating the alleged manipulation of the bid/ask spreads includes (1) analysis of the average size of bid/ask spreads in the FX spot market across major currency pairs from 2003 to 2018 that purports to show that bid/ask spreads were "substantially and consistently larger throughout 2003 to 2013 than they were after [2013]" and "that the same (and oftentimes *greater*) signs of bid/ask spread manipulation are seen in the 2003 to 2007 period, as in the 2008 to 2013 period that the court in *In re FX* has already upheld." SAC at ¶¶ 610-17. In connection to this analysis, Plaintiffs provide graphs showing the average size of spreads for spot transactions in AUD/USD, *see* SAC at ¶ 611, EUR/USD, *see* SAC at ¶ 612, CAD/USD, *see* SAC at ¶614, and GPB/USD, *see* SAC at ¶ 615, (among others) for 2003 to 2007, 2008 to 2013, and 2014 to 2018 that purport to demonstrate that bid/ask spreads were substantially wider in 2008 to 2013 than they were in 2014 to 2018 and that bid/ask spreads were "*even greater still* in 2003 to 2007." (2) Plaintiffs "measured the predictability of bid/ask spreads on a daily basis, from 2003 to 2018" and purportedly found that bid/ask spreads were "far more predictable on daily basis from 2008 to 2013 than they were in 2014 to 2018" and that "bid/ask spreads were more consistent from 2003 to 2007 than in 2014 to 2018—and for several currency pairs, even *more* consistent than they were in 2008 to 2013." SAC at ¶¶ 619-620.

Defendants challenge these analyses as "generalized summaries of certain commissioned economic opinions purporting to show anomalous price behavior." But, "[a]t this level of particularity, the statistical analysis is not a conclusory assertion; it is a factual allegation that the Court must credit." *Dover v. British Airways, PLC (UK)*, No. 12 Civ. 5567, 2014 WL 317845, at *2 (E.D.N.Y. Jan. 24, 2014) (finding that plaintiffs' statistical analysis rendered the claim plausible because it was "sufficiently probative of the elements of that claim.").

Most significantly, although "[c]ourts have dismissed claims that are outside part of a claimed class period where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged," *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 00042, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015), the allegations relating to the years 2003 to 2007 cannot be viewed in isolation from the conspiracy in existence from December 2007 through 2013. Rather, "in antitrust cases [on a motion to dismiss], 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.'" *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). "[A] well-pleaded complaint may proceed even if actual proof of those facts is improbable, and a recovery is very remote and unlikely as long as the complaint presents a plausible interpretation of wrongdoing." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 659 (S.D.N.Y. 2016) (alterations omitted). To plead a conspiracy in violation of Section 1 of the Sherman Act, a complaint need only include "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Precision Assocs., Inc.*, 2015 WL 4987751, at *3 (quoting *Twombly,* 550 U.S. at 556). Plaintiffs have more than met that

standard here because the economic analyses, combined with the specific allegations against individual Defendants in the later years, are sufficient to plausibly allege a conspiracy beginning as early as 2003. *See, e.g., In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d at 563 (finding plaintiffs plausibly alleged conspiracy based in part on economic analysis, and noting that "disregarding all such analyses here would effectively foreclose [p]laintiffs' ability to state an antitrust claim for manipulation of the Silver Fixing unless they had direct evidence, which is generally not required at the pleading stage.").

Defendants argue that Plaintiffs "anchored" their claims to the regulatory investigations cited in the Complaint and therefore need to explain why the regulators made no findings of misconduct before 2007. But the Complaint's citation to regulatory investigations does not restrict the Complaint to the investigatory conclusions, particularly where none of the investigations precludes a finding that the conspiracy existed prior to December 2007. Defendants' objection that the economic analysis does not show conduct by any specific defendant is also not persuasive in light of the nature of conspiracies and where the Complaint alleges Defendant-specific conduct for nine of the eleven years. *See In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 659 ("Because conspiracies nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators, the Court cannot take [p]laintiffs' failure to present direct evidence as a sign that no conspiracy existed." (internal quotation marks omitted)). Defendants' final argument that Plaintiffs "have not alleged facts sufficient to aver an overarching, widespread conspiracy throughout the early period encompassing every currency pair, every instrument, and every day," also fails because it sets too high standard at the pleading stage. *See Forex II*, 2016 WL 5108131, at *4 ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later

in litigation, but do not merit dismissal at this phase.")[21]

