quinn emanuel trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S EMAIL ADDRESS
**danbrockett@quinnemanuel.com**

July 14, 2020

**VIA ECF**

The Honorable Stewart D. Aaron
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY  10007

*Allianz Global Investors GmbH, et al. v. Bank of America Corp., et al.*, 1:18-cv-10364-LGS

Dear Magistrate Judge Aaron:

Pursuant to Your Honor's instructions at the June 24, 2020 status conference in this case, we respectfully submit this letter concerning two discovery disputes that have arisen between the parties.[1]

*Basic Custodial Information*

Plaintiffs respectfully request an order compelling the Deutsche Bank Defendants ("Deutsche Bank") to provide certain basic information about the custodians whose ESI it collected as part of Deutsche Bank's prior productions to government regulators and class plaintiffs in a related action.  Specifically, Plaintiffs seek the custodians' names, job titles, dates of employment, locations, and a brief description of job responsibilities.  This information is critical to the parties' upcoming negotiations over custodians and search terms for the document productions that are required to be substantially completed by October 16, 2020.[2]

---

[1]  The third dispute discussed at the June 24 hearing relating to Citi's audio files was resolved.

[2]  In addition to the exchange of several written correspondence and phone calls, the parties participated in a final telephonic meet and confer on July 13, 2020 at 2:00 pm EST.  Johanna Ong, Matt Hosen, and Razmig Izakelian participated on behalf of Plaintiffs and Patrick Montgomery, Nicole Pereira, and Joseph Zales on behalf of Deutsche Bank.  The call lasted about an hour.  Deutsche Bank's position during the conference was that it would provide custodial information for only a subset of the prior custodians (35 out of 300) because it would take an "extraordinary" amount of time to collect the requested information for all prior custodians, the burden was "disproportionate," and the vast majority of the prior custodians do not have relevant documents because their documents relate to "unilateral conduct."  Plaintiffs informed Deutsche Bank, and Deutsche Bank agreed, that the parties were at an impasse and Plaintiffs would bring a letter motion.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

Like other Defendants, Deutsche Bank's productions to date have been limited primarily to re-producing to Plaintiffs the documents that Deutsche Bank previously produced to regulators and to class plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 1:13-cv-07789 (LGS) ("*FOREX*"). Plaintiffs of course were not involved in those cases and so do not have this basic custodian information. The parties are about to begin negotiations over custodians for new productions targeted to the specific allegations in this case. As part of these discussions, Plaintiffs have agreed to provide this basic information for their own custodians and so have other Defendants.[3] Deutsche Bank argues it should be given special treatment because the requested information is both purportedly irrelevant and unduly burdensome on the Bank.

As Deutsche Bank acknowledges, parties routinely agree to exchange this type of basic information given it requested this information from Plaintiffs. Indeed, the custodial information is particularly relevant here because it will help the parties determine the extent to which prior productions do not fully address the claims in this case. For example, the government investigations and FOREX class action did not include the so called "early period" between 2003-2007, which is now part of this case in light of the Court's May 28, 2020 ruling. As a consequence, prior productions generally do not include materials from this "early period." We need to know which of the Deutsche Bank custodians were employed in FX trading in this "early period" in order to identify which custodians to request as part of additional document collections. The information is also helpful to understand whether Deutsche Bank previously collected documents only from certain types of custodians (e.g., traders) versus sales associates and senior managers who may have been complicit in a policy to manipulate the FX markets. To the extent there were no such custodians included in prior collections, that may counsel towards including them to plug a gap in this case. It will also be helpful to understand where prior custodians were located, which is relevant for purposes of an analysis under the Foreign Trade Antitrust Improvements Act. This rudimentary information is all the more important because the parties have not yet exchanged Rule 26(a)(1) disclosures.

