**VIA ECF**                                                                                           July 24, 2020

The Honorable Stewart D. Aaron
United States District Court for the Southern District of New York
500 Pearl St.
New York, NY 10007

      Re:    *Allianz et al v. Bank of America Corp. et al.*, 18-cv-10364-LGS

Dear Judge Aaron,

Pursuant to the Court's June 24, 2020 Order (ECF 452), the parties provide this joint letter to update the Court on discovery since the last conference and setting forth their positions on current outstanding discovery disputes.

Both sides have been working on their custodial and search-term obligations. Below, the parties address the disputes they allege have arisen on those efforts. The parties anticipate that disputes may arise in August after the parties exchange proposals. To ensure those future disputes can be resolved on a timely basis, the parties jointly request leave to exercise discretion in submitting such disputes pursuant to Your Honor's default rules, rather than waiting until the next omnibus hearing. Finally, after further meeting and conferring, the parties have agreed on all terms of a proposed ESI protocol, attached to this letter as Exhibit A.

**DEFENDANTS' POSITION ON CURRENT DISPUTES: 1. BlackRock should produce documents regarding the destruction of TARs, and a privilege log for any documents it withholds, in advance of its 30(b)(6) deposition.** The 800-plus BlackRock Plaintiffs ("BlackRock") continue to resist discovery regarding the destruction of trading analytics reports ("TARs"), directly relevant documents that refute BlackRock's allegations of anticompetitive conduct and damages in this action. As background, in an April 23 affidavit filed pursuant to an order from Judge Schofield (ECF 372), BlackRock was forced to admit that, in 2015 and 2016, it deleted (in BlackRock's words, "decommission[ed]") the platform hosting TARs. ECF 386 ¶ 8. One of the few remaining TARs that fortuitously survived the "decommissioning" states that, as of June 2010 (*i.e.*, right in the middle of the alleged price-fixing conspiracy), BlackRock's own professionals believed that Defendants' spreads were extremely competitive: "JPMorgan pricing shows significant improvement," "Goldman Sachs and HSBC show aggressive pricing," "UBS, HSBC offer aggressive and consistent pricing." 4/2/20 Tr. 41:2-12. Since filing its affidavit, BlackRock has sought to avoid further scrutiny of its deletion of TARs. During the June 24 conference before Your Honor, BlackRock's counsel objected that its Rule 30(b)(6) witness should not have to testify about the destruction of TARs "apart from what we have already provided in the declaration itself," referring to the April 23 affidavit, and that "the 30(b)(6) is not going to be able to go beyond what is in that declaration already." 6/24/20 Tr. 40:15-23. Your Honor overruled BlackRock's objection, holding that "what happens is in depositions people get to ask questions poking at things," and "[i]t can't be that you put in an affidavit or declaration that's been carefully crafted and your adversary doesn't get a chance to poke at it, for lack of a better term." *Id.* 41:11-19.

BlackRock now again seeks to stymie the typical deposition process by refusing to confirm that it will produce relevant documents concerning the Rule 30(b)(6) topics—including in particular any documents concerning the destruction of TARs. But Defendants are entitled not only to question

BlackRock about the assertions in the affidavit, but also to obtain relevant documents concerning those assertions, including documents concerning the circumstances surrounding the destruction of TARs. In arguing there is no need to produce these documents, BlackRock quotes heavily below from the assertions in its "carefully crafted" affidavit, but Defendants need not accept that affidavit at face value. Instead, BlackRock should produce the contemporaneous documents that shed light on the deletion of TARs—not just an after-the-fact rationalization crafted by its lawyers.

BlackRock also refuses to provide a privilege log for documents related to the destruction of TARs that it seeks to withhold from 2015 or 2016. BlackRock's position is meritless for four reasons. *First*, BlackRock claims the parties have "agreed" on a blanket 2013 cut-off date for documents to be included on their privilege logs, but this misrepresents the agreement. As shown in Section 8.3(D) of the attached Exhibit A, Defendants reserved the right to seek a log in connection with discrete post-2013 requests—like this one. Contrary to Plaintiffs' argument, Section 8.3(D) requires no special showing for such targeted requests or routine production of a log. *Second*, unlike Defendants, who were parties to the *FOREX* class action filed in 2013, BlackRock did not become a party to any FX litigation until 2018. It thus bears no unique burden to provide a log for 2015 or 2016 because it was not engaged in communications about prosecuting a lawsuit. *Third*, on the contrary, the prejudice to Defendants of letting Plaintiffs withhold responsive documents with *no* log far outweighs the incremental burden on BlackRock of providing a log for the discrete set of documents at issue, which is minimal. In contrast, without a log Defendants cannot evaluate what is being withheld or challenge any questionable privilege assertions. *Fourth*, in any case, good cause exists to require a privilege log because BlackRock claims it had no duty to preserve TARs in 2015 or 2016, implying it did not anticipate FX litigation.[1] Defendants should therefore be entitled to review any assertions of work product over the files in question.

