**VIA ECF**                                                                August 26, 2020

The Honorable Stewart D. Aaron
United States District Court for the Southern District of New York
500 Pearl St.
New York, NY 10007

      **Re:**    *Allianz et al v. Bank of America Corp. et al.*, **18-cv-10364-LGS**

Dear Judge Aaron,

Pursuant to the Court's June 24, 2020 Order (ECF 479), the parties provide the accompanying joint letter to update the Court on discovery since the last conference and setting forth their positions on current outstanding discovery issues.


Respectfully submitted,


DONTZIN NAGY & FLEISSIG LLP        QUINN EMANUEL URQUHART &
       SULLIVAN, LLP


By:/s/ Tibor L. Nagy, Jr.             By:/s/ Daniel L. Brockett

Tibor L. Nagy, Jr.                      Daniel L. Brockett
980 Madison Avenue, 2nd Floor       51 Madison Avenue, 22nd Floor
New York, New York 10075           New York, New York 10010
212-717-2900                         Telephone: (212) 849-7000
tibor@dnfllp.com                    Fax: (212) 849-7100
                                     danbrockett@quinnemanuel.com

Counsel for Defendants JPMorgan
Chase & Co., JPMorgan Chase Bank,     Counsel for Plaintiffs
N.A. and J.P. Morgan Securities LLC


cc:  All counsel of record (via ECF).

PLAINTIFFS' POSITIONS ON CURRENT DISPUTES:  **Plaintiffs' request for available information on FX traders and supervisors.**  Plaintiffs long ago requested that Defendants identify their FX traders and supervisors.  The reason is obvious:  the evidence shows the conspiracy was often carried out by traders in multi-bank chatrooms who coordinated to manipulate the FX market. Most Defendants provided the Court-ordered "reasonably available responsive information," Dkt. 486, and Plaintiffs are now engaging with them on custodial lists and search terms.  But two banks—Goldman Sachs and SocGen—have refused to provide this basic information.

*Goldman Sachs* first claimed it had no available information to turn over.  Trying to move the custodial negotiations forward anyway, Plaintiffs found 35 names based on chats and public information.  At the last minute, Goldman admitted it actually *had* the reasonably available information required by the Court's order.  Goldman also argues that Plaintiffs narrowed their requests recently by asking questions about the 35 traders.  Not true.  Plaintiffs' recent questions were asked only after Goldman claimed—falsely, they now admit—that they had no reasonably available information.  The actual requests at issue were posed *in early July*, and were already approved by this Court.  Nor does the fact Plaintiffs were able to find *some* names mean Plaintiffs have no need for additional information.  The information Goldman is withholding likely identifies more-relevant custodians.  And even as to the 35, having the names alone does not put Plaintiffs in a position to make a reasonably informed custodial counterproposal; at very least, Plaintiffs need to know each trader's period of employment, location, or job responsibilities (*e.g.*, currency pairs traded) to determine if they should be included.

*SocGen* has provided employment information for only 76 traders, even though public sources suggest SocGen may have employed as many as 300 traders on average.  Plaintiffs identified over 140 potentially relevant additional traders by numeric ID codes.  But SocGen claims (not credibly) that it cannot link those codes to actual names.  SocGen also seeks to excuse itself from doing more by referring to a "trove of information" available in its documents.  But SocGen made no prior custodial productions, and to date has produced just *96* documents.

Simply put, these two banks have failed to show any "individual circumstances" exempting them from doing what every other bank has been able to accomplish.  The Court should confirm its prior order that all responsive, reasonably available information be provided immediately.  To the extent either of these two banks try to backtrack and now re-claim no such information exists, Plaintiffs respectfully request a supporting affidavit be provided.

**Plaintiffs' request for information on employees disciplined as a result of the FX scandal.**  To identify appropriate document custodians, Plaintiffs asked Defendants for a list of employees who were suspended, fired, or forced to resign in connection with regulatory or internal investigations (the "FX investigations").  The relevance of this information is obvious.  Most banks provided the requested information.  However, three Defendants (UBS, SocGen, Barclays) are refusing, relying on confidentiality and other meritless objections.  But U.S. discovery is governed by U.S. law, and everyone's privacy is protected by the existence of the protective order.  Data privacy aside, courts have frequently ordered disclosure of precisely the types of information Defendants are asking to be shielded here. *See Westmoreland v. Regents of the Univ. of Cal.*, 2019 WL 932220, at *7 (E.D. Cal. Feb. 26, 2019) (disciplinary actions were relevant and denying defendant's attempt to bar testimony on such actions); *Harris v. Panter City Hauling, Inc.*, 2014 WL 29630, at *4 (S.D. Ill. Jan. 3, 2014) (ordering that defendants identify in their interrogatory responses all employees who were subject to disciplinary action).

