**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

November 20, 2020

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/27/2020

WRITER'S DIRECT DIAL NO.
**(212) 849-7345**

WRITER'S EMAIL ADDRESS
danbrockett@quinnemanuel.com

**VIA ECF**

The Honorable Stewart D. Aaron
United States Courthouse
500 Pearl Street
New York, NY 10007

*Allianz Global Investors GmbH, et al. v. Bank of America Corporation, et al.*, 1:18-cv-10364

Dear Judge Aaron,

We submit this letter on behalf of Plaintiff Norges Bank ("Norges") to seek a protective order regarding the number of custodians Norges should be required to search for purposes of its sampling production.[1] Norges maintains five custodians is proportional, and Defendants demand ten. In view of the size of Norges's claims, the representativeness of the five-custodian sample, and the significant burden of adding more, five custodians is more than enough to offer a meaningful sampling production. As explained more fully below, the incremental burden of adding five more custodians is disproportionate to the needs of the case. Due to complexity and expanse of Defendants' search terms and local data privacy regulations, Norges' legal, compliance and IT staff has already devoted close to 70 hours to just getting hit counts for the five agreed custodians. Furthermore, hits on the documents of the five agreed custodians already exceed over two and a half million documents, nearly 90% of the total documents produced by all 16 Defendant groups combined and a clearly sufficient representative sample. As such, Defendants' insistence on at least five more custodians—seeking to impose the same burden on Norges as on Plaintiffs with far larger operations and claims and way more than they were willing to accept for other similarly-situated Plaintiffs—is unreasonable. Accordingly, we respectfully move for a protective order foreclosing Defendants' unreasonable demand.

**Background**

On June 24, 2020, Norges proposed four sample custodians to Defendants. Defendants accepted three and asked for an additional seven custodians. While Norges believes it has few, if any, relevant documents, on July 15, Norges agreed, as a compromise, to add two of the seven custodians Defendants requested, together with the three Norges originally proposed that were accepted by Defendants (the "five agreed custodians"). But Defendants insisted on their original ten custodians—the five agreed custodians plus four former employees (the "four former employees") and Mr. ▇▇▇▇▇ ("Mr. ▇") (a Norges employee who works for a division unrelated to the trades at issue in this litigation).

Nonetheless, in the interest of solving the issue without bothering Your Honor, and despite the incremental burden, Norges: (a) agreed to add the four former employees demanded by Defendants on top of the five custodians already agreed upon; (b) explained to Defendants that these four former employees had Bloomberg chats and other electronic documents, but that their emails were not in accessible format[2]; and (c) started the process of collecting these four former employees' documents. After about two weeks of radio silence, Defendants changed their position, withdrawing their request to add the four former employees and instead requested for the first time that Norges add four different custodians ("four new custodians"). As to Mr. ▇, Defendants recognized his irrelevance to the litigation by initially proposing to drop Mr. ▇ in exchange for a

---

[1] In accordance with Rule II(b) of Your Honor's Individual Practices, Norges certifies that on November 20, 2020, at 3:00 p.m. EST, the parties met and conferred regarding proposed custodians for approximately an hour. This was the last of multiple calls and correspondence on the subject where counsel for Norges, (namely Johanna Ong, Melissa Dalziel and Nicoletta Malogioglio) and counsel for Defendants (namely, Patrick Montgomery and Jason Kolbe). Plaintiffs declared impasse during the November 20, 2020 meet-and-confer call, which was subsequently confirmed by email.

stipulation that Norges is not seeking, and will not seek, damages for trades made by the division where Mr. ▮ worked. Plaintiffs agreed to so stipulate, but then Defendants withdrew their offer, claiming Plaintiffs must prove the trades at issue in the case were not transacted by Mr. Xu's division, on a transaction by transaction level. But Defendants refused to provide the unmasked trade data that would allow Plaintiffs to do this exercise. .

