November 16, 2021

**VIA ECF**

The Honorable Stewart D. Aaron
United States Magistrate Judge
Daniel Patrick Moynihan Courthouse
500 Pearl St.
New York, NY 10007

      Re:     *Allianz Global Investors GmbH, et al. v. Bank of America Corporation, et al.*,
             Case No. 1:18-cv-10364 (S.D.N.Y. 2018)

Dear Judge Aaron,

      Pursuant to the Court's Order of October 18, 2021 (ECF 937), the parties jointly submit
this letter setting forth their respective positions on the issues to be addressed at the November 18,
2021 conference.

Respectfully submitted,

DONTZIN NAGY & FLEISSIG LLP        QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


By:/s/   Tibor L. Nagy, Jr.             By:/s/   Daniel L. Brockett

Tibor L. Nagy, Jr.                    Daniel L. Brockett
980 Madison Avenue, 2nd Floor      51 Madison Avenue, 22nd Floor
New York, New York 10075          New York, New York 10010
Telephone: (212) 717-2900         Telephone: (212) 849-7000
Fax: (212) 717-8088                Fax: (212) 849-7100
tibor@dnfllp.com                   danbrockett@quinnemanuel.com

*Counsel for Defendants JPMorgan*    *Counsel for Plaintiffs*
*Chase & Co., JPMorgan Chase Bank,*
*N.A. and J.P. Morgan Securities LLC*

**DEFENDANTS' POSITIONS ON CURRENT DISCOVERY DISPUTES AND ISSUES**

**The Court Should Impose a Framework for Discovery of Third-Party Location Information Consistent With the Guidance Provided at the Last Conference.**  As discussed at the last conference, Plaintiffs refused to answer RBS's interrogatory seeking office locations of entities that entered into FX transactions on Plaintiffs' behalf.  Such information may show that transactions are extraterritorial, and thus not actionable.  *See* ECF 406 at 16; ECF 493 at 3-4; ECF 929 at 4-5.  Plaintiffs concede that this information may be relevant, but even though the information could generally be obtained very easily—as simply as a phone call with a Plaintiff's investment advisor on which they say that they trade FX out of their New York office—Plaintiffs have not asked any of their agents for the information, falsely asserting that Defendants have asked for "employment-location lists."  Plaintiffs instead seek to force Defendants to identify and serve subpoenas or Hague Convention requests on *more than 125* third parties to obtain the information.[1]

At the October 14, 2021 conference, the Court proposed a practical solution consistent with Plaintiffs' representations that: (i) they "will not be relying on the location of these third-party vendors" to try to prove that trades are in-scope, 10/14/21 Hr'g Tr. at 53:25-54:3; and (ii) "[a]ll we need to do is have an understanding that the one fact plaintiffs will not rely upon, when putting a trade at issue that involves a third-party manager, is the third party's location where we do not know the third party's location . . . the Court can presume it was on Mars."  *Id.* at 56:15-57:12.  The Court directed the parties to meet and confer regarding a stipulation to avoid further burdensome discovery on this issue, proposing that Plaintiffs "concede that any trade where the [P]laintiff has not proven up where that third party is located will be deemed to be located outside the United States."  *Id.* at 57:13-17; *see* ECF 938, ¶ 2.

Defendants proposed a draft stipulation following this exact framework.  Plaintiffs rejected it and countered with a proposal that contradicts their representations and seeks to evade the sensible presumption suggested by the Court.[2]  Instead, Plaintiffs' proposal merely restates their existing obligation not to withhold responsive information in their possession.  And far from streamlining discovery, Plaintiffs' proposal *requires* broad discovery by leaving Defendants in the dark about whether and to what extent Plaintiffs may ultimately seek to place their agents' locations at issue.  Indeed, Plaintiffs now disavow their prior contention that RBS's interrogatories are "moot."  Plaintiffs' shifting positions confirm that their only goal is to make discovery into the locations of their agents—for Plaintiffs' own trades— as difficult and burdensome as possible.

In light of Plaintiffs' refusal to enter into a stipulation consistent with their representations and Your Honor's guidance for resolving this dispute, Defendants respectfully ask Your Honor to (1)

---

[1] Allianz, for example, has to date still failed to provide the *identity* of all the agents who traded on its behalf.

