February 23, 2022

**VIA ECF**

The Honorable Stewart D. Aaron
United States Magistrate Judge
Daniel Patrick Moynihan Courthouse
500 Pearl St.
New York, NY 10007

      Re:    *Allianz Global Investors GmbH, et al. v. Bank of America Corporation, et al.*,
             Case No. 1:18-cv-10364 (S.D.N.Y. 2018)

Dear Judge Aaron,

Pursuant to the Court's January 11, 2022 Order (ECF 987), the parties respectfully submit their respective positions on current issues to be addressed at the February 24, 2022 conference.

Respectfully submitted,

| | |
|---|---|
| DONTZIN NAGY & FLEISSIG LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| By: /s/  Tibor L. Nagy, Jr. | By: /s/  Daniel L. Brockett |
| Tibor L. Nagy, Jr.<br>980 Madison Avenue, 2nd Floor<br>New York, New York 10075<br>Telephone: (212) 717-2900<br>Fax: (212) 717-8088<br>tibor@dnfllp.com | Daniel L. Brockett<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010<br>Telephone: (212) 849-7000<br>Fax: (212) 849-7100<br>danbrockett@quinnemanuel.com |
| *Counsel for Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC* | *Counsel for Plaintiffs* |

**DEFENDANTS' POSITION ON PLAINTIFFS' DEPOSITION LIMITS**

Pursuant to the Court's February 4, 2022 Order, Defendants have conferred with Plaintiffs regarding "those Plaintiff groups for which less than 9 depositions shall be taken." ECF 998 at 4. Defendants have agreed to take "less than 9 depositions" for 12 out of 14 Plaintiff groups, including 6.5 depositions of Brevan Howard, 5 depositions of Allianz EU, and 5 depositions of Bluecrest. Only the two largest Plaintiff groups, PIMCO and BlackRock, remain in dispute. Yet despite the size and sophistication of these two plaintiff groups, their vast and complex FX trading operations, and the "hundreds of millions of dollars" in damages that both groups seek (*see* 2019 interrogatory responses), Plaintiffs refuse to agree to 9 depositions for either group.

Defendants' proposed default limit of 9 depositions each for these two groups, subject to a showing of good cause to depose additional witnesses, is consistent with the Federal Rules and would be presumptively reasonable in any stand-alone action: if either group had filed a separate action seeking "hundreds of millions" of dollars in damages, there would be no question that Defendants could take up to 9 depositions (or more) across each group. Plaintiffs' decision to aggregate their claims should not deprive Defendants of critically-needed discovery on core disputed issues.

Moreover, Defendants are entitled to and need substantially more deposition testimony from PIMCO and BlackRock than from class Plaintiffs for obvious reasons, including because PIMCO and BlackRock had large FX trading operations and traded trillions of dollars of FX. In contrast, the class plaintiffs traded a small amount of FX, employed few, if any, FX traders, and outsourced key FX operations to third parties. The class plaintiffs in *Contant* were natural persons, whom it made no sense to depose more than once. And for Plaintiffs with more limited operations (*e.g.*, CalSTRS, PRIM, and SEI), the parties have agreed on 3.5 depositions. PIMCO's and BlackRock's significantly larger FX operations warrant significantly more depositions. Without them, "Defendants could be held liable for losses they did not cause." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 435 (S.D.N.Y. 2019) ("*FOREX I*").

**The BlackRock Plaintiffs should provide 9 depositions**: Deposing 9 of BlackRock's hundreds of knowledgeable employees (*see* 2019 interrogatory responses; ECF 886 at 10), would barely scratch the surface of BlackRock's disputed activities in this action.

*800-plus Plaintiffs with diverse FX investment strategies:* BlackRock Plaintiffs comprise 800-plus funds managed by 19 separate investment advisers and 90 individual portfolio managers. Within this universe, various groups of funds traded FX for different reasons and in different ways. For example, BlackRock index funds traded FX for hedging purposes, whereas the Global Market Strategies Group ("GMSG") opportunistically traded FX. Defendants need testimony concerning each of these strategies because, for example, GMSG more likely acted as a so-called "liquidity provider," and therefore *charged* spreads to Defendants. This would exempt the trade from damages, contrary to Plaintiffs' argument below, because BlackRock cannot claim damages for trades in which it charged, rather than received, a spread. *See FOREX I*, 407 F. Supp. 3d at 435 ("[W]hether a class member provided liquidity determines which party paid the spread, which is relevant to damages.") ("*FOREX I*"). BlackRock cannot deny that GMSG engaged in such trades, and testimony on these strategies is critical to Defendants' defenses regarding damages.