### D.    Unjust Enrichment Claim

Defendants' motion to dismiss the unjust enrichment claim is denied.  First, Defendants

argue that the Complaint fatally fails to identify the jurisdiction(s) whose laws govern the unjust

enrichment claim.  "The Court is persuaded that such identification is not necessary at the

pleading stage because the elements of unjust enrichment are similar in every state," and

"defendants have made no showing that any differences in the various state laws are material at

this early stage of the litigation."  *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729-30

(S.D.N.Y. 2017) (internal quotation marks omitted); *accord In re Credit Default Swaps Antitrust

Litig.*, No. 13 MD 247 6, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014).[22]

Second, Defendants argue that the unjust enrichment claim must be dismissed where

written contracts -- the ISDA Master Agreements -- govern foreign exchange transactions

between the parties.  But "[a] valid contract defines the obligations of the parties as to *matters

within its scope*, displacing to that extent any inquiry into unjust enrichment."  Restatement

---

[21] Defendants' caselaw is also inapposite, as the claims in Defendants' cited cases were dismissed for time periods during which plaintiffs made no specific factual allegations. *See, e.g.*, *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 00042, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015) ("Here, plaintiffs allege no overt acts later than May 2007."); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2018 WL 1276869, at *4 (S.D.N.Y. Mar. 12, 2018) ("Because the TAC contains no specific allegations of conspiratorial activity after 2013 and the attached documents suggest that the conspiracy ended in 2013 at the latest, [p]laintiffs' claims extending after December 31, 2013, are dismissed.").

[22] Defendants cite *Hines v. Overstock.com, Inc.*, No. 09 Civ. 991, 2013 WL 4495667, at *12 (E.D.N.Y. Aug. 19, 2013), where the court dismissed an unjust enrichment claim for failure to plead and noted, citing out-of-circuit caselaw, that it could not "simply presume that unjust enrichment claims are substantially identical across the country."  *Id.*  In contrast, here Plaintiffs cite to two persuasive cases where Judge Rakoff and Judge Cote found otherwise.  *See In re Propranolol Antitrust Litigation*, 249 F. Supp. 3d 712, 729-30 (S.D.N.Y. 2017); *In re Credit Default Swaps Antitrust Litig.*, No. 13 MD 247, 2014 WL 4379112, at *18 (S.D.N.Y. Sept. 4, 2014).  This Opinion finds the more recent Southern District of New York rulings to be more persuasive.

(Third) of Restitution and Unjust Enrichment § 2 (2011) (emphasis added); *see, e.g., Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *Murray Eng'g P.C. v. Remke*, No. 17 Civ. 6267, 2018 WL 3773991, at *11 (S.D.N.Y. Aug. 9, 2018) ("Dismissal of an unjust enrichment claim for duplication is only warranted where 'the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties[.]'" (quoting *Clark-Fitzpatrick*, 516 N.E.2d at 193)).  However, where Plaintiffs allege a manipulation of the market overall, such conduct is not governed by ISDA Master Agreements because it does not arise out of the subject matter of the agreements.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014) ("[A]lthough the swap contracts clearly required defendants to pay plaintiffs the prescribed floating rate of return using the LIBOR reported by the BBA, the contracts did not 'clearly cover[ ]' the subject matter now at issue, namely whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs.").[23]

Finally, Defendants argue that the unjust enrichment claim is untimely because an unjust enrichment claim was not brought in the *In re Forex* original class action.  This argument is unpersuasive.  The Second Circuit has stated that it

do[es] not regard the fact that the [original class action] was premised on different