Deutsche Bank cannot credibly claim that gathering this basic information will be unduly burdensome or disproportionate to the needs of the case. We are talking only about a list of names and basic employment information. Plaintiffs and all other Defendants have agreed to provide this information for their custodians. Deutsche Bank suggests it should be permitted to withhold the information nonetheless because many of the custodians are salespersons with no relationship to Plaintiffs.[4] Deutsche Bank also asserts that many of the regulatory custodians were not involved in "multilateral" (multibank) conduct, and that their files were collected and produced in connection with unilateral conduct. It pointed to a "partial fill"—which is when some but not all of a trade order is filled—as an example of such unilateral conduct. But Deutsche Bank has not provided any specifics on who those purportedly irrelevant custodians are. More importantly, even if it is true that some of the custodians are irrelevant for the

---

[3] In its latest correspondence, Deutsche Bank has offered to provide custodial information for only 35 prior custodians but only if Plaintiffs agree to forego custodial information for the other 265+ custodians. Ex. A (July 8, 2020 Letter from Patrick Montgomery to Matt Hosen).

[4] *See* Ex. A (July 8, 2020 Letter from Patrick Montgomery to Matt Hosen).

purposes of this action, Deutsche Bank appears to have already gathered much of the requested information, and there is no burden in turning it over so Plaintiffs can evaluate Deutsche Bank's claims of irrelevance.

Deutsche Bank also argues that gathering information for 300 custodians is burdensome *per se*. Providing a list of 300 already-gathered names is definitely not a burden in a case of this magnitude. But even if it were, Deutsche Bank has not specified this alleged burden including detailing costs or time. *See, e.g.*, *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016) ("Vale 'cannot merely assert that compliance with the subpoena would be burdensome without setting forth the manner and extent of the burden and the probable negative consequences of insisting on compliance.'"); *Hemming v. Alfin Fragrances, Inc.*, 1989 WL 223068, at *1 (S.D.N.Y. Aug. 14, 1989) (defendants' burden claim "is entirely unsupported by evidence. The conclusory invocation of this objection … plainly does not meet defendants' burden of proof."). Indeed, because Deutsche Bank already identified these individuals as custodians in its prior productions, it presumably has the information readily available. How else can Deutsche Bank say that certain custodians are not relevant to this action?[5]

Deutsche Bank also asserts that it should be required to provide this information only for new custodians that the parties may agree upon for new productions – but not for its prior productions, even if they were eventually re-produced to Plaintiffs here. But this is upside down. The parties cannot meaningfully discuss the number and identity of supplemental custodians until they have information about the job titles, responsibilities, and dates of employment of the prior custodians. *See* Ralph, M. & Sweeney, C., E-Discovery and Antitrust Litigation, *Antitrust Magazine*, Vol. 26, No. 1 (Fall 2011) ("Negotiating a limit on the number of custodians typically requires the producing party to disclose information about the job responsibilities and functions of various employees during the relevant period.").[6] That information is essential to identifying the gaps in Defendants' previous productions and the identity and number of supplemental custodians needed to fill those gaps.[7]

For the reasons stated above, Plaintiffs respectfully request that the Court compel Deutsche Bank to promptly provide the names, job titles, dates of employment, location, and to the extent reasonably available, a brief description of the job responsibilities of each of the custodians included in the prior productions they have reproduced in this case.

---

[5] Additionally, while Deutsche Bank asserts there are over 300 prior custodians, its document productions reveal only 209 unique custodians. This disconnect underscores Plaintiffs' need for information concerning all custodians so that it can determine any gaps in the productions to date.

[6] The cited article is available at http://files.dorsey.com/files/upload/ralp_sweeney_antitrust_magazine_12-15-11.pdf.

[7] Deutsche Bank has suggested that because it provided the names of custodians included in their previous document productions in *FOREX*, it gave Plaintiffs a "starting point" from which Plaintiffs can piece together the remaining information. But the names of the custodians included in the previous document productions do not provide any "starting point" to determine the roles of those custodians, their job duties, their locations, or the beginning or end dates of their employment. The only information Plaintiffs can gather is the date ranges of custodial emails from the previous productions.

*Plaintiff Name Searches*

Plaintiffs also respectfully request an order compelling Bank of America, Deutsche Bank, Goldman Sachs, Standard Chartered, and UBS to run Plaintiff name search terms across all custodial documents previously collected in prior regulatory investigations and related actions, and to provide hit counts for each prior custodian.