Finally, BlackRock misrepresents the record by claiming that Defendants did not ask for the documents at issue until July 2020. To the contrary, **in March 2019** Defendants broadly requested "all documents concerning Trade Analytics," defined to include TARs and related documents, "from January 1, 2003 to the present." See Defs' First RFPs, No. 9, Mar. 13, 2019. Over the sixteen months that Defendants have been pursuing discovery about TARs, BlackRock has made shifting and contradictory representations about them—and it was because counsel's repeated misstatements were not sufficient that Judge Schofield ordered BlackRock to file a sworn affidavit from an employee about TARs. ECF 372 at 2. At first, BlackRock claimed TARs could not be "located." ECF 362 at 2. Next, after Defendants moved to compel production of TARs, BlackRock conceded that it had such documents, and produced a small handful of TARs. *See id*; *see* ECF 361 at 3. Ultimately, after Credit Suisse's expert in the *FOREX* case, BlackRock's former Head of Currency and Fixed Income, Dr. Michael Melvin, fortuitously confirmed that "BlackRock maintained a central database where TARs were regularly kept" (ECF 361 at 3), BlackRock was finally forced to reveal the truth about the "decommissioning" of the platform that hosted TARs. To discover what happened to those TARs, Defendants recently served more targeted requests that ***narrowed*** their original ask, now seeking records concerning TARs specifically in relation to the "decommissioning." Defendants did so not because these documents were not previously requested (they were), but because of BlackRock's continued stonewalling and pattern of claiming

---

[1] In a declaration from May 2017, BlackRock's counsel stated he was "currently engaged by a small group of very large institutions in connection with their FX claims," and that he had "also spoken with other large institutional investors about FX at various times since 2013." 13 Civ. 7789, ECF 774-1. Below, BlackRock still avoids denying that it first spoke to its counsel in this action about FX litigation against Defendants in 2013.

that Defendants' requests are not sufficiently specific. BlackRock clearly objects to producing such documents or a related privilege log, and its objections should be overruled.[2]

**2. Brevan Howard should add Alan Howard as a custodian without caveats.** Plaintiff Brevan Howard should be compelled to treat Alan Howard as a custodian without special limitations and to produce his relevant documents. Although Plaintiffs have refused to add Mr. Howard as a custodian since June, after seeing Defendants' initial draft of this letter, they made a last-minute effort to avoid full custodial searches for his files by offering to conduct a partial collection with a unique and highly restrictive search protocol that Defendants have never agreed to for any custodian. Worse, Plaintiffs demanded that Defendants agree to seek *no* further custodians for Brevan Howard for the "sampling" production—even though Judge Schofield ordered Plaintiffs to provide "at least" 10 custodians per group (4/2/20 Tr. 32:4), and before Brevan Howard has provided hit counts or a single custodial document. However, the record shows that Mr. Howard (i) controlled the firm's FX trading relationships and frequently engaged in discussions with Defendants about how competitive their FX pricing was; (ii) is listed as a "principal trader" for "Fixed Income and FX," BH000000137 at 11, and as trading in "Global Macro Fixed Income and FX," BH00001396 at 12, in Brevan Howard's own documents; (iii) often placed Brevan Howard's key FX orders with Defendants, rather than delegating those trades to his employees; and (iv) demanded FX analysis directly from Defendants, as shown in documents produced by Barclays and JPMorgan.[3] Mr. Howard's internal records should be collected and produced just like other custodians' files, without Plaintiffs' unreasonable preconditions.