Barclays claims a unique right to refuse because it objected on the grounds *Plaintiffs* did not provide details on *Plaintiffs'* disciplinary actions. If Barclays actually wants that information (to the extent any exists), it is free to request a conferral and, if it cannot resolve the matter, move to compel. Barclays has never seriously sought such information because it is not relevant; Plaintiffs' FX operations were not fined billions, and nothing Plaintiffs did could make Defendants' illegal behavior legal. Barclays' tit-for-tat delay tactics should be rejected.

**Plaintiffs' request for documents previously produced in connection with FX investigations.** SocGen is refusing to produce such materials. It argues that its regulatory productions should be given special treatment because they qualify as "confidential supervisory information." But this is not a well-taken objection. Even SocGen admits, as it must, that those protections do *not* apply to SocGen's own business records, which is what is being sought here. SocGen argues the law protects its *selection* of what materials were produced to regulators. It provides no citation for that position. If such an exception were allowed, it would swallow the statute's plain rule. *See* C.F.R. § 261.2(c)(2) (stating that a bank's own documents prepared for its own business purposes are not "confidential supervisory information"). To the contrary, courts routinely require the re-production of materials given to regulators. For instance, in *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, the court recognized that the production of communications *with* prudential regulators required the use of an administrative procedure. 2016 WL 679901, at *6 (S.D.N.Y. Nov. 16, 2016). But it nonetheless required the full production of documents *given to* prudential regulators, which is all Plaintiffs seek here. *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 1:14-cv-07126, Dkt. 357 (S.D.N.Y. Jan. 20, 2017); *see also, e.g.*, *In re Credit Default Swaps Antitrust Litig.*, No. 13-cv-07634, Dkt. 49 (S.D.N.Y. Sept. 16, 2014) (ordering reproduction of documents produced to the DOJ). SocGen assures the Court that *if* a document is hit upon in custodial searches *then* that document would be produced. That is not a reasonable substitute. Courts require the re-production of already-collected documents so litigants need not hunt blindly for something readily available.

**Defendants' request for TAR spoliation discovery.** Defendants once again seek to manufacture a dispute over TAR reports, this time seeking to compel BlackRock to answer interrogatories concerning alleged spoliation of evidence regarding TARs. But this discovery is entirely premature. Defendants mislead by asserting BlackRock has sworn documents were destroyed. Rather, a database where *some copies were potentially kept* was decommissioned over four years ago. Other copies of the *exact same documents* may well be found in custodial discovery. Indeed, at least five of the 14 custodians whose documents are now being searched were regular recipients of TAR reports. The law in this Circuit and elsewhere is clear that a party is not entitled to spoliation discovery (so-called "discovery on discovery")—with its attendant burden and potential for abuse—until it has been determined that the documents at issue have been destroyed.[1] *If* ongoing custodial discovery fails to uncover more TARs, and *if* Defendants muster more than mere speculation for their spoliation claims, the parties can revisit. Until then, there is no reason to force

---

[1]  *See, e.g.*, *Little Hocking Water Ass'n, Inc. v. E.I. Dupont de Nemours & Co.*, 2013 WL 5311292, at *4 (S.D. Ohio Sept. 20, 2013) (denying request for discovery into document preservation where parties were still searching for documents); *Lewis v. ASAP Land Exp., Inc.*, 2009 WL 2580315, at *2 (D. Kan. Aug. 20, 2009); *Swindell Dressler Int'l Co. v. Travelers Cas. & Sur. Co.*, 827 F. Supp. 2d 498, 508 (W.D. Pa. 2011); *Mannina v. Dist. of Columbia*, 2019 WL 8759125, at *4 (D. D.C. Sept. 30, 2019) ("Absent a showing that the District has destroyed other relevant evidence . . . further discovery into the scope of any alleged spoliation would be a mere fishing expedition.").

BlackRock to divulge its confidential legal deliberations.

As usual, Defendants mislead to justify this invasion.  They observe that Your Honor referred to the date of anticipation of litigation as being "the crux" of the issue.  07/29/20 Hearing Tr. at 12:20-13:19.  But the issue actually being discussed on that portion of the transcript was the cut-off date for privilege logging.  The Court never suggested spoliation discovery was proper even before knowing if any documents are missing.  Likewise, Defendants' assertion that BlackRock has somehow put spoliation discovery "at issue" is nonsense.  BlackRock has done nothing other than respond to Defendants' stream of baseless accusations and rank speculation—which Defendants again resort to here.  Finally, Defendants cite to cases where the production of some evidence did not excuse loss of other evidence.  But this misses the point.  That less than 100 TARs ever existed, and yet dozens were already produced without the aid of any custodial discovery, confirms that Defendants may well end up with *all* TARs that *ever existed*.