**Five Custodians Is Proportional To The Needs of The Case For Norges' Sample Production**

The five agreed custodians offer a robust sample and any more would be disproportionate to the needs of the case. Norges identified only these five custodians as having knowledge of Norges' FX trading with Defendants in their interrogatory responses. They covered and are still covering ▮▮▮▮▮▮▮▮. Given their FX-trading roles and long tenure at Norges, these five agreed custodians are ▮ an sufficient candidates for purposes of the sampling exercise. Hit counts for these five custodians alone total more than two and a half million non-de duplicated documents, close to the *total* number of documents produced by all sixteen defendant groups combined.[3]

There is no reason to believe that simply adding more custodians is going to help Defendants get additional unique and relevant documents. The goal of the sample exercise is to determine whether Plaintiffs have relevant documents and whether the burden of collecting and producing them is reasonable and proportional to their evidentiary value; it is not designed to obtain every possible scrap of paper relating to Plaintiffs' FX trading. Defendants have never articulated why adding five more people would further this goal.

Instead, Defendants have latched onto a misreading of Judge Schofield's April 3, 2020 Order, claiming the Court required Plaintiffs to provide ten custodians per Plaintiff. But that order actually states that "Plaintiffs shall provide Defendants a list of ten possible custodians ***per Plaintiff "group"*** (or any other number to which the parties agree) who are the most likely to be fruitful witnesses, and information regarding (1) the individual's relevant role; and (2) the extent to which those ten possible custodians ***are applicable to the individual Plaintiffs within each group***. Dkt. 372 at 2 (emphasis added). It is evident from the plain wording of the order that the 10-custodian minimum was directed at Plaintiff "groups," such as BlackRock and PIMCO, who comprise hundreds of affiliated Plaintiff funds. Indeed, the backdrop to the April 3 Order was Defendants' proposed custodian list containing over 1,400 custodians for non-foreign plaintiffs alone. Judge Schofield rejected that argument, holding that such Plaintiff "groups" need only search a maximum of 10 custodians.[4] She did not rule that *individual, non-group Plaintiffs*, such as Norges, also had to search 10 custodians.[5] Indeed, Defendants have themselves acknowledged this fact by agreeing to fewer than 10 custodians for most individual Plaintiffs. For instance, Defendants agreed to two custodians for US Plaintiffs PRIM and SEI, and six custodians for US Plaintiff CalSTRS. Also, once custodial negotiations for foreign plaintiffs began in earnest in the summer of 2020, after Defendants' motions to dismiss these plaintiffs were denied and after the Court's April 3 Order was already in place, Defendants still agreed to much fewer than 10

---

[3] These hit counts do not account for revised terms recently agreed to with Defendants which will likely result in an even higher document count.
[4] At the April hearing, Judge Schofield focused on the "group plaintiffs" whose operations are centralized. (*See e.g.*, April 2, 2020 Hearing Tr. at 17:18-24 ("THE COURT: But, Mr. Nagy, as far as you know, how many of these eight plaintiff groups conduct their business, their relevant business, centrally so we would be talking about voluminous searches, within eight entities broadly speaking, rather than 1400? MR. NAGY: Your Honor, I think to some extent a few of the groups, perhaps six of them, do something centrally."); *id.*, at 20:7-9 ("THE COURT: . . . If we were going to try to identify the top one or two custodians from each of the eight groups, how would we do that?").
[5] Defendants also rely on Judge Schofield's presumptive limit of 10 custodians as support for their claim they are entitled to 10 custodians. But Judge Schofield's rules set a ceiling, not a floor. *See* Judge Schofield's Individual Rules and Procedures for Civil Cases, Section IIA1(a) ("a party shall not be required to search for responsive ESI from more than 10 key custodians"). Judge Schofield does not mandate that every Plaintiff search a minimum of 10 custodians' documents, particularly where, as here 10 would not be proportional to the needs of the case.