[2] Plaintiffs proposed: "To the extent a third party placed an at-issue trade on behalf of a Plaintiff, such Plaintiff shall not use any non-publicly available documents or data to establish the location from which the third-party entered into the trade unless such documents or data are produced in discovery, absent further relief by agreement or the Court for good cause shown."

set a deadline of November 30, 2021, by which Plaintiffs must identify which of their trades were entered into by a third party on the Plaintiff's behalf, to the extent they have not already,[3] and (2) set a deadline of January 15, 2022, for all Plaintiffs to produce any evidence regarding the location(s) of such third parties in Plaintiffs' possession or obtained from the third party.[4]

Defendants' proposed framework would achieve the goals that Your Honor articulated at the last court conference because it would streamline any required discovery. For example, it would avoid burdensome international requests through the Hague Convention simply to confirm that dozens of intermediaries domiciled abroad did not somehow trade from the U.S. If Plaintiffs did *not* put forward evidence of trading locations for certain third parties by the January deadline, then consistent with Plaintiffs' burden of proof to establish a domestic trade, those third parties' trades would be deemed to have been placed abroad, and no discovery from those third parties would be needed.[5] If Plaintiffs *did* put forward evidence of third party trading locations by the deadline, Defendants would have the opportunity to either accept Plaintiffs' submission or, if necessary, seek targeted discovery (via RBS's interrogatories, Defendants' other discovery requests on this topic, or third party discovery) focused on any at-issue trades, the location of which may be in dispute. Either way, discovery would be streamlined and targeted only at issues actually in dispute.

Plaintiffs' response largely ignores Defendants' proposal and peddles mischaracterizations at every turn. Plaintiffs fail to note that the Court reserved decision as to whether Plaintiffs should comply with RBS's interrogatory and directed the parties to meet and confer regarding a reasonable path forward. ECF 938, ¶ 2. After Plaintiffs rejected Defendants' proposed stipulation, Defendants promptly suggested the proposal above in an attempt to break the logjam. Despite all the ink Plaintiffs spill on the supposed adequacy of their interrogatory responses, Plaintiffs have not fully answered Defendants' interrogatories and Defendants are attempting to establish a timeline and process that may obviate or narrow the need to do so. Moreover, contrary to Plaintiffs' assertions, Defendants' proposal is not a "contention" interrogatory, nor would it reveal any privileged "litigation strategy" or bar reliance on "public information." Rather, Defendants propose a practical framework to efficiently determine which of Plaintiffs' trades are at issue as far as their agents' location goes, and our proposal requires nothing more than setting a discovery deadline. There is nothing "unprecedented" about that.

**AP2's Significant, Unaddressed Production Deficiencies.** AP2 claims it has substantially completed its custodial sampling productions, but has produced approximately 1,650 total documents and ***fewer than 450 emails***. Indeed, AP2 ***has produced 10 or fewer emails for multiple custodians*** that AP2 identified as individuals with relevant information. Take one sampling

---

[3] Allianz, Anchorage, BlackRock, BlueCrest, and Portigon have not yet disclosed this information.

[4] Contrary to Plaintiffs' suggestion, Defendants' request for such information is not "new." The information is responsive to discovery requests that Defendants served in March 2019 and May 2020 (among others). The only thing "new" about Defendants' request is the request for a deadline for Plaintiffs to produce the information.

[5] *See, e.g.*, 10/14/21 Hr'g Tr. at 48:20-24 ("[I]t's plaintiffs' burden, of course, to put trades, you know, at issue in this case. And as part of our case, if we are not relying on the location of that third-party trader, it's the same as if the trader existed outside the US, right?").

custodian as an example – Anders Sköldberg, a "Portfolio Manager FX and Cash Management" from July 2002 to June 2018 and, according to his LinkedIn profile, "[m]anag[ed] FX hedging, FX trading and cash management[,]" and "[i]mplement[ed] FX strategies and changes to AP2 FX policies[,]" was involved in *3 emails*. Similarly, AP2 has produced *a total of 10 emails* involving Michael Störup—another AP2 custodian who "traded FX for [AP2] from December 1, 2007 to December 31, 2013." Fewer than 450 relevant emails over an 11-year period in a case alleging "millions of dollars" in damages is facially implausible. Adding to these deficiencies, AP2 has not produced a single document from any chat room (among the many) involving AP2 and non-defendant FX counterparties. AP2 has refused to *address these deficiencies*.

Accordingly, Defendants seek an order requiring AP2 to file with the Court by November 24 a declaration (a) detailing its efforts to search for reasonably accessible data for each AP2 custodian that AP2 has in its possession, custody or control, (b) identifying the type, source, date range, and volume of data identified for each custodian, and (c) stating whether the data has been collected and responsive documents from each such data source have been produced.