*4 FX desks in 3 jurisdictions*: BlackRock maintained FX trading desks in San Francisco, New York, London, and Singapore.  *See, e.g.*, BR00791400 (██████████████████████████████████████████████).  Defendants need testimony from each of these teams because they specialized in different regions and currencies—all of which fall within Plaintiffs' alleged worldwide, decade-plus conspiracy in every currency pair.  *See, e.g.*, BR00972329 at -50 (BlackRock offered "████████████████████████████████████████" in 3 jurisdictions).  Most traders also were not employed at BlackRock during the full 11-year period in dispute.  And contrary to Plaintiffs' complaint below, Defendants have explained exactly why discovery is needed from traders on each desk: traders are not interchangeable.  A trader from Singapore employed between 2007 and 2011 specializing in Asian currencies cannot speak to the strategies that a trader in New York from 2012 to 2013 used to drive competition between Defendants in the USD-GBP or USD-EUR market.

*In-house FX research team*: BlackRock's trading research group ("TRG"), analyzed FX trading data and prepared trading analytics reports ("TARs").  *See, e.g.*, BR00085138 (noting that Trading Research is "████████████████████████████████████████").  TARs evaluated Defendants' FX pricing, and often concluded that Defendants competed vigorously.  *See, e.g.*, 4/2/20 Tr. 41:2–12. Defendants need testimony from the individuals who created these reports about how and why their analyses support such conclusions.

*Executives who negotiated with Defendants and evaluated the alleged misconduct*: BlackRock's senior managers also have unique and highly relevant information.  For example, one of BlackRock's co-Heads of Trading regularly led meetings with Defendants to present information on "scorecards" for each bank, which provide a contemporaneous record of "fierce competition" on FX pricing (ECF 929-1, BR00480006 at 07), and his co-Head led BlackRock's efforts "building out" electronic FX trading (ECF 886-2, BR00473847, at 3848), which pushed down spreads over time because of competition from e-FX platforms (*see* ECF 476, Compl. ¶ 546).  Supervisors also led BlackRock's responses to initial public reports about Defendants' activities at issue in this lawsuit.  In June 2013, a manager directed a trader to "████████████████████████████████████████" the main FX benchmark, because "████████████████████████████████████████████████████████████████████████████████."  BR00117343 at 7344.  As part of these "comments" (which do not appear in BlackRock's production), BlackRock likely assured clients that the "facts" showed BlackRock paid *lower* prices than other participants, and therefore was unaffected by any manipulation.  That is what BlackRock's internal analyses demonstrated.  *See* BR00117352 at -63 (████████████████████████████████████████).

In sum, Defendants expect to seek testimony concerning, among other things, (i) GMSG's trading strategies; (ii) trading strategies for index funds; trading on (iii) the San Francisco desk; (iv) the New York desk; (v) the London desk; and (vi) the Singapore desk; (vii) the Trade Research group's FX analyses; (viii) BlackRock's performance evaluations and negotiations with Defendants, and (ix) BlackRock's assessments of Defendants' conduct at issue.  BlackRock's documents include highly relevant discussions from dozens of employees across these groups.  Thus, even with 9 depositions, Defendants will need to triage many witnesses with critically relevant knowledge.

2

Defendants also will seek 30(b)(6) testimony from BlackRock on many subjects. A default of 9 depositions for BlackRock is proportional to Defendants' need for discovery.

**The PIMCO Plaintiffs should provide 9 depositions**: Defendants' request for nine depositions from PIMCO is proportional to the needs of the case because (i) there are more than 250 individual PIMCO entities in the PIMCO plaintiff group, many with different FX trading mandates and strategies, (ii) PIMCO has by far the largest number of trades at issue in this case (more than 50%) with more than a trillion dollars in notional value, and (iii) PIMCO is seeking hundreds of millions of dollars in damages against Defendants.