---

[23] As Plaintiffs observe, the one case that Defendants cite to the contrary involved plaintiffs who themselves argued that the contracts applied.  *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263, 2017 WL 3600425, at *15 (S.D.N.Y. Aug. 18, 2017) ("FrontPoint alleges that it entered into binding and enforceable contracts with [d]efendants Deutsche Bank and Citibank in connection with transactions for SIBOR-based derivatives, and that each contract includes an implied covenant of good faith and fair dealing [that was breached]." (internal quotation marks omitted)).

legal theories as a reason not to apply *American Pipe* tolling . . .  Indeed, limiting *American Pipe* tolling to the identical 'causes of action' asserted in the initial class action would encourage and require absent class members to file protective motions to intervene and assert their new legal theories prior to class certification, thereby producing the very results the New York courts seek to prevent by such tolling, *i.e.,* "court congestion, wasted paperwork and expense."

*Cullen v. Margiotta*, 811 F.2d 698, 721 (2d Cir. 1987), *overruled on other grounds, Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143 (1987); *accord MYL Litig. Recovery I LLC v. Mylan N.V.*, No. 19 Civ. 1799, 2020 WL 1503673, at *7 (S.D.N.Y. Mar. 30, 2020) ("[S]ubsequent precedent has clarified that the Second Circuit do[es] not regard the fact that [a class] action was premised on different legal theories as a reason not to apply *American Pipe* tolling to save the claims of class members." (alterations in original)).[24]  Defendants' cases are not in conflict, because they involve plaintiffs' attempting to raise new factual theories.  *See Friedman v. JP Morgan Chase & Co.*, No. 15 Civ. 5899, 2016 WL 2903273, at *9 (S.D.N.Y. May 18, 2016), *aff'd*, 689 F. App'x 39 (2d Cir. 2017) (finding the new, at-issue claim not to be "substantially similar" to the original claims); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 303 (S.D.N.Y. 2014) ("Here, there can be no tolling . . . [because] [c]laims based on unregistered derivative transactions, such as SRM's Bear Stearns Swaps, are fundamentally different from the claims asserted in the Class Action for common stock traded on the New York Stock Exchange."), *aff'd sub nom. SRM Glob. Master Fund Ltd.*

---

[24] Defendants argue that since "a federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction," *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011), the unjust enrichment claim again must fail because it does not identify which state provides the governing law. Because it is not clear from the face of the Complaint that dismissal for lack of timeliness is warranted, that argument is rejected at this early stage of the litigation.  *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 64–65 (S.D.N.Y. 2016) (where plaintiffs did not specify the state law under which they brought unjust enrichment claims, "and at least some [p]laintiffs' unjust enrichment claims would likely survive based on the more permissive law in their domiciles," the Court declined to dismiss without prejudice to renewal on summary judgment).

*P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173 (2d Cir. 2016). Here, Plaintiffs' unjust enrichment claim rests on the same factual theories as the class action claims, and Defendants' conclusory statements[25] to the contrary do not compel an alternative finding.

### E.   Forum Non Conveniens

Defendants argue for dismissal of Plaintiffs' claims that are covered by forum selection clauses designating the courts of England as the exclusive jurisdiction. This argument is unpersuasive, and Defendants' motion to dismiss for *forum non conveniens* is denied.

Defendants have filed in support of their motion several ISDA Master Agreements,[26] each of which includes provisions similar or identical to the following:

> The English Courts will have exclusive jurisdiction to settle any dispute or claims which may arise out of or in connection with the Agreement for which purpose all parties agree to submit to such jurisdiction.

Other exemplar agreements filed use language such as "any suit, action or proceedings relating to this Agreement." Plaintiffs do not dispute the existence of such contracts or that they may be considered for purposes of this motion. *See Universal Grading Service v. eBay, Inc.*, 2009 WL 2029796, at *10 (E.D.N.Y. 2009) ("In considering a 12(b)(3) motion, courts may review materials outside of the pleadings." (citing cases)).