Defendants previously collected documents from a number of employees who were identified as relevant custodians by government regulators and the FOREX class plaintiffs.  Some of these documents were produced to regulators and the FOREX plaintiffs, and then later to Plaintiffs here.  But many others were not produced to us.  As to this latter subset of already-gathered-but-not-produced documents, we asked Defendants to run test searches for documents specifically mentioning our Plaintiffs (for example, "PIMCO," "BlackRock," "Allianz," etc.) and to provide hit reports on a per custodian basis.  We did so in an effort to evaluate (1) whether these documents should be produced, and (2) which custodians the parties should use for purposes of additional productions.  We first requested these hit reports in June 2019.  But to date, certain Defendants (including Deutsche Bank, Goldman Sachs, Standard Chartered, and UBS) have refused to provide them, and Bank of America has refused to provide hit reports on modified terms on a custodian-by-custodian basis.  This leaves us no option but to seek Court intervention.  There is no valid basis for these Defendants' refusal to provide hit reports specifically mentioning the named Plaintiffs here.  These are FX-related materials of custodians involved in FX trading that have already been collected and are readily available.

*First*, there is no dispute that Plaintiff names are appropriate terms to run over Defendants' already-collected FX-related documents.  This is particularly true in a case where Defendants are alleged to have shared sensitive customer information (including customer names) among themselves as part of their price fixing scheme.  Defendants demanded and we agreed to run Defendants' names as part of Plaintiffs' test search terms, and there is no reason why Plaintiff names are any less relevant.

*Second*, Defendants themselves have argued to the Court that there is no burden to running search terms.  During the May 7, 2020 hearing, Defendants told the Court that "while there may be burden in actually reviewing documents, *there is no burden in simply getting a hit count.  It's standard practice.  You get hit counts; you negotiate off those. That's how it works.*" 5/7/20 Hearing Tr. at 21:9-13.  Based on Defendants' argument, the Court ordered Plaintiffs to provide hit counts even on search terms Plaintiffs contended were overbroad and likely to result in an inordinate number of false hits.  ECF 393 ("[W]ith respect to the dispute concerning search terms, Plaintiffs shall run the disputed search terms and share the hit counts with Defendants.").  The same rule should apply equally to Defendants.

*Third*, several of the Defendants who are refusing  to provide hit count reports have failed to provide any support for their claims of undue burden.  UBS, for example, claims it would be

4

burdensome to provide hit counts because it had 95 prior custodians.[8] But it could not specify how many manhours it would actually take the Bank to run the terms. Nor could UBS explain why it is differently situated than other Defendants who have far more custodians but who nonetheless agreed to provide hit count reports. Barclays, for example, agreed to provide reports for over 230 prior custodians. A blanket claim of burden should not be a basis to withhold this clearly relevant information. *See, e.g.*, *Hemming*, 1989 WL 223068, at *1 ("As for defendants' claim of burden, it is entirely unsupported by evidence. The conclusory invocation of this objection … plainly does not meet defendants' burden of proof.").

Goldman Sachs, for its part, claims that running the hit reports will take 40-60 hours "or more" and cost $10,000 in monthly hosting fees "or more."[9] For a company the size of Goldman with annual profits of over ***eight billion dollars***, these costs are negligible. They are neither an undue burden, nor disproportionate to the needs of a case, given the magnitude of the injury. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering … "the amount in controversy" and "the parties' resources."); *McCutcheon v. Colgate-Palmolive Co.*, 2017 WL 5466668, at *3, 5-6 (S.D.N.Y. Oct. 19, 2017) (granting plaintiff's motion to compel production of documents where defendant was a "$15 billion *Fortune 500* company" and the amount in controversy was $150 million). In fact, Defendants have made numerous discovery requests of Plaintiffs that require time and expense well in excess of the burden Goldman now complains is undue. For example, Plaintiffs spent over 45 hours searching for just one type of report Defendants requested, ECF 386, and over 90 hours identifying portfolio managers for just one Plaintiff group. ECF 385.

As to Deutsche Bank, it claims it would be "extraordinarily costly" to provide hit counts "for more than 300 regulatory custodians," because their documents are stored on "multiple databases" and "large portions" of these databases are archived. Deutsche Bank claims there are 18 terabytes of previously collected documents for these prior custodians, and the costs to host the data alone is $200,000 a month. But it is not clear that the hosting fees are necessary for running test searches – as it is possible to restore most eDiscovery databases and related indices without restoring all related, native and image files. Restoring only the database-related files would allow text and metadata searches on the full corpus at a fraction of the cost to restoring all related files. Further, Deutsche Bank has not indicated whether it explored other more cost effective solutions to conduct these test searches including, for example, buying the review software themselves to eliminate the hosting costs.