**3. The Court should direct Plaintiffs to respond to Defendants' custodian proposals without unreasonable prerequisites so that the parties can expeditiously agree on a search protocol.** Plaintiffs yet again seek to deflect attention from their own delays by raising purported "disputes" that simply are not ripe. Plaintiffs' demands for additional information—including detailed HR information for every single one of the hundreds of FX traders and supervisors employed by any of the Defendants spanning back seventeen years and an inventory of all available documents for these individuals—were made for the first time *this week*, have not yet been discussed in bilateral conferrals, and are still under consideration in good faith by Defendants.

Following the Court's motions to dismiss orders at the end of May, Defendants promptly proposed an efficient process for completing supplemental custodial discovery. Consistent with that, each Defendant already has proposed, or will propose by next week, a list of supplemental custodians.[4] Rather than engaging in that standard process, Plaintiffs have insisted upon myriad preconditions to custodial negotiations, which do nothing but delay progress towards an agreed, supplemental custodian list for each Defendant. All of this is designed to obscure Plaintiffs' own failure to engage in timely custodial discovery. This is clear for at least the following reasons:

---

[2] It is likely that hundreds of TARs have been lost, but Defendants have no way of knowing the number for sure, because we do not know how many TARs "were on a prior system that had since been decommissioned" according to BlackRock's counsel. 4/2/20 Tr. 19-22.

[3] *See, e.g.*, BARC-FX-ALLI_08681321, BARC-FX-ALLI_08681317, JPMC-ALLIANZ-0001057051-0001057061.

[4] There is no basis for Plaintiffs' suggestion that Defendants are stalling or that these issues are ripe. For example, Deutsche Bank submitted its initial custodian proposal on July 14, which included ten custodians, HR information and an offer to meet and confer the next day. Rather than inquire about that proposal or make a targeted request, Plaintiffs responded with the limitless demands set forth herein. On July 20, Deutsche Bank responded by identifying 20 additional FX traders and indicating that it would take Plaintiffs' demands under advisement.

3

*First*, Plaintiffs told Defendants on July 21, 2020 that the floor for any early-period discovery is *dozens* to *hundreds* of custodians for each Defendant. This position is unreasonable and disproportionate. Plaintiffs erroneously argue that such overbroad discovery is justified because Defendants produced documents from hundreds of custodians as part of regulatory investigations into the later period, and the alleged early-period conspiracy is identical to the alleged later-period conspiracy. But Plaintiffs are civil litigants, not government regulators, and the scope of discovery is governed by Rule 26's proportionality standard. *See Hyles v. New York City*, 2016 WL 4077114, at *3 (S.D.N.Y. Aug. 1, 2016) ("the standard [in ESI discovery] is not perfection, . . . but whether the search is reasonable and proportional"). Plaintiffs are not entitled to parity of scope with the regulatory investigations that focused on the post-2007 period. Indeed, giving the lie to Plaintiffs' speculation about the number of individuals involved in the alleged conspiracy, even the regulators that received documents from hundreds of custodians for the post-2007 period never alleged the existence of a single overarching conspiracy involving all of Defendants' FX traders.[5] Rather, the purported conspiracy to which some of the Defendants pleaded guilty involved four traders and was limited to certain transactions concerning a single currency pair. More fundamentally, the fact that some Defendants cooperated with regulators by producing documents from numerous custodians should not prejudice the Defendants in subsequent civil litigation.[6]

*Second*, Plaintiffs raised these demands for the first time *this week* on July 21, 2020. Defendants advised Plaintiffs that each Defendant was uniquely situated, and that we would discuss requests for custodial information during bilateral conferrals. Despite Plaintiffs' attempts to paint the requested information—and arbitrary deadlines—as "basic," Plaintiffs demand a vast amount of information about *hundreds* of employees for each Defendant stretching back seventeen years— for example, "a list of early-year FX traders and supervisors, including names, job titles, dates of employment, departments, locations and to the extent reasonably available, job responsibilities." Yet instead of engaging in bilateral discussions with Defendants to understand these burdens and the limitations on retrieving this information for an entire business line, Plaintiffs have preemptively declared an impasse and presented these purported "disputes" to Your Honor.

*Third*, it makes no sense to require Defendants to produce information about the availability of custodians' files as a precondition to custodial negotiations. Although Plaintiffs complain of "delay"[7] and the potential for future missed deadlines, this demand will unreasonably delay what should be a straightforward process. Plaintiffs' request puts the cart before the horse and is technologically infeasible. Defendants will investigate the availability of each agreed-upon individual custodian's data from the early period.[8] To the extent any custodian's data are unavailable, the parties may propose and agree upon a substitute custodian.