Contrary to Defendants' "obstruction" assertion, BlackRock has spent over 65 hours scouring the company for TARs—less than 100 of which likely ever existed and which concern less than 10% of the at-issue FX trades—including interviewing "at least 19 knowledgeable employees" in six different departments, searching every currently accessible central location where such documents could be found, and filing an affidavit about its extensive search efforts.  Dkt. 386.  This affidavit was filed not because the Court concluded counsel's representations were "insufficient"—as Defendants suggest—but to evaluate "cost sharing."  04/02/20 Hearing Tr. at 44:23.  Instead, Defendants repeatedly misrepresent the affidavit to continue their harassment of BlackRock over less than 100 documents of, at most, tangential relevance.[2]  *See Winfield v. City of New York*, 2018 WL 840085, at *3 (S.D.N.Y. Feb. 12, 2018) ("When the discovery sought is collateral to the relevant issues (i.e., discovery on discovery), the party seeking the discovery must provide an 'adequate factual basis' to justify the discovery, and the Court must closely scrutinize the request 'in light of the danger of extending the already costly and time-consuming discovery process ad infinitum.'").  For example, contrary to Defendants' selective quotation, the affidavit states that "*any additional Reports* would have been stored on its former document management system called 'IQ'" and "the only potential source of additional, centrally-maintained Reports*, if they exist*, would be on any back-up tapes holding the IQ environment."  Dkt. 386, ¶ 8 (emphasis added).  In other words, while some TARs may have been stored on IQ at some point, no one knows if any were on the platform at its decommissioning so long ago.

Defendants fishing expedition also seek to compel BlackRock to produce certain documents discussing the preservation of TARs, including "All Documents concerning discussions about TARs in connection with the IQ Decommissioning."  But BlackRock has carried out a reasonable investigation and determined no such documents can be found.  BlackRock contacted over 20 individuals, including all current employees who BlackRock believes either prepared or received TARs, and current employees with knowledge concerning the decommissioning of the platform where TARs *may* have been housed.  Every person confirmed she or he has no responsive

---

[2]  Defendants' assertion that "Judge Schofield already has concluded that the subject matter of the TARs Affidavit is relevant and discoverable" is not true.  The Court has never ruled on the relevance of TARs because Plaintiffs voluntarily agreed to produce them, while reserving objections.  Indeed, we maintain our position that a plaintiff's beliefs about the defendants' prices is not a defense in a *per se* price fixing case.  That Your Honor ordered many FX documents to be produced for the sample production, despite Plaintiffs' relevance arguments, does not mean it has ruled that would be proportional to allow discovery on discovery.

documents.  BlackRock likewise searched the readily accessible emails of three former employees who were involved in the decommissioning and identified no responsive documents.  Defendants suggest it is "highly unlikely" no responsive documents exist, because BlackRock surely discussed the migration of its document management system.  But Defendants did not request all documents regarding the migration *generally*; only documents discussing TARs, *specifically*.[3]  Having already undertaken a reasonable investigation, and confirmed *no* location would likely house responsive documents, there is nothing more BlackRock can do.

**Defendants' request for hit reports by September 11.**  Defendants ask the Court to impose a September 11 deadline for Plaintiffs to serve all hit reports.  This is both unnecessary and not feasible.  Indeed, the Court already considered Defendants' request and rejected it.  *See* Dkt. 452, ¶ 1 ("Plaintiffs shall provide the hit counts to Defendants as soon as reasonably practicable.").  Plaintiffs are complying with the Court's order by doing everything possible to collect custodial documents as quickly as they can, run the search terms, and serve hit counts on Defendants.  To date, all of the *domestic Plaintiffs* except two have served hit counts.  One Plaintiff still cannot gain access to physical drives due to COVID and the other Plaintiff—a government-regulated entity that is generally required to keep processing in house—expects to provide hit counts in about two weeks.  As to the *foreign Plaintiffs*, most only recently reached agreement as to custodians, and negotiations for three (Norges, Allianz Taiwan, and PFA) are nearing conclusion.  It is simply not possible to gather 10-years' worth of custodial documents—some hosted by third parties and spread across multiple locations—load the data, process the data, and run search terms in two weeks.  Defendants' unrealistic deadline is nothing more than "tit-for-tat" retaliation to divert attention from their own delays.  Accordingly, to the extent the Court imposes a deadline, similar timeframes should be imposed on Defendants.