custodians for all the foreign plaintiffs except Norges.  Defendants agreed to three custodians for EAA, four custodians for PFA, five custodians for AP1, AP2 and AP3, and six custodians for AP4.  During months of meet and confers, Defendants have never offered any reason why Norges should be treated differently.  Instead, they have simply repeated the mantra that they are entitled to 10 custodians, regardless of relevance or proportionality.  But the Court has repeatedly recognized that "the plaintiffs are not a monolithic group, nor are the defendants.  The devil's in the details, as well as in the individual organizations." July 29, 2020 Hearing Tr. at 28:13-16; *see also* November 10, 2020 Hearing Tr. at 26:23-24 ("The plaintiffs, both sides of the caption, I don't believe should be treated as a monolith.").  In the case of Norges, five custodians is proportional to the needs of the case.  Unlike institutional Plaintiffs, such as PIMCO or BlackRock, Norges has significantly fewer employees (during the relevant period, Norges had from 116 employees in 2003 to 370 in 2013) as opposed to thousands for Blackrock and PIMCO.  Norges also has just a fraction of the FX trades of these other Plaintiffs.  For example, Norges has less than 1% of PIMCO's FX trades by number (5,270 trades compared to approximately 1 million).  Similarly, Norges has less than 1% of BlackRock's trades by number (5,270 trade records compared to approximately 567,000).  In these circumstances, forcing Norges to search 10 custodians, when PIMCO and BlackRock are searching 13 and 14 custodians, respectively, makes no sense.

**Searching Five Additional Custodians Will Constitute Undue Burden.**

As noted above, in Norway, accessing and processing electronic files of employees is subject to stringent privacy regulations.  As such, collecting and processing electronic files especially emails and chats for Norges is not a purely mechanical exercise.  Norges has to ensure that any searches of employees' electronic files comply with local privacy regulations and its own procedures, which include receiving relevant compliance approvals, providing notifications to employees, and accommodating each employee's right to be present during any search.  While Norges has not had difficulty processing such searches in prior litigations, the breadth of Defendants' search terms in this case presented significant challenges and added tens of hours of work for its employees.  Specifically, Defendants' search terms were so extensive and complex that they could not be run on Norges' own network and considering local privacy regulations Norges could not just export entire mailboxes to a third party vendor.  Accordingly, Norges had to install and test a new software on an isolated laptop, and export relevant custodians' entire mailboxes and/or chatrooms onto that laptop and then run the search terms.  This process took about 40 hours just for the IT staff, at least 25 hours for legal staff to coordinate with the IT staff, external counsel, and privacy data experts, and several hours for compliance staff to provide approvals for searches and relevant notices to employees.  While processing another five custodians may be somewhat easier, Norges estimates it will still take at least another 25 to 30 hours of work.  We respectfully submit that considering the significant production that has already been gathered from the five agreed custodians, this is undue burden.

\*\*\*

In consideration of all the above, we respectfully ask that Your Honor issue a protective order foreclosing Defendants' demand that Norges add yet another five custodians to the five already agreed upon.

|  | Respectfully submitted, | */s/ Daniel L. Brockett* |
|---|---|---|

Daniel L. Brockett
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor, New York, New York 10010
Telephone: (212) 849-7000 / Fax: (212) 849-7100
danbrockett@quinnemanuel.com

Jeremy D. Andersen (pro hac vice)
Anthony P. Alden (pro hac vice)
Johanna Y. Ong (pro hac vice)
865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017
Telephone: (213) 443-3000 / Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
anthonyalden@quinnemanuel.com
johannaong@quinnemanuel.com

*Counsel for Plaintiffs*

cc: Counsel for all parties via ECF

ENDORSEMENT: Plaintiff Norges Bank's Letter Motion for a protective order (ECF Nos. 661 & 663) is DENIED. Norges chose to sue as a plaintiff in this case, and the Court sees no persuasive reason why the default number of ten custodians provided by Judge Schofield's 4/3/20 Order (ECF No. 372), and Judge Schofield's Individual Rules, should not apply to Norges. In addition, considering the confidentiality and privacy interests at issue, the Letter Motions to seal that were filed at ECF Nos. 662, 668 and 674 are GRANTED. SO ORDERED.
Dated: 11/27/2020

*[Signature: Stewart D. Aaron]*