**PFA's Significant Production Deficiencies Remain Unaddressed.** PFA's production is similarly deficient. PFA has produced only 246 custodial documents for Robin Stentoft Cortes—a Senior Portfolio Manager and Risk Manager—and only 232 custodial documents for Christian Lindstrøm Lage—who served as Chief Investment Officer and a Senior Portfolio Manager at PFA Asset Management. These flaws are just the start – Cortes is listed as the only custodian for emails he is not even on, and Cortes and Lage are not listed as custodians for emails they sent or received. Worse, last week, PFA disclosed for the first time that it collected virtually *no* emails for Cortes, claiming that his email mailbox "contained only 119 documents from 2003-2013, most of which were 'Undeliverable' bounce-backs from postmasters." PFA did not timely inform Defendants that Cortes was not a meaningful custodian so that Defendants could have selected an alternative custodian. PFA's excuses do not add up – PFA claimed that it collected emails for Cortes from "November 2003 to November 2013," but Cortes *began* working at PFA in October 2010, long after 2003, and remained a Senior Portfolio Manager until August 2021.

PFA's erroneous representations underscore Defendants' concerns. Over a year ago, PFA told Defendants that it had "searched diligently" but found "no data available for Martin Hygild Sørensen and Martin Schiött Rasmussen" (another requested sampling custodian). 8/28/2020 M. Dalziel Email. Defendants renewed their request for Mr. Sørensen after PFA's documents cast doubt on this representation. PFA again insisted that it "determined that [PFA] has no reasonably accessible emails or chats for" Mr. Sørensen, ECF No. 929 at 34, but after the Court recognized Mr. Sørensen's obvious relevance, counsel belatedly disclosed that, "[a]fter further investigation, PFA believes it has emails for Martin Hygild Sorensen." 10/25/2021 A. Alden Email. The only explanation PFA offered was that it was previously "confus[ed] ... because it was investigating two 'Martins' at the time: Martin Rassmusen and Martin Hygild Sorensen." *Id.*

Accordingly, Defendants seek an order requiring PFA (1) to add an additional custodian to remedy its failure to timely disclose the purported lack of custodial documents for Cortes; and (2) to file

with the Court by November 24 a declaration (a) detailing its efforts to search diligently for all reasonably accessible data (including emails and chats) for each PFA custodian that any PFA Plaintiff or any non-Plaintiff PFA entity has in its possession, custody or control, (b) identifying the type, source, date range, and volume of data identified for each custodian, and (c) stating whether the data has been collected and responsive documents from each such data source and custodian have been produced.

**The Court Should Require Portigon and AP2 to Promptly Identify Whether Retained Audio Exists and Any Associated Burden.** Plaintiffs Portigon and AP2 should be required to provide details about the burden of collecting and reviewing audio files from a handful of newly-added custodians. At the April 2, 2021 conference, Your Honor stated that a Plaintiff custodian's participation in chatrooms that Plaintiffs themselves claim to be problematic is a "sufficient showing" to require that Plaintiff identify the burden of collecting audio. ECF No. 806, at 36:21-22 & 37:1-10. At that hearing, Defendants identified a specific Portigon trader's participation in a "smoking gun" chatroom (ECF No. 806, at 29:16-22), and Your Honor stated, "if that person were a custodian during the relevant period, then that, to me, is some evidence that perhaps some burden should be placed on Portigon to try and locate this information." ECF No. 806, at 34:15-18. On October 4, 2021, Portigon agreed to add that specific trader, Onur Sert, as a custodian. Because Sert participated in at least two permanent chatrooms that Plaintiffs previously represented to this Court "as containing 'smoking gun' evidence of the conspiracy," (*see* ECF 624 at 4; ECF 641, Appendix A), Portigon should be required to identify whether retained audio exists for this single custodian, over what time period, and the expected time and expense to collect, restore, and review those files.[6] Contrary to Plaintiffs' assertions, this is more than sufficient to satisfy the standard set by Your Honor at the April 2, 2021 conference.[7]

In light of AP2's on-going deficiencies detailed above, and the nearing discovery deadlines, Defendants requested that AP2 provide audio details for its three newly-agreed, and one still un-produced, custodians: Peter Mannerbjörk, Håkan Wilke, Ole Petter Langeland, and Mathias Eriksson. AP2 has refused, including by asserting that the requests are untimely. This assertion underscores the need for AP2 to provide baseline audio details now; it should be disqualified from demanding a heightened showing of relevance when it has impermissibly withheld the documents