Nine depositions is also proportional to the needs of the case because, during the relevant time period (2003 through 2013), PIMCO's FX trading operations were global with dozens of traders and supervisors employed in different geographic locations around the world (*e.g.*, US, Europe, and Asia). Each of those traders and supervisors were responsible for different currencies, at different time periods, in different geographic locations, and therefore, will have different views on highly relevant topics, including, but not limited to: (i) the type of FX transactions to employ or quotes to request in different market conditions (*e.g.*, two-way quote or spread versus a fix order, market order, limit order, etc.), (ii) negotiations with Defendants about prices for FX transactions and the information used to guide those negotiations, (iii) PIMCO's analysis of Defendants' FX spreads, pricing, services, and execution and how PIMCO used this information to decide which Defendant to trade with, (iv) the development and implementation of PIMCO's FX "scorecards," (v) factors that individual PIMCO traders used in deciding which venue to execute FX trades (e.g., voice, electronic, etc.), (vi) specific trading strategies used by the trader and the implementation of those strategies, and (vii) the competitiveness of Defendants' pricing versus non-defendants' pricing and the information used to make those determinations.

Even with nine depositions, Defendants will only obtain testimony from a small sub-set of the dozens of FX traders and supervisors who have relevant information. Given the global nature of PIMCO's FX trading operations, the millions of FX trades executed by PIMCO, and the enormous damages sought by PIMCO, nine depositions is entirely reasonable and proportional.

**Plaintiffs' arguments are baseless**: Plaintiffs argue that the groups with the *most* complex FX trading operations and the *highest* alleged damages should give the *fewest* depositions. This turns proportionality on its head, and Plaintiffs' arguments do not justify such a paradoxical result.[1]

*Plaintiffs' failed relevance objection misses the point.* Plaintiffs contend that the Court has never ruled on their argument, made repeatedly since 2019, that their ability to force Defendants to compete is irrelevant because they assert *per se* antitrust claims.[2] But as Your Honor stated in October, "I do find relevance on the importance element, which is part of proportionality, you know, the main event is the per se price fixing, and certainly you're entitled to some information

---

[1] Defendants are not seeking "parity," as Plaintiffs argue. In the aggregate, Defendants seek a total of 66 party depositions, far less than their remaining allotment of 96 under the deposition protocol (*see* ECF 186 at 9; ECF 992 at 2), whereas Plaintiffs are entitled to take and/or rely upon up to 120 depositions of Defendants (*see* ECF 186).

[2] Plaintiffs' assertion that government investigations have somehow left Defendants with "no credible defense" is simply not true, as those investigations say nothing about Plaintiffs' farcical theory that 16 banks conspired to manipulate benchmark rates and to widen spreads on all currencies globally for an 11 year period.

3

regarding antitrust injury and damages." 10/14/21 Tr. 15:15–18. That was just the most recent ruling on this same issue.[3] And last month, while denying summary judgment to both sides in *FOREX*—where the plaintiffs similarly allege a "per se" conspiracy—Judge Schofield confirmed that "*[c]ompetition may be evidence that the conspiracy existed but did not achieve its goal, or that there was no conspiracy.*" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 294118, at *10 (S.D.N.Y. Feb. 1, 2022) (emphasis added) ("*FOREX II*"). Ignoring these orders, Plaintiffs argue their trading activities are "utterly irrelevant," and label themselves "victims," as though that obviates the need for discovery on whether Plaintiffs can *prove* that Defendants did not compete on a single currency trade over an 11-year period. But under Judge Schofield's and Your Honor's orders, Plaintiffs' techniques to drive competition on price and other factors are relevant to (1) whether Defendants actually agreed not to compete, (2) whether Plaintiffs suffered any injury; and (3) the quantum of any injury. Plaintiffs' knowledge of Defendants' conduct is also relevant to their burden to establish equitable tolling of their claims. *See Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 463 F. Supp. 3d 409, 418, 426 (S.D.N.Y. 2020). Relevance has been established. The only issue is whether Defendants' requests are proportional. For the reasons stated above, they plainly are.

***Trade data are insufficient***. Plaintiffs falsely argue that Defendants do not need depositions because data provide all relevant information, including the spread on each trade and whether a plaintiff charged or received a spread. But Plaintiffs know, based on years of analysis, that data do *not* show whether a spread was paid, the amount of any spread, or which party was the liquidity provider. *FOREX I*, 407 F. Supp. 3d at 434–35 (rejecting data as "unreliable" means of determining who paid the spread, and noting that "Defendants did not maintain data regarding the spreads that customers were quoted"). Judge Schofield has already held that these issues are "highly material" and require "fact-intensive individualized inquir[ies]." *Id.* at 433. Data also do not show Plaintiffs' trading strategies or techniques to drive competition, nor how Plaintiffs obtained multiple competing quotes from Defendants and others for each transaction to satisfy "best execution" requirements. To explore these topics, Defendants do not need testimony on every single trade, but rather depositions from a reasonable number of traders that cover PIMCO's and BlackRock's vast trading operations as they evolved over an 11-year period.