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atlantic Marine Const. Co., Inc. v. U.S.*

---

[25] Defendants assert in footnotes that "to adequately plead an unjust enrichment claim, Plaintiffs would need to allege additional facts that were not alleged in" *In re Forex*, and that the unjust enrichment claim is not based on the same factual theory as the claims brought there because the claims brought in *In re Forex* "do not involve quasi-contract or even contract theories of liability." But Defendants do not explain what additional allegations would be necessary or how the unjust enrichment claim is based on different facts, and accordingly these arguments are rejected.

[26] Defendants note that it is difficult to identify the specific agreements covering Plaintiffs' transactions because Plaintiffs have not yet identified the specific transactions on which they bring claims.

*Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 60 (2013).  The Second Circuit summarized

the appropriate analysis as to the enforcement of a forum selection clause in a four-part test in

which the court determines:

> (1) whether the clause was reasonably communicated to the party resisting
> enforcement; (2) whether the clause is mandatory or permissive, i.e., whether the
> parties are required to bring any dispute to the designated forum or simply
> *permitted* to do so; and (3) whether the claims and parties involved in the suit are
> subject to the forum selection clause.  If the forum clause was communicated to
> the resisting party, has mandatory force and covers the claims and parties
> involved in the dispute, it is presumptively enforceable.  A party can overcome
> this presumption only by (4) making a sufficiently strong showing that
> enforcement would be unreasonable or unjust, or that the clause was invalid for
> such reasons as fraud or overreaching.

*Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (alterations, quotation marks and

citations omitted).  Plaintiffs dispute the third and fourth elements, arguing that the claims

brought are not subject to the forum selection clause and that forcing litigation of the claims in

England would result in inefficiencies, inequities and inconsistencies.  The fourth element need

not be reached, as the claims are not subject to these forum selection clauses.

      In the exemplar agreements' forum-selection provisions identified by Defendants, three

different phrases are used to define the scope of the provision -- "arise out of," "in connection

with" and "relating to."  First, with respect to the phrase "arise out of," the Second Circuit has

found that, "[t]o decide whether [a plaintiff's] claims arise out of the agreement, we are []

required to determine if [the plaintiff's] rights . . . originate from the [] contract." *Phillips v.

Audio Active Ltd.*, 494 F.3d 378, 390 (2d Cir. 2007).  "To 'arise out of' . . . generally indicates a

causal connection." *Id.* at 389.  "[W]hen ascertaining the applicability of a contractual provision

to particular claims, we examine the substance of those claims, shorn of their labels." *Id.* at 388.

Here, Plaintiffs' rights originate from the Sherman Act and principles of equity, not the ISDA

Master Agreement, and assert antitrust and unjust enrichment claims, not contractual claims.  As

there is no causal connection between the claims and the terms of the contract, any forum

selection provision applicable to claims arising out of the ISDA Master Agreements does not

apply to Plaintiffs' claims here, and the motion to dismiss based on such provisions is denied.

*See, e.g., In re Optimal U.S. Litigation*, 813 F.Supp.2d 351, 366 (S.D.N.Y. 2011) ("[T]he dispute

does not center on, *e.g.,* [plaintiff's] 'right' to those fees *under the* [contract].").

    Other exemplar forum selection provisions use the terms "in connection with" or

"relating to."  The Second Circuit has described these two terms as "equivalent" to each other,

*see Coregis Ins. Co. v. American Health Foundation, Inc.*, 241 F.3d 123, 128–29 (2d Cir. 2001),

and "broader in scope than the term 'arising out of.'"  *Id.* at 129; *see also Phillips,* 494 F.3d at

389-90 (applying the *Coregis* court's interpretation to forum selection clauses).

> The term "related to" is typically defined more broadly and is not necessarily tied
> to the concept of a causal connection.  Webster's Dictionary defines "related"
> simply as "connected by reason of an established or discoverable relation."  The
> word "relation," in turn, as "used esp[ecially] in the phrase 'in relation to',," is
> defined as a "connection" to or a "reference" to.

*Coregis Ins. Co.*, 241 F.3d at 128.