To the extent there are certain terms Defendants believe will result in an unreasonable number of false hits, we are of course willing to discuss these matters. We have already told Defendants we are willing to tailor certain terms, including applying limiters to exclude certain Plaintiff/Defendant chats that the Court previously ruled need not be produced. For example, Bank of America ("BofA") previously ran the Plaintiff name terms across all prior regulatory

---

[8] Ex. B (Email from Matt Hosen to Amy Feagles dated June 30, 2020).

[9] Ex. C (Email from Rishi Zutshi to Matt Hosen dated July 9, 2020).

and *FOREX* custodians, and provided Plaintiffs with a high-level summary of what terms hit on an unreasonable number of documents, which BofA contended was 5,000 documents including family members.[10] At no time did BofA provide Plaintiffs with term-by-term hit counts on all of the Plaintiff name search terms, nor did the Bank provide hit counts on a custodian-by-custodian basis. Plaintiffs were working with BofA to amend these terms, and BofA was to make a proposal on limiting the number of potentially irrelevant "blast emails" brought in by these terms, when BofA reneged on its prior agreement to provide hit count reports on modified terms across the materials of all prior custodians.[11] BofA now claims it will only test any modified terms on the 10 custodians it recently proposed.[12]

*Fourth*, Defendants refusing to provide hit reports argue that these searches should be part of the larger negotiations on search terms and custodians that will not begin until late July or early August 2020. But there is no legitimate reason for Defendants to delay these hit reports, as the Plaintiff name terms are likely to capture relevant, FX-related documents with no burden to Defendants. Plaintiffs are entitled to relevant documents from these already-collected sets regardless of any additional search terms and custodians that may be proposed for supplemental searches down the road.

*Finally*, Defendants seek to make a false equivalency by arguing that, as to these already-collected post-2007 documents, they should only run Plaintiff names over the materials of a small subset of prior custodians, possibly as low as 10 custodians, as that is the number of custodians the Court ordered per Plaintiff group for sample productions from Plaintiffs. But there is no equivalence because, unlike Plaintiffs who have started a collection effort from scratch, Defendants have already collected custodial documents from relevant custodians and these documents can be searched with "no burden". Plaintiffs have no similar stash of already collected readily available documents because they were never investigated by the government or required to collect and produce documents relating to a conspiracy engineered by Defendants.

In short, there is simply no credible reason why Defendants should not provide hit counts for terms they concede are relevant over documents they have already collected.[13] To that end, Plaintiffs respectfully request that the Court order the above Defendants to run the Plaintiff name search terms across their already collected materials and provide Plaintiffs with hit counts on a custodian-by-custodian basis. These Defendants' attempts to "hide the ball" as to which Bank employees discussed Defendants' FX dealings with Plaintiffs should be rejected. Defendants have admitted in open court there is "no burden" to simply provide hit counts, and providing these hit counts will speed up the parties' negotiations over which custodians and search terms will be used to collect additional documents.

---

[10] It should also be noted that BofA produced far fewer documents to regulators and in *FOREX* than other Defendants. To date, BofA's total production totals 1,841 documents which is a small fraction of the documents produced by almost every other Defendant in those prior investigations or actions.

[11] Ex. D (Email from Matt Hosen to Jeffrey Resetarits dated April 23, 2020).

[12] Ex. E (Email from George Adams to Matt Hosen dated June 19, 2020).

[13] Ex. F (Chart of conferrals between the parties on hit count reports for Plaintiff name searches).


Respectfully submitted,

/s/ Daniel L. Brockett

Daniel L. Brockett
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com

Jeremy D. Andersen (pro hac vice)
Anthony Alden (pro hac vice)
Johanna Ong (pro hac vice)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
anthonyalden@quinnemanuel.com
jeremyandersen@quinnemanuel.com
johannaong@quinnemanuel.com

*Counsel for Plaintiffs*