---

[5] Indeed, many government regulators pursued no enforcement actions against many defendants.

[6] In response to questions from Plaintiffs' counsel about a numerical limit on supplemental custodians during the parties' July 21 conferral, Defendants confirmed, multiple times, that they did not intend to impose any type of artificial numerical limit on their custodian proposals. Plaintiffs' insinuations to the contrary are a red herring.

[7] Your Honor has already declined to impose any deadline for Defendants' disclosure of custodians and search terms. *See* ECF 435, 453. And Plaintiffs' claim that Defendants are "largely withholding" their first proposals is patently false. Defendants sent the first of their rolling proposals on July 14, and are continuing to work diligently to provide the others, based on the timing they anticipated in early June.

[8] Recognizing that their position was untenable, Plaintiffs' position has evolved to include only information "on all proposed custodians," proving there is no ripe dispute.

*Fourth*, while Defendants have been diligently moving the case forward, it is Plaintiffs that have caused delay after delay. Defendants initially proposed custodians and search terms for Plaintiffs' document collection in November 2019. Eight months later, after dozens of meet and confer discussions, multiple motions to compel, and three Court orders overruling Plaintiffs' various objections, not a single custodial document has been produced. As Plaintiffs concede, the vast majority of Plaintiffs have not even provided the hit counts that Judge Schofield ordered them to disclose on May 7, 2020. *See* ECF 393 at 2. Nor have Plaintiffs committed to a specific date for when the remaining 16 Plaintiff groups will produce these hit counts. Making matters worse, Plaintiffs' "sampling" production is only the first step in determining what additional custodial discovery Plaintiffs should undertake in light of the documents produced in the sampling.

Additionally, Plaintiffs' insistence in this letter that Your Honor impose an arbitrary August 14 deadline for the completion of custodian and search term negotiations is unreasonable under the circumstances. Not only would that deadline be inequitable when compared to the eight-month timeline along which Plaintiffs have proceeded for *sampling* discovery, but it is also plainly incompatible with Plaintiffs' simultaneous demand that Defendants immediately respond to new onerous and unreasonable information requests. While Defendants are diligently investigating what responsive information is readily available, it is clear from the breadth of the requests that preparing responses will take months, and much of the information is particularly unnecessary here because Plaintiffs already have the benefit of substantial custodial discovery—more than 2.3 million documents from hundreds of Defendants' custodians. Plaintiffs' refusal to make a counter-proposal until Defendants provide responses would therefore delay the process by months. If Plaintiffs would instead prefer to advance this case expeditiously, as they request above, they must, at a minimum, withdraw their preconditions, tailor any requests to a reasonable subset of data and individuals, and make counterproposals to each Defendant promptly—that is, they must proceed with custodial discovery according to a typical process.

**4. The Discovery Stay Should Continue as to RBC and MUFG Bank.** The Court granted MUFG Bank's ("**MUFG**") and the Royal Bank of Canada's ("**RBC**") Rule 12(b)(2) motion on April 30. ECF 389. Through that time, the Court stayed discovery as to them and certain Foreign Defendants, which continued through Plaintiffs' two prior amendments and through resolution of their Rule 12(b)(2) motion. ECF 144; *see e.g.,* ECF 383 at 2. While Your Honor permitted Plaintiffs to file a Third Amended Complaint ("**TAC**") (ECF 471), ***the TAC has not yet been filed***. Thus, MUFG and RBC remain dismissed and have no discovery obligations with which to comply. *See*, *e.g.*, *Treppel* v. *Biovail Corp.*, 233 F.R.D. 363, 369 (S.D.N.Y. 2006) (dismissed defendants "no longer [need to] respond to discovery requests . . . ."). Further, MUFG and RBC have 14 days to file any objections to Your Honor's July 20 ruling, *see* Fed. R. Civ. P. 72(a), and are considering whether to do so.[9] If objections are sustained, MUFG and RBC will not be subject to party discovery. *Biovail*, 233 F.R.D. at 369. A finding of jurisdiction is not "inevitable" and MUFG and RBC may very well be dismissed again.[10] Therefore, MUFG and RBC respectfully request

---

[9] The Court stayed discovery as to Société Générale S.A., pending resolution of its motion to reconsider the denial of its Rule 12(b)(2) motion. ECF 393 at 2; May 7, 2020 Tr. at 23:3–24:5. Plaintiffs' reliance on *Guiffre* and *In re Towers Fin. Corp.* below is misplaced: neither involved foreign defendants who had previously prevailed on Rule 12(b)(2) motions.