**Defendants' request for trading data deadlines.**  Defendants ask Plaintiffs to "specify which information they will not include" with their upcoming data re-productions.  As an initial matter, this is not about Plaintiffs producing their transaction data—we produced all of the data long ago.  What Defendants are referring to is the *re*-producing of the data to account for the Court's dismissal rulings and to add additional fields in response to Defendants' changing requests.  More to the point, Plaintiffs do not intend to withhold any requested data fields that exist and can be reasonably located.  But if the data does not exist, Plaintiffs are not obligated to create it for Defendants' convenience.  *See, e.g.*, *Hallmark v. Cohen & Slamowitz, Midland Funding LLC*, 302 F.R.D. 295 (W.D.N.Y. 2014) ("It is basic that in responding to a document request . . . a party is not required to create documents . . . only to produce documents already in existence.").

Next, Defendants ask for data-related conferrals to occur by September 18.  But there is no need to order conferrals that *are already happening*.  As discussed above, the only real issue is whether the many data fields Defendants seek for millions of trades actually exist.  This requires Plaintiff-specific investigations into multiple data fields across numerous trade data systems, which are often administered by different groups of people and some of which are maintained by third parties.  Plaintiffs are moving as quickly as possible and have no incentive to delay.

---

[3]  Defendants' suggestion that BlackRock anticipated litigation based on a Bloomberg article in 2013 and its status as a class member in a related class action is absurd.  Indeed, Judge Schofield rejected the argument that Plaintiffs were on inquiry notice for statute of limitations purposes based on the Bloomberg article.  Dkt. 406 at 21-23.

Finally, Defendants ask for Plaintiffs' data reproductions by November 1. But Defendants previously demanded the same disclosure by June 1, 2021—a full six months *later* than their new proposed deadline, Dkt. 435-2 at 6—and the Court rejected it. This is because it ignores the enormous amount of both client- and expert-assisted work involved. For example, Defendants seek the location of millions of FX trades. While certain Plaintiffs' data systems may track the identity of the FX trader, manual investigations must often be done to determine *where that trader worked*. Adding to this are Defendants' simultaneous demands for more information. For instance, Defendants served 13-single-spaced pages of questions, with two accompanying explanatory Excel spreadsheets, on Allianz alone. Then, only one month ago, Defendants served a new set of demands for over 80 data fields, which each Plaintiff must also now investigate.

In short, Defendants cannot impose an arbitrarily compacted deadline on Plaintiffs' data analyses, just so they have the "substantial time" they desire to do their own analyses. Indeed, we are unaware of a single case of this kind in this District (including the *Credit Default Swaps* (Judge Cote), *Interest Rate Swaps* (Judge Engelmayer); *LIBOR* (Judge Buchwald), *Gold* (Judge Caproni) and *GSE* (Judge Rakoff) cases) where a court has required Plaintiffs to complete their data analyses so far in advance of expert discovery. Defendants themselves took years to finalize their data productions in *FOREX*. Plaintiffs are working diligently to analyze their data and make refined reproductions. An arbitrary deadline of November 1 is unnecessary and unfair.[4]

**Defendants' request for guidance on custodial discovery is improper and premature.** After the parties conferred about what issues would be raised in this joint letter, and after multiple drafts had been exchanged, literally ***one hour before the filing deadline*** Defendants inserted for the first time a request for Court guidance on the "order of magnitude for custodial counts." Plaintiffs objected to such ambush tactics, but Defendants refused to budge. The number of custodians each Defendant should search is an enormously important issue, but we do not have the time or the space to brief the issue or correct Defendants' mischaracterizations now. Defendants remarkably blame Plaintiffs, arguing that Plaintiffs only recently made custodian counter-proposals. As an initial matter, this elides that Plaintiffs' counterproposals were each made within *days* of receiving Defendants' information, sometimes the next day. Further, Defendants' excuse-making only confirms that the parties have not completed their meet and confers. Plaintiffs made reasonable counterproposals to each Defendant in the context of a case about Defendants' 10-year conspiracy to manipulate the trillion-dollar FX market via multiple mechanisms and communication channels. Plaintiffs also expressed their willingness to confer to adjust the proposals as appropriate based on Defendants' individual circumstances. And Defendants have not even responded to questions raised by Plaintiffs about Defendants' proposal to impose artificial caps— which contradicts Defendants' earlier assurances they were going to do no such thing. In sum, any discussion of custodial limits must be in the context of facts unique to each Defendant (including, for example, whether the Defendant has made adequate prior productions), all of which cannot be addressed in one paragraph one hour before a filing is due. That Defendants offered Plaintiffs an additional day or page does not excuse their behavior, nor make these issues ripe.