---

[6] Defendants are not seeking to "relitigate" any prior ruling and the request is timely. This Court's invitation to rehear the issue of Plaintiffs' audio in the future did not impose a one-month deadline—which would not have made sense given Plaintiffs' sampling production had just begun, and post-sampling custodians were only agreed in October. Indeed, mere days after Plaintiffs agreed to add Sert, Defendants promptly made the audio request. Plaintiffs' assertion that Defendants should have added Mr. Sert as a custodian "in April" is disingenuous – Plaintiffs' consistently refused to consider "piecemeal" requests for additional custodians until Defendants provided a "complete list." *See* 7/15/2021 email from A. Alden to J. Kolbe. Defendants' timing is the natural consequence of Portigon's delay in agreeing to post-sampling custodians and AP2's failure to provide meaningful discovery over three years into this case.

[7] Contrary to Plaintiffs' regurgitated objection that their own documents are not relevant, Plaintiffs' documents reveal that their own traders engaged in the same conduct that Plaintiffs allege is improper, and continued those discussions by phone. *See, e.g.*, BC00155954-955 (BlueCrest trader asking dealer to share non-public trading information, and non-party dealer responding with offer to continue conversation over telephone). Based on Plaintiffs' own allegations, it is likely that Sert's audio files – like his allegedly "smoking gun" chatroom correspondence – "would be reasonably likely to contain relevant information." April 2, 2021 Order, ECF No. 802.

likely to satisfy that showing. *See, e.g.*, *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12 CIV. 6283 VSB MHD, 2014 WL 904595, at *2 (S.D.N.Y. Mar. 4, 2014), *aff'd*, 880 F.3d 620 (2d Cir. 2018) (a party avoiding discovery obligations should not "profit from its own misconduct").

**The Court Should Deny Plaintiffs' Request to Bar Further Extensions**.  Plaintiffs' characterization of their communications with several Defendants concerning data productions and unmasking ignores the fact that the requested data was in many cases old, not reasonably accessible and only obtained through an iterative process involving numerous data sets.  Plaintiffs also unfairly call into question legitimate requests for extensions, coming from different parties with different counsel, and based on individual circumstances, mischaracterizing them as "constant."  And notably, while seeking to cut off further extensions for certain Defendants, Plaintiffs refused to agree to tell the Court in this letter that they presently expect to meet the December 6 substantial completion deadline for post-sampling custodians in accordance with the Court's October 18, 2021 Order (ECF 937), which likely signals an intent to seek extensions themselves.  But because those Defendants expect to meet the presently operative and agreed-to deadlines, Defendants need not further address Plaintiffs' argument here, with the following exceptions:

**BNPP**.  *Data*: For nearly three years, Plaintiffs have been in possession of BNPP's transaction data production, consisting of nearly 130 million lines of data covering the period 2003-2015.  After Plaintiffs finalized their requests for additional fields relating to those trades, BNPP agreed to re-pull the trade data with the additional fields, as well as extract approximately 5 million rows of data from BNPP's order data system (even though any transactions resulting from those orders are in the prior production).  BNPP previously sought a two-week extension to complete the transfer of both datasets to its outside counsel for review.  ECF 941.  BNPP completed the transfer during the requested two-week period.  Upon further review of this data, however, BNPP has determined that more redactions than previously anticipated are required before the data can be produced to Plaintiffs.  BNPP also observed certain anomalies in the data and is investigating this further with its technical personnel.  Those investigations began last week and are continuing.  Based on BNPP's investigations to date, we expect that an additional data extraction may be required, which may necessitate a further request to extend the deadline.

*Futures*: Pursuant to the Court's Order dated, October 18, 2021 (ECF 937), BNPP writes to update the Court on the results of its investigation into "early period" data.  After a diligent investigation, BNPP has confirmed that it does not have any "early period" CME futures execution data.  BNPP's diligent search included reviews of multiple legacy data systems, all of which either were not in use during the "early period" in this case or were not used for FX futures.

**There Is No Dispute About Bank of America's Early Period Trading Data**.  As Plaintiffs' know, Bank of America informed Plaintiffs nearly two weeks ago that, absent unforeseen circumstances, it would produce its early period trading data by November 30, 2021.  Plaintiffs nevertheless felt compelled to waste the Court's and parties' resources including this topic in the joint letter, even though there is no dispute.  To the extent the Court has any questions about Bank of America's early period trading data, we would be happy to answer those questions.