***PIMCO and BlackRock are in a class of their own***. Plaintiffs argue that other Plaintiffs in this case, and class plaintiffs in *FOREX*, are similarly situated to PIMCO and BlackRock. But none of those entities are remotely as large. Nor do the class plaintiffs, natural persons, or smaller opt-out Plaintiffs with limited operations, including several that outsourced aspects of FX trading, have large global operations specifically dedicated to FX, as BlackRock and PIMCO did. Because of their size and sophistication, PIMCO and BlackRock often forced Defendants to trade FX at a loss. *See, e.g.*, FX-BOFA-Allianz_122828 (commenting, "most of the times they [PIMCO] deal with

---

[3] *See, e.g.*, 4/2/20 Tr. 9:1–5; 21:20–22 (Judge Schofield recognizing that Defendants seek discovery "in service of their defenses to talk about competitive prices, to talk about market power"); 8/19/21 Tr. 6:3–13 (Your Honor holding that "the conditions in the market should be scrutinized to determine whether the alleged price fixing resulted in antitrust injury to the plaintiff").

4

us we lose money" on FX generally).  This makes it especially likely that any purported conspiracy "did not achieve its goal" for PIMCO and BlackRock.  *FOREX II*, 2022 WL 294118, at *10.

***Defendants do not seek "thoughts," they seek evidence of competition***.  Plaintiffs argue that what their traders "thought" about market conditions are irrelevant.  The issue is not what PIMCO and BlackRock "thought," but how they successfully forced Defendants to compete.  In contending there is no evidence of such competition, Plaintiffs ignore the record in this case, which shows PIMCO and BlackRock repeatedly obtaining different spreads from Defendants (contrary to the alleged "agreement" on spreads asserted in the Complaint), negotiating with Defendants to achieve better pricing, and producing detailed analysis about how Defendants' pricing and spreads were *different*, not the same.  Defendants will use these documents to examine traders about (i) what techniques they used to drive competition; (ii) how each trader satisfied best execution requirements; (iii) what types of orders they placed (*e.g.*, resting orders, exempted from damages, *see FOREX I* at 433–34); and (iv) what type of market color they expected from Defendants, *i.e.*, the same information Plaintiffs now claim was illegal to share and that would demonstrate Plaintiffs were on notice of their claims more than a decade ago.  In any case, the quotations from BlackRock's TARs and scorecards above are not mere "thoughts," they are informed analyses of trading data that, in BlackRock's judgment, showed competition.  Defendants seek testimony about how BlackRock reached such conclusions, which contradict Plaintiffs' allegations here.

***There should be no special presumption against percipient witnesses for the two largest Plaintiff groups***.  Seeking to weaponize Defendants' willingness to compromise, Plaintiffs argue that the parties' agreement on all other Plaintiff groups justifies *fewer* depositions from PIMCO and BlackRock.  This is backwards:  Defendants compromised on lower limits for the smaller groups because their FX operations are far more limited, and they collectively traded less than half the volume at issue in this litigation.  Plaintiffs nevertheless seek to limit Defendants to *a single 30(b)(6) deposition each* for BlackRock and PIMCO, and then effectively force Defendants to demonstrate good cause for every single percipient witness.  The Court's February 4 Order (*see* ECF 998 at 4) declined Plaintiffs' previous request for this same relief for all Plaintiffs (*see* ECF 993).  The Court should not now impose this uniquely restrictive standard on the two largest Plaintiff groups.  In any case, 30(b)(6) testimony also is not a substitute for witnesses with actual knowledge.  Defendants respectfully request an order setting a default of 9 depositions for the PIMCO and BlackRock groups.[4]

**PIMCO AND BLACKROCK'S POSITION ON PLAINTIFFS' DEPOSITION LIMITS**

Plaintiffs long ago warned that "[b]ecause numerous government investigations and resulting guilty pleas have left Defendants no credible defense, their strategy has been to use discovery as a tool for harassment."  ECF 447 at 2.  Defendants deploy that strategy yet again here, seeking **66** depositions of the victims—about the same as the banks produced in the class actions.  Simply put, the notion that there should be parity between discovery given by Defendants (the perpetrators of the conspiracy) and Plaintiffs (the victims of the conspiracy) is false and not supported by any precedent.  It also undermines Congressional intent to encourage private antitrust enforcement.