    Courts in this district have not had many opportunities to analyze whether claims of

market manipulation "relate to" agreements governing transactions between the parties for

purposes of forum selection.  Judge Buchwald addressed the question in the context of personal

jurisdiction in a case alleging manipulation of the London Interbank Offer Rate ("LIBOR").  *See*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*Libor I*"), No. 11 MDL 2262, 2015 WL

6243526 (S.D.N.Y. Oct. 20, 2015), *on reargument in part*, No. 11 MD 2262, 2016 WL 1301175

(S.D.N.Y. Mar. 31, 2016); *see also re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*Libor*

*II*"), No. 11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).  There, the plaintiffs

brought, *inter alia*, claims under the Sherman Act and for unjust enrichment, and there existed

ISDA Master Agreements governing the plaintiffs' swap agreements with defendants with forum

selection provisions that applied to claims "relating to" the agreement.  *See Libor I*, 2015 WL 6243526, at *34; *Libor II*, 2016 WL 7378980, at *12.  Judge Buchwald found this sufficient to find personal jurisdiction over signatory defendants as to the plaintiffs' unjust enrichment claims, *see Libor I*, 2015 WL 6243526, at *34 ("Here, claims brought against counterparties in their capacity as counterparties relate to the ISDA Agreements, even if they sound in unjust enrichment or fraud in the inducement, because they depend upon the existence of a contractual relationship between the parties."), but insufficient to find jurisdiction over Plaintiffs' state antitrust claims.  *See Libor II*, 2016 WL 7378980, at *12 ("The claim must relate to the particular contractual relationship. . . . [W]e will not uphold jurisdiction over a counterparty for antitrust claims simply on the basis of a forum selection clause.").  Similarly, Judge Broderick found that a defendant had not consented to personal jurisdiction over Sherman Act and unjust enrichment claims under a forum selection clause, where the clause applied to claims "relating to this Agreement" (which governed the plaintiffs' purchases of interest rate swaps) and the claims alleged manipulation of LIBOR.  *See Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 561 (S.D.N.Y. 2018) ("These terms expressly limit the parties' consent to claims 'relating to this Agreement.'  The language does not extend to consent to jurisdiction as to any dispute between the parties.").

Defendants argue that that these cases are distinguishable because they "involved narrower forum selection clauses (e.g., 'any suit, action or proceedings relating to this Agreement'), as opposed to the broader clauses at issue here (e.g., 'any dispute arising out of or in connection with this Agreement')."  But that is exactly the reverse of the law in this circuit. *See Phillips*, 494 F.3d at 389 ("We do not understand the words 'arise out of' as encompassing all claims that have some possible relationship with the contract, including claims that may only

"relate to," be "associated with," or "arise in connection with" the contract."); *Coregis Ins. Co.*, 241 F.3d at 128 (observing that the term "related to" is "typically defined more broadly" than "arising from"); *accord ESI Cases & Accessories, Inc. v. Home Depot Prod. Auth., LLC*, No. 18 Civ. 11507, 2019 WL 4256364, at *3 (S.D.N.Y. Sept. 9, 2019).

The opinions of Judge Buchwald and Judge Broderick are persuasive on this issue. Plaintiffs' allegations of an international conspiracy among Defendants relating to the foreign exchange market are not "related to" contracts governing the terms of foreign exchange transactions between the parties.  Indeed, Plaintiffs brought claims based on transactions with non-defendants against Defendants, which are dismissed herein in part solely due to untimeliness.  Although the terms "related to" and "in connection to" may be broader than the term "arising out of," they do not extend to "any dispute between the parties." *Sonterra Capital Master Fund, Ltd.*, 366 F. Supp. 3d at 561.  Here, Plaintiffs' claims do not "depend on the existence of a contractual relationship between the parties," *Libor I*, 2015 WL 6243526, at *34, and, accordingly, Defendants' motion to dismiss on this basis is denied.

## F.    Miscellaneous

Finally, the motion makes two arguments in footnotes: (1) that the Complaint does not contain sufficient allegations against Defendant SG Americas Securities LLC and SG Americas Securities LLC should therefore be dismissed; and (2) that certain Plaintiffs did not opt out of the *In re Forex* class action, and should therefore be dismissed with prejudice.  Defendants' arguments are persuasive and the motion to dismiss is granted as to these two issues.