[10] MUFG and RBC also intend to move to dismiss the TAC under Rule 12(b)(2). The Court has now **twice** dismissed MUFG Bank from FX cases, and dismissed RBC in the only FX action to name it as a defendant. ECF 389 at 1;

that the discovery stay continue pending resolution of any Rule 72(a) objections and Rule 12(b)(2) motions.  If Your Honor declines to stay discovery, MUFG and RBC should not be compelled to produce documents until 1) the TAC is filed, 2) MUFG and RBC have served Rule 34 objections and responses, 3) the parties meet and confer, and 4) any ripe disputes arise.  These basic civil procedures are all the more necessary when Judge Schofield's prior order ***never previously required*** non-Foreign Defendants to produce documents previously produced to government regulators or prior search protocols before service of such responses and objections.  *See* ECF 143.

**PLAINTIFFS' POSITION ON CURRENT DISPUTES:  1a. Defendants seek to compel from BlackRock tangential documents pursuant to discovery requests served last week.**  Specifically, Defendants seek documents related to the decommissioning of a database in 2015, which may or may not have once held additional TAR reports.  Defendants only served these document requests last week, on *July 16*.  Rule 34 allows BlackRock 30 days to respond; Defendants' justification for instead providing only two business days—purportedly needing the documents in advance of a Rule 30(b)(6) deposition—is contrived.  The database-related declaration and deposition notice were served three months ago, in April.  Yet, it was only this month that Defendants indicated that new documents were needed for an imminent deposition.  Their claim that these requests have been outstanding for a year is also without merit.  The prior requests did not seek documents about events occurring with respect to an enterprise-wide document management system in 2015 and 2016.  If they did, Defendants would not have needed to serve additional requests seeking precisely that.  Defendants suggest otherwise by claiming BlackRock "stonewalled" and insisted narrower requests be served.  To the contrary, Defendants never even *mentioned* these documents until the July 16 requests were served.

BlackRock's Rule 34 and conferral rights would govern in any context.  But they are particularly important here, given Defendants' numerous misstatements.  For instance, there was never an "en masse" "destruction" of TARs.  These were *monthly* reports done for only a *portion* of the period—based on this, less than 100 likely ever existed.  Defendants' expert similarly averred he was only aware that "close to 100" ever existed.  BlackRock has already produced "several dozen."  Dkt. 386 ¶ 3.  "*To the extent* additional Reports were created [beyond those already produced], BlackRock believes they likely would have been distributed via email to certain BlackRock employees."  *Id.* ¶ 11 (emphasis added).[11]  Custodial searches are accordingly underway to locate any additional reports.  Indeed, five of the 14 BlackRock custodians for sample discovery were likely regular recipients of TARs.  *See Little Hocking Water Ass'n, Inc. v. E.I. Dupont de Nemours & Co.*, 2013 WL 5311292, at *4 (S.D. Ohio Sept. 20, 2013) (denying discovery into preservation issues where searches were still ongoing).

Defendants also misstate the chronology.  BlackRock's document management platform was decommissioned in 2015 and early 2016 for a long-planned upgrade of the entire BlackRock business to a new enterprise-wide solution.  This case was filed almost three years later, in November 2018.  Defendants try to fill this multi-year gap by referring to Quinn Emanuel's pre-November 2018 work in the FX space.  But Defendants well know Quinn Emanuel previously

---

*Contant*, No. 17-CV-3139 (S.D.N.Y.) ("*Contant*"), ECF 263 (dismissing MUFG Bank).  It would be premature to subject them to discovery unless and until there is a finding of jurisdiction.

[11] *See also Alaimo v. Trans World Airlines, Inc.*, 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) ("Plaintiff . . . seeks to have the Court infer that relevant maintenance evidence regarding the door was destroyed simply because defendant does not retain its maintenance records for more than a two year period.  Such an inference is unreasonable.").