---

[4]   Defendants misrepresent the record in asserting that PIMCO and BlackRock have not responded to Defendants' questions about trade data. But those Plaintiffs *did* long ago answer many of Defendants' requests, and have engaged in numerous conferrals. That those answers led to more questions only confirms this is an iterative process.

**DEFENDANTS' POSITIONS: BlackRock Should Answer Defendants' Recent Targeted TARs Discovery Requests.**   BlackRock should be compelled to answer Defendants' interrogatories concerning its failure to preserve Trade Analytics Reports ("TARs"), centrally-relevant documents that reveal BlackRock's own assessment of Defendants' "aggressive" and competitive pricing during the alleged conspiracy.  *See* 4/2/20 Tr. 41:2-12.  On April 2, 2020, after nearly a year of meet-and-confer discussions and multiple motions to compel, Judge Schofield concluded that Plaintiffs' counsel's conclusory assertions about BlackRock's failure to produce its TARs were insufficient, and that BlackRock must file an "affidavit from a person with knowledge at BlackRock to explain" a number of facts about its collection of TARs, including "the location of the TARs that have not been produced."  ECF 372 at 2.  In that April 23, 2020 affidavit (the "TARs Affidavit"), BlackRock revealed for the first time that in 2015 or 2016—two or three years *after* the Bloomberg article that led to this litigation was widely publicized and the *FOREX* litigation had been filed—it *deleted* the entire database on which it stored its TARs.  Since it filed the Court-ordered TARs Affidavit, BlackRock has continued to obstruct discovery concerning its TARs and the assertions made in its TARs Affidavit.  For example, though Judge Schofield herself stated that Defendants should take a Rule 30(b)(6) deposition of BlackRock concerning TARs, BlackRock objected to allowing its witness to provide any testimony "beyond what is in that declaration already" (6/24/20 Tr. 40:22-23)—forcing Your Honor to explain that "in depositions people get to ask questions poking at things" (*id.* 41:13-15).

BlackRock also has not produced a single document concerning its assertions about its TARs, including its repeated suggestion that it did not anticipate litigation in 2015 or 2016.  *See, e.g.*, ECF 474 at 6 (arguing "[t]his case was filed almost three years later"); 6/24/20 Tr. 40:10 (same).  On July 16, 2020, in anticipation of their upcoming 30(b)(6) deposition of BlackRock, Defendants served targeted discovery requests: (1) two interrogatories asking BlackRock to identify (i) "the date" on which BlackRock first communicated with legal counsel concerning "any potential litigation … against any Defendant arising out of FX trading" and (ii) "the date" on which BlackRock retained counsel in connection with any such litigation (collectively, the "Interrogatories"); and (2) four requests for documents concerning the assertions in the TARs Affidavit, including documents "sufficient to show" "the date(s)" on which any TARs were preserved or deleted, and steps taken to preserve TARs.[5]

BlackRock refuses to answer the Interrogatories, but its objections to doing so are entirely without merit and should be overruled.  <u>First</u>, BlackRock misstates the law and mischaracterizes its own cited cases.  None holds that it must be "conclusively determined that documents have been destroyed" before any discovery into document preservation is allowed, but only that "*mere speculation*" does not justify further inquiry.  *Ceglia v. Zuckerberg*, 2012 WL 12995636, at \*10 (W.D.N.Y. June 28, 2012) (emphasis added).  Here, BlackRock filed a sworn admission that relevant documents *were* destroyed.  *See* ECF 386.  BlackRock attempts to escape that admission, but (i) Defendants fortuitously learned from Credit Suisse's *FOREX* expert that BlackRock maintained a "central database where TARs were regularly kept" (ECF 361 at 3), (ii) counsel offered the excuse that those TARs "were on a prior system that had since been decommissioned"

---

[5] Plaintiffs' counsel represents that BlackRock has **no** responsive documents about TARs in connection with the "decommissioning" of its document management system.  This strikes Defendants as highly unlikely.  Defendants now seek to confirm that BlackRock has not refused to search locations where responsive documents are likely to be stored, and is not withholding responsive documents on any basis.  In any case, Defendants will question BlackRock's 30(b)(6) witness about what appears to be an untenable assertion by counsel.