**PLAINTIFFS' POSITIONS ON CURRENT DISCOVERY DISPUTES AND ISSUES.  Plaintiffs Already Answered The Pending Interrogatory As Required By The Rules.**  Defendants served an interrogatory asking for the "identi[ty]" and "location" of third-party traders.  ECF 927 at 4 n.3.  Plaintiffs responded identifying the third-party trading firms and providing what information they had.  Defendants moved to compel Plaintiffs to call every one and ask them each to prepare employment-location lists going back 15 years.  Plaintiffs resisted this imposition on grounds of proportionality, and the Court indicated it would likely refuse the request to require Plaintiffs to do more.  10/14/2021 Tr. at 60:21-23 ("aside from that entity which is an affiliate, this information is not within [Plaintiffs'] possession, custody, or control").  Plaintiffs have answered the pending interrogatories in accordance with the Rules.  That is dispositive.  If Defendants want different information—all facts Plaintiffs intend to rely upon—Defendants need to serve a discovery request actually seeking that information so Plaintiffs can object and the parties may confer.  It is improper to use a fully answered interrogatory as an excuse to make a new and different demand, especially when made *minutes* before serving a draft of this letter.  Indeed, Defendants admitted they are *not* now moving to compel under the interrogatory they served, while purporting to reserve rights to do so in the future.  That confirms there is no basis to grant the currently requested relief.

Defendants' last-minute request also violates Local Rule 33.3(c), which recognizes that "contention" interrogatories can only fairly be answered "at the conclusion of other discovery."  Courts also recognize it is improper to compel responses when discovery is ongoing,[8] and that all litigants are entitled to amend their discovery responses—a right Defendants have vigorously asserted with respect to their own data.[9]  Yet Defendants demand Plaintiffs finalize their jurisdictional plan, conduct any third-party discovery they may want, research all public information they would want to use, and fully disclose all of Plaintiffs' jurisdictional litigation strategy to Defendants in short order, and well before the fact discovery cutoff.  That is absurd.

Defendants say the normal rules should be suspended here because otherwise Defendants will be uncertain as to what facts they will need to rebut.  But such could be said of any issue by any party in litigation.  Even that aside, if Defendants think they might need information from third parties to raise a jurisdictional defense, they are already empowered to collect it because the relevant third parties have been identified.[10]  And if Plaintiffs "ambush" Defendants—something we, of course, have no intent of doing—the Court can deal with it based on the actual facts at the time with the far easier solution of allowing Defendants additional time to gather targeted rebuttal information.  The solution is not to prospectively form an unprecedented, prejudicial, prophylactic rule.

---

[8]   *Trilegiant Corp. v. Sitel Corp.*, 272 F.R.D. 360, 367 (S.D.N.Y. 2010) (interrogatories that sought "each fact" supporting an allegation "should not be served until the conclusion of other discovery"); *Bath and Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 2012 WL 5278528, at *4 (S.D.N.Y. Oct. 23, 2012) (striking interrogatories that sought "all facts" concerning affirmative defenses).

[9]   *Cont'l Coal, Inc. v. Cunningham*, 2008 WL 234678, at *3 (D. Kan. Jan. 28, 2008) (denying motion to preclude evidence and stating that "[n]o specific time period is established for these duties to supplement"); *Bankston v. Kansas City S. Ry. Co.*, 2005 WL 8155221, at *2 (M.D. La. Oct. 17, 2005) (supplementation "need not be made as each new item of information is learned" but at "appropriate intervals" and "with special promptness" as trial approaches).

[10]   This is true even for Allianz, who already provided all responsive third-party names it could locate after a reasonable search.  Similarly, all Plaintiffs already provided what information they have on which trades went through a third party after a reasonable search.  Defendants' suggestions otherwise—and their demand for a new "deadline" for answers that have already been given—thus appears at best to be moot, and at worst to eliminate Plaintiffs' right to supplement, amend, or rely on public information equally available to Defendants.