---

[4] Once this dispute is resolved, Defendants anticipate the parties will confer about an appropriate schedule for completing depositions.

*See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977) (noting "the longstanding policy of encouraging vigorous private enforcement of the antitrust laws").

**Permitting nine depositions of a victim in an antirust conspiracy would be unprecedented in private antitrust litigation.**  In the *FOREX* and *Contant* class actions, Defendants agreed to a maximum of three depositions of each plaintiff across two cases. ECF 186 at 9, ¶ 8. Ultimately, Defendant Credit Suisse took only one deposition of each plaintiff in *FOREX*. These numbers are consistent with other large antitrust cases litigated in the S.D.N.Y. For example, *In re: Commodity Exchange, Inc., Gold Futures and Options Trading Litigation*, No. 14-MC-2548 (VEC), and *Alaska Elec. Pension Fund, et al. v. Bank of America Corp.*, No. 14-cv-7126 (JMF), are both large antitrust cases involving benchmark manipulation. But the defendant-banks took only one or two depositions per plaintiff. Similarly, in *In Iowa Public Employees Retirement System v. Bank of America Corp.*, No. 17 Civ. 6221 (KPF), which concerns an alleged bank boycott to block new entrants into the stock loan market, the defendant banks took at most three per plaintiff. Citations could go on and on, but the point is made: plaintiffs even in large antitrust cases are not asked to provide significant discovery for the simple reason that what they said, did, or perceived is not relevant. The focus is on defendants' conduct, not the victims'. To excuse the lack of precedent, Defendants assert that class-action named plaintiffs may have had less market power than non-named plaintiffs. As below, the victim's specific "market power" has never been recognized as a defense. But if it was a defense, that would mean defendants in *all* antitrust class actions would have an incredibly strong incentive to depose numerous victims in order to defeat commonality or typicality. The lack of precedent for Defendants' current request thus confirms its lack of merit.

**Defendants fail to link their unprecedented request to any legitimate defense in this case.**

*Contrary to Defendants' disingenuous assertion, the Court has never decided "market power" is relevant in this case, let alone that it requires an extreme discovery burden.* Almost all of Defendants' purported justifications are different ways of saying they are entitled to explore whether BlackRock and PIMCO "drove competition." But the case law makes clear that a victim's "market power" is not a defense in a *per se* antitrust case. *FOREX*, 2022 WL 294118, at *10 ("[E]vidence of competition does not preclude the existence of a conspiracy."); *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("The per se rule . . . eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work."); *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of Univ. of Oklahoma*, 468 U.S. 85, 86 (1984) ("[T]he absence of proof of market power does not justify a naked restriction on price or output."); *In re Aspartame Antitrust Litig.*, 2008 WL 2275528, at *4 (E.D. Pa. Apr. 8, 2008) ("[t]o suggest that a conspiracy was not as successful as it might otherwise have been because of plaintiffs' countervailing economic power is absurd").

Defendants gloss over any discussion of the actual law, claiming this Court has already decided against Plaintiffs on this issue. As we have been forced to point out numerous times before, *see, e.g.*, ECF No. 927 at 7-8, what actually has happened is that the Court has been able to resolve the parties' prior disputes without ever actually resolving the underlying questions of relevance. The issue has never been briefed to or decided by Judge Schofield. And Your Honor's thoughts on "market power" were expressly subject to the simultaneous admission that it was something that Your Honor would have to "give much more thought to." 8/19/21 Tr. at 6:2-3. That the Court was previously able to navigate past issues in such a way does not mean the Court has "repeatedly" ruled that a victim's *thoughts* about competition gives rise to a defense. Nor does it mean "market

6

power" is a talisman of proportionality. Defendants also misstate the record with respect to Judge Schofield's recent order. In *FOREX*, Credit Suisse argued that the conspiracy was implausible because the FX market is too big and too fast. 2022 WL 294118, at *10. The Court did not address the issue of a plaintiff's market power because the issue was not before it. Rather, all Judge Schofield said was that *whatever* certain facts "may" be relevant to, they did *not* show the conspiracy was implausible, and so summary judgment was inappropriate.