As to the first argument, the Complaint alleges a single chat in which SG Americans Securities LLC participated: a 2009 chat with a Credit Suisse entity trader in which the traders described some of the trades in which they were engaging, including "what [they had] at the fix."

38

*See* SAC at ¶ 221 n.78.  The chat does not mention spreads or implicate manipulating the

benchmark.  Plaintiffs argue that "once a conspiracy is shown, only slight evidence is needed to

link another defendant with it," *In re Currency Conversion Fee Antitrust Litig.*, No. 05 Civ. 7116

WHP, 2012 WL 401113, at *4 (S.D.N.Y. Feb. 8, 2012), but fails to note that "[p]laintiffs must

provide evidence 'pertaining to each defendant' to demonstrate that the defendant participated in

the conspiracy."  *Id.*  This single chat is insufficient, on its own, for the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at

678.  Accordingly, SG Americas Securities LLC is dismissed.

     As to the second argument, Defendants identify four Plaintiffs that they claim did not opt

out of the class action: Allianz Funds, Allianz Funds Multi-Strategy Trust and AllianzGI

Institutional Multi-Series Trust are trusts that hold funds that opted out and, per the Complaint,

were included as plaintiffs "in an abundance of caution."  Carne Global Fund Managers (Ireland)

Limited purportedly "took over management responsibilities for the relevant FX instruments" of

an entity that opted out.  Plaintiffs argue that "[t]he requests for exclusion by the underlying

funds and affiliate were, at the very least, a reasonable indication of a desire to opt out, which is

all that is required.  [T]these claims should not be deemed released merely because the request

for exclusion did not pre-specify how the caption to this case would look."  Plaintiffs are correct

that "[a]ny reasonable indication of a desire to opt out should suffice."  *McReynolds v. Richards-

Cantave*, 588 F.3d 790, 800 (2d Cir. 2009); *accord In re Sunedison, Inc. Sec. Litig.*, No. 16 MD

2742, 2018 WL 2356663, at *3 (S.D.N.Y. May 1, 2018).  However, "the burden [is] on the class

member to establish that he or she made a sufficient effort to communicate an intent to opt out

through the appropriate channels. The class member must show that notice was effectively and

timely communicated."  *In re Sunedison, Inc. Sec. Litig.*, 2018 WL 2356663, at *3 (quoting *In re*

*WorldCom, Inc. Securities Litigation*, 2005 WL 1048073, at *4 (S.D.N.Y. May 5, 2005)). Plaintiffs do not allege that Allianz Funds, Allianz Funds Multi-Strategy Trust and AllianzGI Institutional Multi-Series Trust opted out, only that the funds they hold opted out.  Similarly, Plaintiffs do not allege that Carne Global Fund Managers (Ireland) Limited opted out, but rather that it now manages FX instruments for another entity that opted out.  This is not sufficient to show that notice was "effectively and timely communicated" that these Plaintiffs opted out.  *In re Sunedison, Inc. Sec. Litig.*, 2018 WL 2356663, at *3.  Accordingly, these Plaintiffs are dismissed.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED and the Sherman Act claim is narrowed to exclude the following: claims based on algorithmic-based transactions on Defendants' single-dealer platforms where the algorithm used trading data that was purportedly corrupted by the alleged manipulation of other trades; claims against Barclays PLC, J.P. Morgan Securities LLC and Royal Bank of Canada premised on benchmark manipulation; and claims based on transactions with non-defendants.  Defendants motion is also GRANTED as to claims asserted by Plaintiffs Allianz Funds, Allianz Funds Multi-Strategy Trust, AllianzGI Institutional Multi-Series Trust and Carne Global Fund Managers (Ireland) Limited; and as to claims asserted against Defendant SG Americas Securities LLC.  Defendants' motion is otherwise DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket Nos. 236 and 307.

Dated: May 28, 2020
       New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

40