6

attempted to represent two different classes, bringing complaints on behalf of client groups that did not include BlackRock. A declaration about a December 2016 Quinn Emanuel memorandum used prior to a February 2018 opt-out in no way raises a serious question as to whether BlackRock spoliated (less than 100 irrelevant) documents in 2015. It did not.

Finally, Defendants ignore Your Honor's plea for a "reset." BlackRock has previously addressed the mischaracterizations of its efforts and representations, and will not again do so here. Suffice to say that BlackRock has already invested far more than is proportional to the needs of the case to look for the perhaps 100 (irrelevant[12]) TARs, and has honestly and diligently responded at every step in Defendants' campaign. *See, e.g.*, Dkt. 386 ¶ 6. That Defendants are now reduced to pursuing "discovery on discovery" even before they know if a single TAR is 'missing' confirms this is not about gathering evidence, but harassment.

BlackRock will serve its written responses to the July 16 requests in accordance with the Rules, the parties will then confer, and then disputes, if any, can be brought to the Court's attention on an actual record. Defendants do not and cannot claim prejudice. They chose to serve their requests only last week, and there is no reason the deposition needs to be held imminently.

**1b. Defendants seek to force BlackRock to log privileged documents that are responsive to their week-old document requests.** The parties have agreed that by default neither side need log materials dated after 2013, the year the related *FOREX* class action was filed. Defendants claim an exception is warranted for privileged documents responsive to their July 16 requests. But, again, BlackRock has not yet had a chance to investigate and respond. It is thus not known what documents will be gathered, let alone what privilege or logging issues may exist.

Defendants fail to overcome the premature nature of their request. Defendants argue that some (but not all) Defendants were party to *FOREX* in 2013, and BlackRock was not. But the parties nonetheless agreed to use 2013 as the default rule. It follows that Defendants must show more than BlackRock was not a party in *FOREX*; otherwise, the "exception" would swallow the *agreed-upon* "rule." Defendants next assert that BlackRock is not seeking materials from Defendants after 2013. Not true—for instance, Plaintiffs have requested documents relating to investigations after the scandal broke. Regardless, Defendants fail to explain what relevance this has. Defendants also assert the burden on BlackRock will be slight. As BlackRock has not had the opportunity to even respond under Rule 34, that is baseless speculation.

**2. Defendants' request to add Alan Howard as a custodian is based on misleading claims.** Brevan Howard has not been rejecting this request "since June." Given the obvious concern about a request to add Brevan Howard's founder and CEO as a document custodian—it is the very definition of "apex" discovery, rife with potential for abuse—Plaintiffs requested that Defendants provide the documents they cited in support of their request. Defendants provided these documents only *three days ago*. After finally receiving these documents and solely in the interest of avoiding a dispute, Brevan Howard offered to include Mr. Howard as a custodian, subject to certain reasonable conditions. This offer is not an admission that Mr. Howard has any

---

[12] It is not a defense to a *per se* price fixing case that the plaintiff *thought* the defendants' prices were "competitive," "aggressive," or an "improvement" from past prices. *In re Auto. Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, at *8 (E.D. Pa. May 26, 2006) (an antitrust plaintiffs' activities are "almost wholly irrelevant"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 137-39 (C.D. Cal. 2007) ("it will not be necessary to engage in an analysis of each [plaintiff's] negotiations with [defendant]").

7

"relevant" documents. Indeed, Defendants make up from whole cloth the notion that Mr. Howard "controlled" FX relationships and placed "key" FX trades, for example. Rather, Plaintiffs agreed to add Mr. Howard as a sampling custodian for the same reason as the others—to demonstrate that Plaintiffs do not in fact have relevant documents.

Given Mr. Howard's many non-FX related activities as founder and CEO, Plaintiffs have simply requested that the search terms be tailored to FX trading-related documents to reduce the burden of reviewing false-positives and to lower the opportunities for abuse of this apex custodian. This is precisely what Your Honor has ordered. Dkt. 452 ("Plaintiffs shall produce to Defendants all non-privileged documents containing search terms *that relate in any way to FX trading*.") Defendants have agreed to tailored search terms for other custodians with multiple roles, but have refused here. Plaintiffs have also requested that there be some assurance that his inclusion will not merely add to a still-growing list. Defendants' latest proposal—received yesterday—is already at 13, beyond the 10 person "sample" referenced by the Court.