(4/2/20 Tr. 43:21-22), and (iii) the TARs Affidavit likewise admitted those TARs "would have been stored" on the "decommission[ed]" system (ECF 386 ¶ 8).  BlackRock's argument about the "possibility" of recovering *some* TARs also does not preclude discovery about the loss of TARs from that system.  *Cf. Taylor v. Shippers Transp. Express, Inc.*, 2014 WL 12560879, at \*6 (C.D. Cal. July 7, 2014) (spoliation possible where a party may not "recover all" documents from alternative source).  Second, BlackRock mischaracterizes Your Honor's instructions that, because "the crux of the issue here may be when BlackRock reasonably anticipated litigation," that issue should be "addressed by the parties."  7/29/20 Tr. 12:25-13:9.  It was precisely because of "the issue of privilege, after the objections are served"—*i.e.*, BlackRock's objections to the requests now in dispute—that Your Honor gave those instructions.  *Id.* 12:15-16.  Third, BlackRock again asserts that it did not anticipate litigation in 2015 or 2016, but tellingly once again refuses to say when it *did* anticipate litigation.  BlackRock's own arguments put that date in dispute—and the date is not privileged.[6]  Fourth, BlackRock resurrects its failed relevance argument for the fourth time, but "the relevance point" has "*already been decided*."  7/29/20 Tr. 12:1-3 (emphasis added).

**Plaintiffs Should Provide Hit Counts By September 11.**  On May 7, 2020, Judge Schofield ordered that "Plaintiffs shall run the disputed search terms and share the hit counts with Defendants."  ECF 393 at 2.  Plaintiffs did not provide any hit counts until July, and to date have done so for fewer than half of the 18 Plaintiff groups.  Critically, Plaintiffs' existing custodians are only for the "sampling" production (ECF 372 at 2), which is "without prejudice to [Plaintiffs] perhaps ultimately needing to produce much more or even as much as the defendants want." 4/20/20 Tr. 27:7-9.  Only after Plaintiffs disclose their hit counts can Defendants (a) negotiate the searches that will be run, (b) review the sampling production and assess what additional custodians are needed, and (c) present any disputes to Your Honor.  To ensure that we have adequate time to pursue these steps, we have repeatedly asked Plaintiffs to propose a date for substantially completing their hit counts.  Plaintiffs have refused to provide *any* date.  Defendants respectfully request that Plaintiffs substantially complete their disclosure of hit counts by September 11.

**Plaintiffs' Revised Trading Data.**  At the June 24, 2020 conference, Plaintiffs told the Court that they would produce revised trading data for those FX transactions that Plaintiffs assert are still at issue in this case.  Defendants will then compare Plaintiffs' revised data to their own data, and the parties will meet and confer to determine which trades are in-scope and which are in dispute. Given the volume and complexity of trading data in this case—encompassing hundreds of millions of trades—reconciling the parties' data will require substantial time and effort.  This process is critical because Defendants' data may contain unique information showing that certain transactions are out-of-scope.  To streamline this process, Defendants have tried to negotiate with Plaintiffs regarding what will be included in their revised data production.  Plaintiffs, however, have largely refused to engage, giving rise to two disputes.

First, on July 22, Defendants made a comprehensive proposal for the exchanges of information regarding trading data, including a detailed list of the data fields that Defendants seek in the revised production to facilitate the reconciliation analysis.  Defendants believe that the large majority of these data fields are likely contained in Plaintiffs' raw data, because they were in various Plaintiffs' prior trading data productions.  Additionally, for fields that are not directly contained in Plaintiffs'

---

[6] *See, e.g., Arjangrad v. JPMorgan Chase Bank, N.A.*, 2011 WL 13253324, at \*5 (D. Or. Oct. 19, 2011) (compelling disclosure of the dates of engagement and discussions with counsel); *E3 Biofuels, LLC v. Biothane, LLC*, 2012 WL 2523048, at \*8 (D. Neb. June 29, 2012) (requiring disclosure of date when a party "first contemplated filing suit").

raw trading data, Plaintiffs may have related information that could inform the analysis.   In response, Plaintiffs have asserted that "85%" of the data fields in Defendants' proposal are "derived" fields, *i.e.*, fields that cannot be automatically generated from raw data, and have argued that Plaintiffs need not include purportedly "derived" fields in the revised trading data.   However, Plaintiffs have refused to identify which fields they assert are "derived," and refused to say when, if ever, they would identify those fields.   Second, Plaintiffs refuse to provide any timeline for their revised trading data production or for conferring with Defendants in advance.   Plaintiffs' delay will prevent Defendants from mapping Plaintiffs' voluminous data against our own with sufficient time to seek additional fact discovery about the transactions in dispute.   Defendants respectfully request that the Court direct Plaintiffs to (i) specify any requested data fields that they will not include in the revised production, and their basis for excluding each field, (ii) thereafter meet and confer with Defendants by September 18, 2020 about the format and scope of their revised trading data production, and (iii) complete that production by November 1, 2020.[7]