Finally, Defendants argue that their "now-or-never" proposal is consistent with statements we made at the prior hearing. As in the stipulation we proposed, what we were trying to convey was that Plaintiffs obviously cannot make jurisdictional arguments based on information Plaintiffs do not have. That would leave *Defendants to argue* at the appropriate time that any question marks over the location of the third-party traders were fatal, and it would leave Defendants free to gather their own information to undermine Plaintiffs' showing. We did not thereby concede that the "trade" would be "deemed" to have occurred elsewhere. Indeed, consider what would happen if Plaintiffs do call dozens of vendors asking for employment lists going back a decade, and the vendors refuse to act without a subpoena. Under Defendants' proposal, Plaintiffs could be counterintuitively forced to *themselves issue a subpoena* just to avoid a "deemed placed abroad" legal determination. Plaintiffs should not be punished in such a way, when they have fully responded to the pending interrogatory in accordance with the Rules.

In sum, Defendants have laid a trap, arguing that *if* third-party location information is irrelevant, *then* Plaintiffs should be happy to bear the risk of a "now or never" rule. Such a rule goes beyond Plaintiffs' intended argument, including by barring Plaintiffs from relying on public information equally available to Defendants, or on discovery obtained later. But even if Plaintiffs' refusal to sign Defendants' proposed stipulation convinces the Court third-party location information might be relevant, the solution would be the interrogatory actually served. It still remains the case that the burden of contacting dozens of vendors to get employment lists should fall on Defendants, if they believe the information is relevant to their defense. And it still remains the case that Plaintiffs do not "control" their vendors so the Rules do not allow the shifting of that burden. Because Plaintiffs have fully answered the interrogatory posed as required under the Rules, no relief is appropriate. In the alternative, the only rule the Court should impose is that proposed by Plaintiffs: To the extent a third party placed an at-issue trade on behalf of a Plaintiff, such Plaintiff shall not use any non-publicly available documents or data to establish the location from which the third-party entered into the trade unless such documents or data are produced in discovery, absent further relief by agreement or the Court for good cause shown.

**Plaintiffs Have Identified No "Deficiencies" In AP2's and PFA's Productions**. Plaintiffs long ago warned that Defendants would "generate as many disputes as possible for Court resolution— often based on outright misrepresentations, without adequate briefing, and asserting positions squarely at odds with their own." ECF 447 at 3. This time, Defendants try to spin their easily answered questions into "deficiencies." The bottom line is that both AP2 and PFA have collected all reasonably accessible data for the sampling custodians. To the extent Defendants have remaining questions, they can ask them during a deposition, as is standard practice.

*AP2*. AP2 collected custodial documents from all reasonably accessible sources and ran the terms Defendants requested. That AP2 has produced relatively few emails is because (1) AP2 did not have a policy or other obligation to retain emails during the relevant period, 2003-2013; (2) Defendants agreed that Plaintiffs, including AP2, could exclude certain categories of documents; (3) Plaintiffs need not produce communications with Defendants, 4/2/2020 Tr. at 7:5-9 ("I'm not going to require the plaintiff to produce those."); (4) what was left mostly did not hit on search terms; and (5) AP2 did not maintain chats, while those that it obtained from Bloomberg were non-responsive. AP2 is confident it has collected documents from all reasonably accessible sources. Nonetheless, in the interest of giving Defendants even more comfort, AP2 has agreed to re-run the search terms over the custodial documents.

Defendants can question AP2 about its document collection at a Rule 30(b)(6) deposition, but they should not waste this Court's time or AP2's with a baseless demand for an "affidavit," a request the Court has repeatedly rejected. *See generally* ECF 855 ¶ 2 (denying request for a specific description of data destruction); ECF 938 at 4 ("PFA's document retention policies . . . may be addressed in a 30(b)(6) deposition."). If the Court is willing to compel an affidavit simply because a party raises a question, then Plaintiffs would ask the Court to require Bank of America to provide an affidavit explaining how they "missed" early-period data during *two years* of conferral attempts.

**PFA** has already represented that it has "undertaken a diligent search for custodial documents." Indeed, "[o]ut of an abundance of caution, in response to Defendants' letter, the PFA Plaintiffs conducted another examination to determine whether any additional data of any kind—accessible or not—could be located for the sampling custodians. No additional data was found." As with AP2, the size of PFA's production is no reason to disbelieve this representation. PFA had no policy or other obligation to keep emails going back so far. That a party cannot find many emails from 10- to 20-years ago should not be in the least surprising. Former Defendant MUFG had no custodial documents before 2006 and Standard Chartered has no chats from 2003 and 2004.