Even if Plaintiffs' market power were a defense in this case (and it is not), testimony from Plaintiffs will add nothing. As the Court has recognized, it does not matter what Plaintiffs *thought or did* in terms of whether they were getting a "deal"; it only matters if Plaintiffs *actually got* a "deal." 10/14/21 Tr. at 29:9-12 ("Isn't the question, if BlackRock really were able to get much more favorable pricing – or . . . that money may have been lost on these trades by the defendants, but isn't that what matters rather than what Mr. Kapito and Mr. Fink thought about?"). Whether Plaintiffs actually got a deal will be in the data. Plaintiffs' trading "strategies," "mandates," "requirements" and "techniques" are utterly irrelevant to any issue in this case. Live testimony of the victims will be of little (or no) probative value.[5]

To suggest otherwise, Defendants couple the fact that Judge Schofield in *FOREX* referred to the need for evidence on "each trade," with the fact Defendants kept lousy records. But the notion that a trader's recollections from over a decade ago will fill holes in Defendants' trade data is laughable; Plaintiffs carried out millions of trades. No witness will remember anything about any particular trade, let alone "each" of them. Forcing 18 individuals—many of whom will be former employees who haven't had anything to do with FX for years—to each give up a day of work so Defendants can show them emails about specific trades from a decade ago in the hopes the person remembers something about the spread on that deal is the definition of pointless discovery.

*Discussions with Defendants are legally immaterial.* Defendants once again argue that Plaintiffs' understanding of certain high-level discussions with Defendants is somehow relevant. But as seen in the quote above, the Court has already recognized that what matters, if anything, is not what Plaintiffs thought or did, but how *Defendants actually responded*. 10/14/21 Tr. at 29:9-12. Indeed, the Court already discounted the same type of evidence Defendants regurgitate here. ECF 938 n. 3 ("Setting aside the parties' dispute as to whether the subject of that communication is relevant (see 10/14/21 Tr. at 27-29, 31-32), the fact that a CEO desired to 'pay . . . less' is unremarkable and unlikely to be probative of anything material.").[6] Despite having

---

[5] When asked whether the fact BlackRock thought pricing was uncompetitive would be probative of Defendants' conspiracy or damages, Defendants flatly denied it would be. Apparently, somehow, only a belief that the market was *competitive* is relevant, but not vice-versa.

[6] Despite having hundreds of thousands of Plaintiffs' documents, Defendants attempt to justify their requested fishing expedition by consistently mischaracterizing their contents or engaging in rank speculation. For example, Defendants rely on nothing more than their own prior argument to misleadingly assert that BlackRock "often concluded that Defendants competed vigorously." Likewise, Defendants speculate that BlackRock "likely" assured clients that it paid lower prices, without citing to a single supporting document. BR00117363 does not demonstrate that "BlackRock paid *lower* prices than other market participants." It addresses pricing differences for one day of trading at the WMR fix, as opposed to trading not at the fix. And FX-BOFA-Allianz_122828—which Defendants substituted into this letter at the last minute—is even further afield. In that chain, bank employees internally discuss losses on electronic dealer-platform trades that were "auto-quoted, autosplit, and auto-confirmed." As an internal bank document, nobody from PIMCO could testify about it. Moreover, given Defendants (largely, successfully) argued that a computer-priced platform trade would not ordinarily be impacted by their conspiracy, ECF 406 at 11-12, it is difficult to understand how the bank's supposed losses could possibly be caused by PIMCO's supposed negotiating prowess. Indeed, the

reams of trade data and millions of documents, Defendants have failed to produce a shred of evidence that BlackRock and PIMCO somehow "successfully forced" 15 of the world's largest banks to compete or obtained "different spreads."  And, again, even if one side (or the other) *thought* they were receiving (or giving) a "deal," that in no way would establish what actually happened across millions of trades.

*Defendants' other summary explanations of relevance also fail.*  Defendants assert that "Plaintiffs' knowledge of Defendants' conduct is also relevant" to equitable tolling.  Despite having millions of pages of Plaintiffs' documents, Defendants have pointed to no evidence suggesting PIMCO or BlackRock knew of the conspiracy before the news reports.

Defendants also claim they intend to examine traders about "what types of orders they placed" and "what type of market color they expected from Defendants."  But as explained long ago, ECF 361 at 5, Plaintiffs "disagree with class witness's supposed concessions" and so "will demonstrate that trades of all types were victimized."  *Compare with FOREX*, 407 F. Supp. 3d 422, 433 (S.D.N.Y. 2019) (relying on class witness testimony and class definition carve-outs in concluding individualized inquiries would be required to identify and exclude certain types of trades).  In any event, no witness is going to remember the specifics as to any particular trade—the documents and data are going to be the only source for trade-specific information.  And the notion that Defendants need 18 people to speak as to the "types" of trades as an abstract concept is specious.