**3. Plaintiffs need basic information to assess Defendants' custodian and search term proposals.** Defendants' productions to date have been limited primarily to re-producing materials that were produced to regulators and to class plaintiffs. Those prior productions were mostly limited to documents from 2008 to 2013. But Plaintiffs here plausibly allege the conspiracy also existed in 2003 to 2008. Defendants will need to gather materials for that period as well.

Defendants' FX chats and recorded phone calls are at the very core of this antitrust action. This case is about the same conspiracy that caused Defendants to produce documents from *dozens to hundreds of FX custodians per bank* for the later years.[13] There is no reason to expect that a conspiracy involving so many people in 2008 happened to involve only a fraction of that number in 2007. Four bank groups have proposed custodians, two of them just this evening. Of those, despite repeatedly assuring Plaintiffs they were not relying on any "caps," the Court's default rules, or the (irrelevant) Plaintiff "sampling" protocol, three just happen to have identified exactly 10 people; the fourth, 12 people. This strongly suggests that conferrals are going to be needed when the remaining Defendants disclose their lists. To create a straw man, Defendants claim Plaintiffs insist there is a "floor" of "hundreds" of custodians. Not true. Plaintiffs' point is merely that the scope of the prior document gathering efforts are undeniably relevant. Why Deutsche Bank has 309 custodians after 2008 but only 10 before 2008 is something Plaintiffs are entitled to understand, even as Plaintiffs are not demanding Deutsche Bank hit any particular magic number. For these and other reasons, to *meaningfully* evaluate Defendants' forthcoming proposals, Plaintiffs need certain basic and routinely exchanged information, particularly as Defendants have not yet served Rule 26(a)(1)(A) disclosures.

- Defendants should provide biographical information for each proposed custodian, and explanations as to why each person was selected. Plaintiffs need to understand who the proposed person is, as well as why he or she was elevated over other candidates.

---

[13] For example, a review of the "metadata" of Defendants' prior productions suggests Bank of America used 29 custodians, Barclays 246, Credit Suisse 20, Deutsche Bank 309, HSBC 159, Goldman 28, JPMorgan 101, Morgan Stanley 66, Standard Chartered 15, and UBS 181. But it has never been denied that all productions to date have focused on the later-year period.

- Because this is the same conspiracy as alleged in the pending class action and government investigations, Defendants should explain how their current proposals differ from what was done before. This will greatly assist in evaluating the reasonableness of Defendants' proposals. At a minimum, Defendants should disclose (a) the search term and custodial protocols used previously, (b) explanations for differences with what will be proposed here; (c) a list of early-year FX traders and supervisors, including job titles, dates of employment, locations, and job responsibilities, and (d) a list of all bank employees who were suspended or fired by the Bank for their involvement in the conspiracy. Plaintiffs obviously cannot evaluate Defendants' custodian proposals if they do not know who the potentially relevant actors are.

- Defendants argue investigating what files are available for hundreds of people would be a waste. But Plaintiffs merely ask Defendants to do what Plaintiffs have done: disclose what is *reasonably known* about the availability of documents from custodians *Defendants are proposing*, to avoid wasting time discussing people whose documents are unavailable.

Defendants claim these routine requests are still "under consideration in good faith." Yet, they make a series of meritless arguments opposing the prompt provision of this information.

*First*, they accuse Plaintiffs of not conferring. But the Court's opinion upholding Plaintiffs' claims with respect to the early years was issued in May. Shortly after the opinion issued, we requested proposals for Defendants' custodians and search terms by July 10. Defendants refused. We then asked basic questions to determine whether any fundamental disputes were already known to exist. Defendants took over a week to respond, and even then just said that all questions were premature prior to July 31. Defendants then said that individual conferrals would be needed. Plaintiffs sought additional conferrals, but no Defendant has yet made itself available.

*Second*, Defendants claim to have proposed an "efficient process" for dealing with their forthcoming custodian and search-term proposals. Defendants also posit that they "should not have to" comply with information requests until after Plaintiffs make a "counterproposal." These arguments do not relate to whether the information should be provided, but when. Defendants would provide the information in dribs and drabs throughout August or beyond, or worse, require Plaintiffs to file motions to compel, further prolonging the process. And the notion that Plaintiffs should have to propose replacement custodians before they can ask for information makes no sense. The above information is needed *to form* a reasonable counterproposal in the first place. The need for this information is not, as Defendants contend, obviated by the production of "2.3 million documents"—again, most of those documents are from after 2008, and thus they cannot inform Plaintiffs on who was in what role before then.