**Reasonable Limits Should Apply to the Number of Custodians for Defendants' Supplemental Document Collection Efforts**.   Based on Plaintiffs' recent custodian counter-proposals for document collection efforts focusing on the early period (2003-07), there is a fundamental disagreement about what early period custodial discovery is reasonable and proportional to the needs of the case.   Plaintiffs have requested nearly **1,000** custodians for just 12 of the 16 Defendants, as four other banks are still awaiting counterproposals.[8]   Several banks have received requests in the range of 86 to 131 custodians, which is up to *13* times the usual limit of 10 custodians set by Judge Schofield's Individual Practices (*see* § II-A-1-(a)).   Defendants, in turn, have proposed that document collections focusing on the early period—and supplementing the 2.3 million documents already produced—should cover a total of 240 custodians across all 16 Defendant groups (an average of 15 custodians per group—*50% above* the usual limit).   To account for any arguable need for more custodians for some banks, Defendants would permit Plaintiffs to request up to 25 custodians for specific banks, provided Plaintiffs adjust the requests to other banks so that the overall total does not exceed 240.   Plaintiffs have rejected this proposal.

Plaintiffs' custodian demands are so dramatically overbroad and disproportionate as to require the Court's guidance.   Their attempts to prevent Defendants from even raising this issue only underscore this fact.   Plaintiffs' complaints that we raised this issue at the last minute are a red herring.   Plaintiffs waited many weeks after receiving Defendants' custodial proposals, and until just before the Court's August 24 deadline, to make their sweeping counterproposals.   Defendants promptly responded by raising this threshold issue on August 24 and even offered today to jointly request more time and space to address it.   Plaintiffs declined.   Although Defendants stand ready to continue conferring on each bank's custodian list, general guidance from the Court about this gating issue—the reasonable order of magnitude for custodians—would substantially advance the parties' discussions, avoid delay, and discourage wasteful and unproductive negotiation postures.

---

[7] Plaintiffs claim deadlines are unnecessary because "the parties are already conferring about data-related issues," but this ignores Plaintiffs' pattern of delay.   As just one example, Defendants are still waiting for answers to questions they sent Plaintiffs about PIMCO's data in December 2019 and BlackRock's data in January 2020.   Plaintiffs simply will not advance this process at a reasonable pace unless ordered to do so.

[8] Plaintiffs' proposals thus far include a total of 970 custodians from Bank of America (70), Barclays (131), Citi (101), Credit Suisse (46), Deutsche Bank (128), HSBC (71), JPMorgan (48), Morgan Stanley (89), RBS (86), Société Générale (47), Standard Chartered (86), and UBS (67).

**Defendants' Report on Plaintiffs' Refusal to Narrow Their Custodial Informational Requests.**  The Court's August 4 Order (the "8/4 Order") required Plaintiffs to confer bilaterally with each Defendant "on *narrowing* the remaining informational requests" by August 14, 2020, so that each Defendant could then "use its best efforts to provide *reasonably available* responsive information based on its individual circumstances" in advance of the August 24, 2020 deadline for the parties to "reach agreement on initial search terms and custodians."  (ECF No. 486 at 4.)  Plaintiffs failed to comply with the Court's directives to narrow their prior informational requests or to compromise.  To the contrary, on the eve of the Court-imposed August 24 deadline, Plaintiffs either sent Defendants new informational requests or made highly expansive counterproposals.

Plaintiffs now indisputably have a trove of information—indeed, much more than they provided to Defendants—from which to make informed decisions about custodians, including millions of custodial documents that Defendants produced in early 2019, and extensive information in response to Plaintiffs' informal requests.  As the Court has noted, it has been charged with getting this case moving.  The only way to achieve that goal is for the Court to reject Plaintiffs' requests for further custodial information that serve only to delay the selection of custodians.[9]

**Plaintiffs' Request for Additional HR Information.**  In each bilateral conferral following the Court's 8/4 Order to narrow their requests, Plaintiffs refused to narrow their broadest request for comprehensive identification of all FX traders and supervisors worldwide and all available HR information for the entire five-year "early period" from 2003 through 2007, and extended to the full decade spanning 2003 through 2013 for SG.  Defendants nevertheless provided extensive employee information, which Plaintiffs used to inform their custodial counterproposals.  No additional information is needed.  Indeed, with regard to SG, in addition to the tens of thousands of interbank chats with SG participants that Plaintiffs already possess, SG has provided all U.S.-based organizational charts that it could identify, and detailed HR information for each of the 76 individuals that Plaintiffs have specifically requested.