That certain PFA custodians had few materials was *already used* by Defendants to justify their request for supplemental custodians, ECF 927 at 29 ("PFA's sampling custodian productions to date appear deficient"), which the Court granted. The Court should deny Defendants' attempt to end-run the Court's limitation on requesting *still more* custodians by disingenuously relying on exactly the same facts to call into question PFA's diligence. And for the same reasons discussed above with respect to AP2, the Court should deny the request for an affidavit as a flailing attempt at make-work. The Court has already held that if Defendants actually want to know something about PFA's documents, they can take a deposition. ECF 938 at 4 ("PFA's document retention policies . . . may be addressed in a 30(b)(6) deposition.").

Defendants make random observations about the "metadata" provided by PFA. But all have benign explanations, and thus do not show there was a problem in PFA's gathering efforts. For instance, that PFA searched for emails beyond Mr. Cortes' employment period shows *extra* diligence, not lack of it—and the reason there are no December 2013 emails from Mr. Cortes is because he had none. It is also unsurprising that Mr. Cortes is seen on emails produced from the files of other custodians. That just means other custodians saved those documents, while Mr. Cortes did not. Similarly, Mr. Cortes could appear as a "custodian" in the metadata on emails he did not personally send or receive or that pre-date his employment period, if he saved emails included as attachments, for instance. Finally, as to Mr. Sorensen, we were open with the fact that the client had been on vacation and thus had no opportunity to weigh in. 10/14/2021 Tr. at 35:22-23. After PFA had the opportunity to investigate further, we promptly advised Defendants that PFA did have some data for Mr. Sorensen and would collect it.

**The Court Should Reject Defendants' Untimely And Meritless Request To Re-Litigate Plaintiffs' Audio Files**. Only after the Court allowed targeted discovery into Defendants' audio files, and almost two years into discovery, did Defendants decide to retaliate by suddenly raising an issue with Plaintiffs' audio files. In April 2021, the Court *denied* Defendants' request to impose the enormous burden on Portigon and AP2 of having to determine if they had any audio recordings for specific custodians without a greater showing of relevance. Defendants must make "more of a showing as to what the record evidence shows with respect to the custodians in question and

whether there are recordings that they likely would be party to" and "what it is that they expect these custodians, the AP2 and Portigon custodians, to have."  4/2/2021 Tr. at 34:5-8.[11]

Presumably aware of how long it takes to pull audio audio—Defendants have taken from three to six months—the Court also set a deadline:  "I'm happy to take that showing in a letter motion filed before the next monthly report.  Or you can make it part of the next monthly joint letter."  *Id.* at 34:23-35:1; *see also* ECF 802 at 2, ¶ 4 (Defendants' showing "may be made . . . in . . . the parties' next monthly joint letter").  Rather than dealing with the issue in the "next letter" in May 2021, Defendants waited *seven months*, until the end of October 2021, to even approach Plaintiffs about it again.  There is simply no way either Portigon or AP2 could produce any audio within three months, let alone by the December 6 substantial completion deadline.  This alone is grounds for denial of relief.  The case should not be artificially extended by such transparent delay tactics.[12]

Defendants' request also fails to meet the Court's standard.  Unlike Defendants, where we know they engaged in telephone conversations central to this case, there is nothing to suggest Portigon or AP2 had any relevant communications via telephone, let alone communications of sufficient importance to justify a months' long needle-in-a-haystack exercise of listening to hours and hours of audio recordings.  Indeed, the Portigon custodian Defendants request, Onur Sert, is the same person they identified at the April 2021 hearing.  4/2/2021 Tr. at 29:16-22.  The rationale for the request is also exactly the same—that he was in two chatrooms with Defendants.  Nothing has changed since April.  Indeed, Defendants *still* cannot to say what they are actually looking for.  *Cf.* 4/2/20 Tr. at 36:23-25 ("I should hear from the defendants first with respect to what it is that they expect these custodians, the AP2 and Portigon custodians, to have.").

Defendants fail to identify a single document—even among Defendants' own chats—that suggests Mr. Sert would have any relevant audio communications internally or with third parties.  Tellingly, the only document Defendants reference even discussing audio is from *BlueCrest*.  In fact, it is highly unlikely Mr. Sert would have had internal telephone communications concerning FX trading because most such discussions would have been with those on his desk.  And his conversations with third parties are irrelevant because Portigon's third-party trades are not at issue.  The Court should deny the request for Mr. Sert's audio for the same reason it did so in April 2021.