Finally, Defendants refer to what information Plaintiffs "expected" from Defendants.  But this case concerns competitors sharing of information among themselves; what Defendants shared with Plaintiffs is irrelevant.  There is no *in pari delicto* defense to an antitrust claim. *See Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) ("We therefore hold that the doctrine of in pari delicto . . .is not to be recognized as a defense to an antitrust action.").

**That BlackRock and PIMCO have multiple offices, desks, and employees changes nothing.** As discussed above, Defendants fail to identify any subjects of testimony that are actually relevant to this case.  Defendants attempt to avoid having to tie their request to the law by referring repeatedly to how "big" BlackRock and PIMCO are.  But if a victim's testimony has little (or no) probative value, it does not matter how "big" the victim's operation might be.  Indeed, the plaintiffs in *FOREX* include The City of Philadelphia, Board of Pensions and Retirement, State-Boston Retirement System, and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund.  Each of these plaintiffs controlled billions of dollars in assets.   If market power was a defense in a *per se* antitrust suit, one would have expected the *FOREX* defendants to take scores of depositions of these named *and unnamed* plaintiffs to establish differences in market power so as to defeat commonality and typicality.  The lack of precedent confirms Defendants are using size as a pretext to put BlackRock and PIMCO to maximum burden and expense.  Saying a plaintiff is "big" is no substitute for the failure to explain the relevance of these victims' testimony to an actual defense in this case.

For instance, Defendants refer to the number of affiliated BlackRock and PIMCO investment funds.  But these are merely investment vehicles which "may be aggregated for fact testimony, and will be capable of designating 30(b)(6) witnesses to testify on behalf of" the group as a

---

email instead itself ascribes the bank's losses to the fact "the mkt jumped up due to the fannie/freddie news," and that the mere three platform trades being discussed all came in at "odd hours" in a "volatile" market.

whole. ECF 992 n.1. Despite Plaintiffs' repeated requests, Defendants have not explained why adopting the usual practice of Rule 30(b)(6) depositions will be insufficient.

Likewise, that various funds "traded FX for different reasons," had "different FX trading mandates and strategies," or used different types of FX transactions is irrelevant. Whether a fund traded "for hedging purposes" or "opportunistically" makes no difference to whether Defendants conspired among themselves to inflate spreads and fix benchmarks, or whether the fund was damaged thereby. These facts are in Defendants' documents and the data. Indeed, even assuming, purely *arguendo*, that BlackRock's Global Market Strategies Group ("GMSG") "*charged* spreads to Defendants—for which Defendants fail to produce a shred of evidence—this would be shown by the trading data, not someone's vague recollection from over a decade ago.[7] If this were a case alleging pricing collusion among car manufacturers, one obviously would not need to depose every car purchaser to understand why and how they bought their car. Either the records show the car was overpriced or it was not. This case is no different.

Defendants once again roll out the disingenuous canard that Plaintiffs somehow disclosed "hundreds" of knowledgeable employees. Not so. Plaintiffs responded to the interrogatories as written, which literally asked them to identify every single person with any knowledge pertaining to "FX trading activities," regardless of how minimal or immaterial. And in the document Defendants cite, BlackRock stated only that a particular custodian was "one of hundreds of portfolio managers." ECF 886 at 10. Indeed, Judge Schofield recognized that not all FX traders and portfolio managers are going to have relevant knowledge and that one purpose of document discovery was "to figure out who the people are" that do. 4/2/20 Tr. at 19:9-10.

Relatedly, despite repeated requests, Defendants fail to offer any credible explanation as to why the fact that BlackRock and PIMCO maintained several trading desks in different regions and traded in different currencies justifies more depositions. Indeed, when Plaintiffs asked whether any of Defendants' defenses were either jurisdiction- or currency-specific, Defendants refused to answer. Plaintiff Portigon had FX traders in at least three jurisdictions (London, Dusseldorf, Sydney), yet Defendants agreed to just four depositions. The reason is simple: either the data will show that spreads and prices were manipulated by Defendants in different currencies or it will not. What a PIMCO trader in Germany, as opposed to a PIMCO trader in London, happened to think about the market 15 years ago adds absolutely nothing to this case. *See In re Auto. Refinishing Paint Antitrust Litig.*, 2006 WL 1479819, at *8 (E.D. Pa. May 26, 2006) ("Plaintiffs' activities are almost wholly irrelevant in proving or disproving the underlying charge" and the "claim must be substantiated by evidence of Defendants' activities, not Plaintiffs'"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 137-39 (C.D. Cal. 2007) ("it will not be necessary to engage in an analysis of each [plaintiff's] negotiations").[8]