*Third*, Defendants argue that Plaintiffs "have yet to prove the existence of any conspiracy" during the 2008-2013 period. But this case is in discovery; we do not have to "prove" anything yet. That said, if there were any case where protestations of innocence should not justify discovery shortcuts, it is this one. This conspiracy was the subject of extensive government investigations, several banks admitted to their involvement, billions in settlements were paid, numerous plea deals were reached, and several bank employees were convicted. TAC ¶¶ 277-444.

*Finally*, Defendants seek to deflect attention by poisoning the well. Defendants posit that they made a custodial proposal for Plaintiffs in November 2019. But they omit that that proposal was not serious—they demanded 1,400 custodians *plus* an attestation that there was a custodian

for every one of millions of trades. Dkt. 361 at 4. Defendants claim they were victorious in the resulting motion practice. But it was Plaintiffs' alternative proposal of 10-person sampling that the Court adopted. Dkt. 372. Defendants' refusal to accept anything less than 1,400 custodians, not Plaintiffs' purported non-responsiveness, led to the delays of which Defendants complain. In any event, none of this has anything to do with the propriety of Plaintiffs' requests above.

*In sum*, Defendants have known of their obligations to gather documents with regard to the early-year period since at least May. (Many, even longer, because of litigation in the U.K. involving the early-year period.) They have unilaterally delayed their initial proposals until July 31, and refused to have any substantive conversations before then. If the basic information necessary for Plaintiffs to even assess Defendants' initial proposals is withheld, then the entire process will grind to a halt. Put another way, the information requested above can only move the case forward in a timely fashion if the information is itself provided in a timely fashion. Plaintiffs respectfully request that Defendants' proposals *and* the basic categories of information discussed above be required by July 31. They also request that the Court impose an August 14 deadline for the completion of negotiations concerning custodians and an initial set of search terms.

**4. MUFG Bank, Ltd. and the Royal Bank of Canada should fully participate in discovery.** These Defendants argue that the question of whether the Court has personal jurisdiction over them is not yet fully settled. But a discovery stay does not follow from that assertion. *See, e.g.*, *Guiffre v. Maxwell*, 2016 WL 254932, at *2-3 (S.D.N.Y. Jan. 20, 2016) (declining stay because plaintiff pled concrete facts and made a "strong showing"); *In re Towers Fin. Corp. Noteholders Litig.*, 1996 WL 622386, at *2-3 (S.D.N.Y. Jan. 29, 1996) (denying stay despite possible appeal). Judge Schofield has set out the personal jurisdiction rules multiple times: if an entity is plausibly pled to have been part of the FX conspiracy, then it is subject to personal jurisdiction. *See, e.g.*, Dkt. 389 at 5. The only reason these two defendants were dismissed was because the prior complaint only included two chats and did not delineate between entities in the bank family. *Id.* at 13. As Your Honor found, the proposed amended complaint includes an avalanche of new incriminating chats by these banks and otherwise provides the "greater specificity" required. Dkt. 471 at 7.[14] Staying discovery would only delay the inevitable. Judge Schofield previously required other Defendants, even before the service of formal document requests, and even where non-jurisdictional motions to dismiss were expected, to produce documents previously given to the class. *See* Dkt. 143. Similarly here, these Defendants should be ordered to immediately produce all FX-related documents they previously produced in the class action and to government regulators (including the search term and custodian protocols used to gather these documents). The Court should also clarify that they should participate in all other aspects of discovery. Any other result would cause these Defendants to fall further behind, putting the entire case schedule in more.

---

[14] That MUFG was dismissed in *Contant* is of no relevance, as *Contant* plaintiffs did not cite to any of the newly chats included in Plaintiffs' TAC.

Respectfully submitted,

| DONTZIN NAGY & FLEISSIG LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
|---|---|
| By:/s/ Tibor L. Nagy, Jr. | By:/s/ Daniel L. Brockett |
| Tibor L. Nagy, Jr.<br>980 Madison Avenue, 2nd Floor<br>New York, New York 10075<br>212-717-2900<br>tibor@dnfllp.com | Daniel L. Brockett<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>danbrockett@quinnemanuel.com |
| Counsel for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC | Counsel for Plaintiffs |

cc: All counsel of record (via ECF).