Despite all this, on the eve of the August 24 deadline, Plaintiffs requested more information from SG and GS.  For example, on August 20, SG received a list of approximately 150 numerical IDs that had just "come to [Plaintiffs'] attention" even though Plaintiffs had been in possession of SG's trade data since July 2019.  In making these delinquent requests, which SG has confirmed do not even map to its HR data systems, Plaintiffs admitted they had only recently reviewed public information and documents produced more than a year ago to identify potential custodians.  This puts the October 16, 2020 substantial completion deadline in jeopardy.  The parties must agree on custodians quickly so that collection, testing of search terms, and review can commence.

Plaintiffs also completely misstate the negotiations with GS.  GS provided extensive responses to Plaintiffs' broad information requests by August 14.  Plaintiffs then made new requests last week for (1) HR information for 35 individuals, and (2) HR information for late-period FX traders who were excluded as custodians in the broad prior regulatory investigations (and thus are highly unlikely to have relevant communications for the early period).  In any event, despite the

---

[9]  Plaintiffs have also ignored the Court's instruction to "bring any disputes to the Court on a Defendant-by-Defendant basis."  Instead, Plaintiffs lump together differently situated Defendants to avoid addressing Defendants' specific arguments.  While the Court should reject Plaintiffs' requests for the reasons stated herein, should it question whether Plaintiffs are entitled to more information, Defendants respectfully request Defendant-specific briefing as provided by the August 4 Order, as space limitations have prevented Defendants from presenting their full positions.

untimeliness and irrelevance of these requests, GS has produced the very information Plaintiffs are requesting for 21 of the new individuals and is continuing to investigate what additional information is readily accessible for the remainder.  Plaintiffs' untimely information requests should be denied.

**Plaintiffs' Request for Identification of Suspended and Terminated Employees.**  Plaintiffs' request that the Court order Defendants Barclays, SG, and UBS to identify "employees who were suspended, fired, or forced to resign" ignores the 8/4 Order's requirement that disputes need to be raised on a "Defendant-by-Defendant" basis in an effort to elide Defendants' individual circumstances.  For example, Barclays' objection here is that *Plaintiffs* are refusing to identify their employees that were suspended or terminated for FX-related misconduct.  From July 28 through August 19, Barclays requested this information four separate times.  But Plaintiffs simply *ignored* Barclays' request until this joint letter.  Plaintiffs' assertions that Barclays "never seriously sought such information" and that Plaintiffs are willing to meet-and-confer to "resolve the matter" are demonstrably false.  Barclays has repeatedly asked for this information for almost a month and Plaintiffs have been stonewalling.  As this Court has admonished before, in discovery "the door swings both ways."  (6/24/20 Tr. 42:24.)  If Plaintiffs want this information from Barclays, they should have to provide it in return.

Further, Defendants are subject to data privacy laws and regulations in many foreign jurisdictions, and specific termination agreements, that may prevent certain disclosures.  Plaintiffs ignore this and claim that only U.S. law applies here.  This is incorrect.  If Plaintiffs want to litigate these issues they should do so in the defendant-by-defendant manner prescribed by this Court.[10]

**Plaintiffs' Request for Documents Produced By SG to U.S. Prudential Regulators.**  SG has made no regulatory productions to the DOJ, the CFTC, the U.K. Financial Conduct Authority, the European Commission, or any other U.S. or foreign competition regulators.  Plaintiffs have brought a case grounded in alleged antitrust violations, yet Plaintiffs attempt to seek from SG documents produced to its prudential regulators.  To the extent they exist, such documents are confidential supervisory information ("CSI") and exempt from disclosure by statute.  *See, e.g.*, 12 C.F.R §§ 261.2(c), 261.20; N.Y. Banking Law § 36.10.  As Plaintiffs' own authorities make clear, "documents prepared by, on behalf of, or for use of" prudential regulators are "protected from disclosure unless a person files a written request" seeking permission from the applicable prudential regulator, and such "request is considered be an exhaustion of administrative remedies for discovery purposes." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2016 WL 6779901, at *5-6 (S.D.N.Y. Nov. 16, 2016) (denying motion to compel CSI because "the materials Plaintiffs seek cannot – at least in the first instance – be obtained via subpoena from defendants"); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 5125089, at *2 (C.D. Cal. Dec. 28, 2009).

SG does not contend that contemporaneous documents produced to prudential regulators are CSI but the compilation and selection of these materials is CSI under the regulators' broad interpretation of CSI and its analogs in foreign jurisdictions.  This constrains SG's ability to produce any compilation of materials previously produced to prudential regulators so Plaintiffs must pursue the appropriate administrative remedies.  SG is, however, willing to produce any contemporaneous documents previously produced to prudential regulators to the extent they are identified in the ordinary course during custodial discovery.

---

[10] None of the employment law cases Plaintiffs cite is to the contrary because none addresses issues of foreign law.