With respect to AP2, Defendants offer no rationale at all beyond the assertion that AP2's document production is "deficient."  That assertion is both false and irrelevant.  AP2's document production has nothing to do with the extreme burden of searching for, reviewing, and producing *audio* recordings, particularly where the recordings would be in a foreign language (Danish for AP2 and German and Turkish for Portigon).  As Defendants have themselves argued:  "Unlike written documents, audio is generally not searchable. . . .  Audio is also inherently more time-consuming to review compared to written documents because audio generally must be listened to in its entirety

---

[11]  Defendants selectively quote the Court to suggest they all need show is a custodian's participation in a chat.  But the Court was discussing evidence of "conversations."  4/2/21 Tr. at 37:3-7.  Defendants have not produced a single piece of evidence than any Portigon or AP2 custodians engaged in relevant telephone conversations.

[12]  Defendants argue that the Court's deadline makes "no sense" because "sampling discovery had just begun."  But by April 2021, Plaintiffs had already produced over 150,000 documents.  And, in any event, given Defendants' requests to add Mr. Sert as a custodian and for his audio both rely solely on Defendants' own documents, there was nothing stopping Defendants from requesting Mr. Sert as a custodian in April.  *See* 9/15/21 Ltr. from J. Kolbe to A. Alden (requesting Mr. Sert be added as a custodian because he "was a participant in two permanent chatrooms").

at the pace of natural speech.  The audio here will also be filled with trading jargon, as well as slang unique to various jurisdictions, which will further slow the pace of review."  ECF 624 at 6. Defendants have still not come close to justifying this enormous burden, particularly where it is likely to delay the case by months.  *Physicians Committee for Responsible Medicine v. Glickman*, 117 F. Supp. 2d 1, 4 (D.D.C. 2000) ("[d]iscovery to pursue a suspicion or a hunch is unwarranted").

**The Court Should Impose A Deadline For BofA's Newly-Discovered Early-Period Data.** Judge Schofield denied Defendants' motion to dismiss the early-period claims in mid-2020.  ECF 406.  Ever since, Plaintiffs have repeatedly sought data from the 2003-2007 period, which Defendants did not gather in *FOREX*.  For years, BofA claimed it did not have any to produce. *E.g.*, ECF 854 (BofA "has repeatedly told plaintiffs that [] it does not have any FX trading data for the early period" and thus "further discovery into [BofA's] early-period data is . . . a waste . . . of the Court's time").  The Court declined to require the bank to submit an affidavit, holding instead such assertions could be fodder for deposition questions.  ECF 855.  But on October 29, 2021—a month after BofA's deadline for substantial completion, and more than two years into the case— BofA alerted Plaintiffs that it had discovered early-period data.  Putting aside for now Plaintiffs' questions about this troubling turn of events, Plaintiffs respectfully request the Court set a November 30, 2021, deadline for the production and unmasking of this early period data.

**The Court Should Put An End To Defendants Constant Extension Requests.**  The Court entered customized deadlines for each Defendant to produce their unmasked data—based on Defendants' own requests.  The Court stated that it "may extend these deadlines upon showings of diligence and good cause."  ECF 892.  Instead, conclusorily asking for extensions at the very last minute has become the rule, rather than the exception.  Below we summarize some of the chronologies.  At this point, Plaintiffs respectfully ask for order that no further extensions for Defendants' data productions and unmasking will be granted absent an affidavit demonstrating diligence and unforeseen, extenuating circumstances.

*BNPP* relies on the timing of its copy/paste production of data given in *FOREX*.  But that production was identified as under-inclusive in many ways.  BNPP's deadline for rectifying those problems—i.e., for substantial completion—was October 29.  A week prior, BNPP requested a two-week extension.  BNPP then asked for three more weeks, but refused to commit to the new-new deadline.  This, even though the data requests have been outstanding for over a year and the case is more than two years old.  This late in the game, BNPP should not be uncertain as to whether its data will require another "re-pull" or "additional time for redactions."  *JPMorgan* asked for an extension regarding a subset of the trade data, two days before the deadline.  JPM has agreed not to make further requests absent extenuating circumstances.  *RBC* asked for a multi-week extension for unmasking was needed to tie up a "loose end."  RBC represented they would seek an additional request "only if something unforeseen arises."  *Standard Chartered* had various deadlines for data and unmasking, depending on the source.  Standard Chartered requested extensions for various pieces on both October 13 and again on November 11.  Standard Chartered has agreed no further extensions would be sought absent extenuating circumstances.  *UBS* asked for a one-week extension to complete its production of data, and three weeks to complete its unmasking.  UBS has agreed no further extensions for unmasking would be sought absent extenuating circumstances.