---

[7] Contrary to Defendants' misleading assertion, Judge Schofield has never held that trades where a plaintiff acted as liquidity provider were "exempt" from damages in this case or that data was an "unreliable" means of determining spread. Rather, in the specific context of a Rule 23(b) predominance analysis for the "OTC Class" in *FOREX*, the Court rejected plaintiffs' expert's proposed methodology for using the data and noted that plaintiff-specific inquiries would be required as to "whether the class member or the Defendant provided liquidity." *FOREX*, 407 F. Supp. 3d at 431. This inquiry was necessary because the *FOREX* plaintiffs limited their OTC claims to trades "where Defendants provided liquidity." *Id*. at 427-28. In contrast, Plaintiffs' claims here are not so limited.

[8] Despite Defendants' contrary suggestion, BlackRock has identified several traders who were employed at BlackRock during the entire relevant period.

9

**Many, if not most, of the BlackRock and PIMCO deponents will be former employees.** Given the relevant period ended almost a decade ago in 2013, if Defendants are permitted to take nine depositions of BlackRock and PIMCO, it is likely that many, if not most, of the deponents will be former employees. Of the 18 and 17 BlackRock and PIMCO document custodians, 7 and 9 are former employees, respectively. Indeed, Defendants have already identified five former PIMCO employees they seek to depose. Many of these former employees will likely have had nothing to do with either BlackRock or PIMCO, or even FX trading, for many years, and will view a deposition as a significant disruption. Having spoken to many of the former employees Defendants have already identified, many of them attest to having little to no memory from that period. The burden is particularly high for foreign witnesses, who have little familiarity with U.S. litigation.

**The PIMCO and BlackRock Depositions Cannot be Fairly Viewed in Isolation.** Defendants present the issue as if the only evidence they could gather is deposition testimony from PIMCO, and then again as if the only evidence they could gather is deposition testimony from BlackRock. As above, this ignores all the documentary evidence produced in this case. It also ignores the testimonial evidence of numerous other victims, including co-Plaintiffs in this action. Plaintiffs recognize, of course, that some points are party-specific. But the Rules' default allowance of 10 depositions *per side* is recognition of the fact that there is a point of diminishing returns and increased efficiency as more and more witnesses—from any party—are taken. Here, that Plaintiffs other than BlackRock and PIMCO have agreed to a total of *48 victim-depositions* is further confirmation that Defendants do not need *18* more, meaning the 66 victim-depositions here would be on par with the total bank depositions taken in *FOREX*. Relatedly, contrary to Defendants' suggestion, all Plaintiffs think all of Defendants' requests, individually and in totality, are improper. Other Plaintiffs took deals only because it protected them, individually, from the worst of Defendants' abuses. Those deals in no way mean that a "floor" was created whereby BlackRock and PIMCO need go higher merely because they are "bigger."

**Conclusion.** Defendants' request for 66 victim depositions, including 18 from just two, is unprecedented and grossly disproportionate. While Defendants throw out a handful of vague assertions, none of them answer the basic question as to why the victim's testimony matters. What Plaintiffs thought of Defendants or the market, and how or why they traded with Defendants, are irrelevant to this case. Either Defendants colluded or they did not, and what the *victims* thought, or what market share they had, makes no difference. Defendants' attempt to make this case about Plaintiffs should be rejected, particularly where most of the deponents will likely be former employees for whom a deposition will be a significant cause of stress and disruption. The sensible course is for Defendants to begin by taking a Rule 30(b)(6) deposition of BlackRock and PIMCO, which will likely require the designation of several witnesses to cover the various topics. If, at that point, Defendants believe they need additional depositions, the parties can meet and confer and bring any disputes to the Court. This has the advantage of seeing how the depositions go and providing the Court with a concrete record to consider. This approach does not impose a "good cause" standard on Defendants. Rather, it allows the parties to commence depositions, see what Defendants are able to obtain via the usual Rule 30(b)(6) routine, and then confer with some testimony in hand.